UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NANCY NEMHAUSER and
LUBOMIR JASTRZEBSKI,

        Plaintiffs,

vs.

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation

        Defendant.

_____/

CASE NO. ___5: 1 8 - c v - 8 7 -Oc 30PRc___

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Nancy Nemhauser and Lubomir Jastrzebski ( Homeowners) have been threatened with a fine in excess of $10,000, increasing by $100 a day up to the value of their house, unless they paint over the treasured Starry Night-inspired mural adorning their home and a surrounding wall—despite the fact that no ordinances within Mount Dora regulate the permissible colors, patterns, or designs of paint on residential homes. Mount Dora contends that the mural is a "sign" prohibited by the city's sign code. Threatened with immediate and irreparable damage to their expressive speech rights and compounding fines, they have filed suit in this Court to challenge the constitutionality of Mount Dora's Sign Code, Land Development Code Chapter VI, section 6.7 and Chapter VIII.[1] Together these statutes create a blanket prohibition on signs within the City of

_____

[1] True and correct copies of the ordinances at issue in this complaint are attached as Exhibits H and I to this memorandum. *See* Ex. K Declaration of Jeremy Talcott.

1

Mount Dora, and then create exceptions to the prohibition using content-based distinctions. Plaintiffs seek immediate relief in the form of a temporary restraining order and preliminary injunction to enjoin enforcement of the unconstitutional sign code and all attendant actions so that they may retain their mural without fear of mounting penalties.

Plaintiffs satisfy all four factors for immediate injunctive relief in the form of a TRO and preliminary injunction. They are likely to succeed on the merits of their claims because the sign code is a content-based restriction on speech that is "presumptively unconstitutional," *see Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015), and its enforcement against their artistic mural presents significant overbreadth, unbridled discretion, equal protection, and due process concerns. Plaintiffs face immediate threat of irreparable harm and cannot wait for a hearing on the motion for preliminary injunction; each day that passes the fines increase and they are further pressured into forfeiting their First Amendment rights and painting over the mural. The balance of equities weigh in favor of injunctive relief, because maintaining the status quo presents no danger to public health or safety and will allow Plaintiffs to exercise their First Amendment rights freely during the pendency of this civil rights lawsuit. Finally, Plaintiffs respectfully request that this court waive the bond requirement, because this is a civil rights lawsuit in the public interest that presents no threat of harm to the public and concerns important constitutional rights. A TRO followed by a preliminary injunction is therefore appropriate.

## FACTUAL BACKGROUND

Nancy Nemhauser and Lubomir Jastrzebski own the property at 306 West Sixth Avenue, Mount Dora, Florida. Ex. K Declaration of Nancy Nemhauser ¶ 2. The property is surrounded on two sides by an exterior wall which formerly was faded, cracked, and peeling. *Id.* ¶ 4.

In July 2017, the Homeowners were approached by a local artist about repainting the wall. *Id.* After discussing potential themes and styles, they contracted with the artist to paint a mural in the style of "Starry Night," by Vincent Van Gogh, with some additional features representing important parts of Mount Dora. *Id.* at ¶ 5. Before any work was begun on the wall, Mrs. Nemhauser contacted multiple people with the Mount Dora Planning & Development Department asking whether a painting could be put on the wall. *Id.* ¶ 6. Mrs. Nemhauser was told that there were no approval or permitting requirements to paint an exterior wall in Mount Dora. *Id.* Further, Nancy was told that—because Mount Dora has no aesthetic ordinances restricting colors or patterns of paint—there were "no restrictions" on painting. *Id.*

The artist began painting in July 2017, and later that month Mount Dora Police Chief John O'Grady forwarded an email from Interim Planning Director Vince Sandersfeld with several attached pictures of the mural to Mount Dora Code Enforcement Officer Cindy Sommer. Ex. A Transcript of September 29, 2017 Hearing at 9. Based on this complaint, Ms. Sommer drove to inspect the mural on July 26, 2017. *Id.* That same day, Ms. Sommer left a "door hanger" notice of violation on the front door of the house, citing violations of "graffiti, prohibited, and a business advertisement, prohibited," giving five days for the issue to be corrected. *Id.*

After discovering the door hanger, Mrs. Nemhauser called Ms. Sommer, asking about the nature of the violations and what would need to be done to correct the issues. Ex. K Nemhauser Decl. ¶ 8. Ms. Sommer told Mrs. Nemhauser that the mural was graffiti under City code. *Id.* Ms. Sommer also said that the wall "had to be the same color as the house." *Id.* In response to Ms. Sommer's statements, in September the Plaintiffs further contracted with the artist to paint the walls of the house in the same style as the exterior wall. *Id.* ¶ 9.

3

On September 29, 2017, a magistrate conducted a hearing on the alleged violation. Trans. at 1. At the hearing, the City dropped the alleged "graffiti" violation under Section 22.960 and proceeded solely on the theory that the mural constituted an unpermitted sign. Ex. A Trans. at 5.

At the end of the hearing, the Magistrate ruled that the mural constituted a sign because "these designs on the wall and house structure . . . attract the attention of the public." *Id.* at 115-16. The Magistrate held that the mural did not fall within any of the categories of signs allowed with a permit, and was therefore an impermissible sign. *Id.* at 116. He further ruled that the definition of "sign" under the sign code did not contain any intent element. *Id.* ("Whether that was the purpose or an intention, it's the effect and the actuality of what's happened.").

The Magistrate ordered that the Homeowners paint over the mural within 30 days. Trans. at 119. He further ordered that the wall and structure be painted "in a solid color. No graphics. No design. Nothing that is going to end up attracting the attention of the public." *Id.* The Magistrate issued his written order on October 6, 2017. Ex. B Order of October 6, 2017. The Homeowners thereafter filed a notice of appeal in the Circuit Court for Lake County, Florida. Ex. K Nemhauser Decl. ¶ 10.

The City next moved for an imposition of fine hearing. At the initial hearing, the Magistrate imposed a fine of $3,100: $100 per day for the 31 days the couple had failed to paint over the mural following the deadline set in the October 6, 2017, order. Ex. D Order of December 13, 2017. Unsatisfied with the order, the City moved for rehearing and asked for continually accruing fines. Ex. E City of Mount Dora's Motion for Rehearing or Reconsideration of Findings of Fact, Conclusions of Law and Order Dated December 13, 2017. On February 1, 2018, the Magistrate imposed continuing fines of $100 per day for every day after November 6, 2017 that the mural

was not painted over with solid color paint. *Id.* That amount is now over $10,000 and continues to accrue at $100 per day. *Id.*

Faced with this new threat of ever-increasing fines—which puts added pressure on the Homeowners to paint over their beloved mural—on February 8, 2018 the Homeowners voluntarily dismissed their appeal from the Circuit Court of Lake County and now file a civil rights lawsuit under Section 1983 asking this Court to vindicate their constitutional rights and enjoin enforcement of the City's Sign Code. Ex. K Nemhauser Decl. ¶¶ 15-16.

## LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER

The issuance of a temporary restraining order or preliminary injunction is governed by Federal Rule of Civil Procedure 65 and 28 U.S.C. §§1651 and 2283. Under Rule 65, District Courts consider four factors when choosing whether to grant temporary equitable relief: movants must show (1) a likelihood of success on the merits of the underlying complaint; (2) the risk of suffering irreparable harm if preliminary relief is not granted; (3) the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) whether granting preliminary relief would be in the public interest. *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). The standard is the same for either the issuance of a TRO or preliminary injunction. *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995). Plaintiffs easily satisfy all four factors.

## ARGUMENT

## I

## PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT THE SIGN CODE VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS

The Homeowners are likely to succeed on the merits of their claim that the Sign Code is unconstitutional under the First Amendment. The Sign Code prohibits all forms of expression that

meet a sweeping definition of "sign," and then creates exceptions to the general prohibition using content-based distinctions. Supreme Court precedent confirms that content-based distinctions like Mount Dora's are "presumptively unconstitutional" and subject to strict scrutiny, which the City cannot meet. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). Moreover the sign code is drastically overbroad, preventing homeowners from putting up signs that communicate a vast amount of expression, including political signs, artistic signs, and sports signs of any size. Such a law simply "prohibits too much speech," *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994), and is unconstitutionally overbroad. Because the definition is so broad, and so vague, the ordinance also grants unbridled discretion to the City to suppress disfavored speech, in violation of the First Amendment. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

The Homeowners are also likely to succeed on the merits of their Fourteenth Amendment claims. The Defendant City has relentlessly pursued violation proceedings and fines against the Homeowners, while completely ignoring other similarly situated murals and displays throughout the city of Mount Dora. Selective enforcement of the sign code, without any rational basis for the disparate treatment, deprives the Homeowners of equal protection of the laws. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Such subjective enforcement is invited by the inherent vagueness of the sign code. Indeed, the sign code is so vague that the Homeowners could not have known that their conduct would be prohibited, depriving them of due process under the Fourteenth Amendment. *See Grayned v. City of Rockford*, 408 U.S. 104 (1972).

## A.   The Sign Code's Content-Based Restrictions on Speech Cannot Survive Strict Scrutiny

Mount Dora's sign code is an unconstitutional content-based restriction on speech. *See Reed*, 135 S. Ct. at 2226. The sign code only permits certain categories of signs, like "campaign," "community center," "construction," and "directional" signs, which are defined by what they say.

The sign code treats these permissible signs differently depending on what category they fit into. Some signs can be larger than others, or placed on property for longer amounts of time. "Campaign signs," for example, are signs that "announce[] or promote[] a candidate for election to public office," and in residential zones these signs can be up to 4 square feet in size and must be removed no more than ten days after an election. Mount Dora Land Dev. Code, Ch. VIII; *id.* at Ch. VI § 6.7.1(9)(a). "Community center signs" are signs "associated with and erected by a community center," and can be up to 32-square feet in size. Mount Dora Land Dev. Code, Ch. VIII; *id.* at Ch. VI § 6.7.1(1). "Construction signs" announce the parties responsible for construction on a given site, and in residential zones can be up to 8-square feet in size and must be removed no more than 15 days after construction has ceased. Mount Dora Land Dev. Code, Ch. VIII; *id.* at Ch. VI § 6.7.1(9)(b). Ordinances that treat speech differently on the basis of its content are "presumptively unconstitutional," and subject to strict scrutiny under the First Amendment, which the sign code cannot meet. *See, e.g., Reed*, 135 S. Ct. at 2226; *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992).

In *Reed*, 135 S. Ct. at 2218, the Court struck down a sign ordinance that permitted 23 types of signs, but treated the permissible categories of signs differently based on what they said. For example, the law subjected "ideological" signs to certain restrictions, subjected "political" signs to heightened restrictions, and subjected "temporary directional signs," which the Petitioners sought to put on their property, to even stricter standards. *Id.* at 2224-25.

Even assuming that the Town could establish a compelling interest in preserving aesthetic appeal and traffic safety, the Court held that those interests could not justify the content-based distinctions, which were "hopelessly underinclusive." *Id.* at 2231. The Town could not claim that "placing strict limits on temporary directional signs was necessary to beautify the Town when other types of signs create the same problem," nor could the Town show that temporary directional

signs pose a greater threat to public safety than ideological or political signs, which were subject to laxer standards. *Id.*

Similarly, the Eleventh Circuit has repeatedly ruled that content-based sign codes like Mount Dora's violate the First Amendment. In *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005), the court struck down a sign ordinance that contained content-based exemptions for certain signs, including exemptions for "flags and insignia of any government, religious, charitable, fraternal, or other organization," directional signs, certain campaign signs, holiday decorations, memorial signs, and others. As in Reed, the court held that—even assuming the City's interests in aesthetics or traffic safety were compelling—the sign code could not withstand strict scrutiny because it was not narrowly drawn to achieving those ends. *Solantic*, 410 F.3d at 1268. The ordinance contained no findings of fact establishing why political speech would distract motorists more than commercial messages or that political signs were more aesthetically displeasing than commercial advertisements. *Id.* at 1267-68. Moreover, the City provided no evidence that its interests in aesthetics or traffic safety rose to a compelling level in that case. *Id.* at 1268. Because "only the most extraordinary circumstances will justify regulation of protected expression based on its content," the sign code ordinance was unconstitutional. *Id.*; *see also Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1234 (11th Cir 2006) (sign ordinance's exemption of real estate signs from permit requirement did not further aesthetics or safety because it did not "make the City of Alabaster shine more brightly or make it a safer place to drive or stroll."); *Cafe Erotica of Florida, Inc. v. St. Johns County*, 360 F.3d 1274 (11th Cir. 2004) ("The County can achieve its goals simply by mandating that all messages, whether political or commercial, be limited to the same size" but could not discriminate against speech based on its content); *Dimmitt v. City of Clearwater,* 985 F.2d 1565, 1569-70 (11th Cir. 1993) (the City's interests in aesthetics

8

and traffic safety did not justify content based distinction because "the deleterious effect of graphic communication upon visual aesthetics and traffic safety, substantiated here only by meager evidence in the record, is not a compelling state interest of the sort required to justify content based regulation of noncommercial speech").

Mount Dora's sign code is undoubtedly a content-based restriction on speech. Only certain signs are allowed, and even then, permissible signs are subject to different regulations based on their content. Such differential treatment is "presumptively unconstitutional," *Reed*, 135 S. Ct. at 2226, and will only be upheld under "extraordinary circumstances." *Solantic*, 410 F.3d at 1268. Even assuming that the City could rely on general and unspecified aesthetics and traffic safety concerns as a compelling interest,[2] the code cannot survive strict scrutiny analysis. Such goals can be as effectively served through content-neutral means.

## B.    The Sign Code Is Overbroad

Mount Dora's sign code is also unconstitutional because it prohibits a vast amount of protected speech, and a "substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *U.S. v. Stevens*, 559 U.S. 460, 473 (2010). Even if the code could legitimately be applied to the Homeowners' mural, they are entitled to challenge the law as facially overbroad. *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1571 (11th Cir. 1993).

Overbreadth is of particular concern when the government regulates expressive speech on private property, which is a "unique and important" means of communication. *See City of Ladue*, 512 U.S. at 54, 56 (noting that "[d]isplaying a sign from one's own residence often carries a

---

[2] Aesthetic and traffic concerns have been described as "substantial governmental goals," but have never been held to be compelling. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 491 (1981) (plurality opinion); *and Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993).

message quite distinct from placing the same sign someplace else). In *City of Ladue*, the city banned all residential signs except for "residence identification" signs, "for sale" signs, and signs warning of safety hazards. The Court held that the law "simply prohibit[ed] too much protected speech." *Id.* at 51. It essentially "foreclosed that medium to political, religious, or personal messages," a concern that was compounded by the City's "sweeping" interpretation of "sign." If the City was concerned with traffic or aesthetics, it could achieve its ends through "more temperate measures." *Id.* at 59; see also *Solomon v. City of Gainesville*, 763 F.2d 1212, 1214 (11th Cir. 1985) (holding that a statute that restricted any sign with an "obscene, indecent or immoral nature" was unconstitutionally overbroad because the statute did not further only safety and aesthetic interests, and instead banned both protected and unprotected speech).

Likewise here, the sign ordinance outright bans the vast majority of otherwise protected speech. By defining "sign" as nearly any imaginable object or design that draws attention and limiting the types of permissible signs to a few narrow categories, it prohibits reproductions of the Mona Lisa or a displayed photographic portrait of Martin Luther King, Jr, in any size. It would restrict a mailbox depicting the University of Florida helmet, or the Marlins logo. Indeed, given the Magistrate's broad definition of "sign"—anything that attracts attention—it would prohibit even placing an American flag on a flag pole, one of the most common and ubiquitous forms of personal expression on private property.

The sign code also restricts a large amount of protected political speech. It would restrict a mural depicting the iconic Shepard Fairey portrait of Barack Obama used during his 2008 presidential campaign. It would forbid a person from posting a sign or painting a mural of the Constitution, or the text of the First Amendment. Because permitted "campaign signs" are limited to signs that promote a candidate, it would restrict a "Yes on Prop 7" sign, or a sign that simply

says "Resist." *See* Mount Dora Land Dev. Code, Ch. VIII. Because the list of permitted signs is so narrow, the sign code is unconstitutionally overbroad.

## C.    The Mount Dora Sign Code Unconstitutionally Grants Unbridled Discretion to City Officials to Restrict Speech

Laws that give unbridled discretion to government officials to enforce speech regulations violate the First Amendment. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("[government] may not delegate overly broad licensing discretion to a government official"); *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969) (ordinance violates the First Amendment where it "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official"); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 (1988) ("[the unbridled discretion] doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice").

Unbridled discretion creates two distinct harms in the First Amendment Context. First, when coupled with the prior restraint of a permitting scheme, it "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Child Evangelism Fellowship of Md. v. Mongomery Cnty. Pub. Schs.*, 457 F.3d 376, 386 (4th Cir. 2006) (citing *Lakewood*, 486 U.S. at 757-58). Second, where standards are unclear, it becomes difficult to differentiate between "a legitimate denial of access and an 'illegitimate abuse of censorial power.'" *Id.* at 386 (citation omitted); *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553448 (1975) ("[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion").

The expansive definition of "sign" under the code—coupled with the interpretation adopted by the Magistrate at the September 29, 2017, hearing—leaves Mount Dora free to demand removal

of almost any distinctive object or decoration within Mount Dora. This creates a risk of both self-censorship by the citizens of Mount Dora, and express censorship by government of artistic works like the mural on Homeowners' property.

Mount Dora code enforcement officials repeatedly claimed nearly unbridled discretion to choose what constitutes an unlawful sign. During the September 29, 2017, hearing, the code enforcement officer was unable to articulate any objective standard for enforcement. Transcript at 51 ("I don't know if I would call [a painted mailbox] signage."); Transcript at 55 ("A flag a sign? I wouldn't think so, no."); *and* Transcript at 52 ("Q. Why is painting a house signage versus painting a mailbox not signage? A. I don't have an answer for that."). Indeed, the hearing transcript makes clear that officials within the City of Mount Dora acted based on animus to the mural itself rather than any predetermined, objective standard. Transcript at 29, 33-34 (stating the reason for enforcement were "anonymous complaints" about the mural). Indeed, initial enforcement proceeded only under the idea not that the mural was a sign, but that it was graffiti. Ex. A Trans. at 30 ("This is exactly the email says. He stated the property was zoned residential. Would this activity fall under graffiti? And then the chief sent it to me to address it."). The officer also expressed clear personal animus towards the Mural. *See* Transcript at 34 (It appeared to be some kind of a juvenile-type painting of some sort); *and* Transcript at 49 ("I'm not into that type of artwork."). Finally, the officer admitted that she would not enforce the sign code against messages she favored. Transcript at 52 ("Q. I mean, if they painted Go Gators on there, do you think they were advertising the University of Florida? A. I would be all for it if they had Go Gators on there.").

The placement of expressive speech on private property is unquestionably protected by the First Amendment. *See City of Ladue*, 512 U.S. at 54, 56. Under the interpretation adopted by the Defendant, the application of the sign code to otherwise lawful and peaceful enjoyment of free

12

speech rights on private property becomes entirely contingent upon the will of the enforcing official. *See Shuttlesworth*, 394 U.S. at 151. Such unbridled discretion violates the First Amendment.

### D.     Mount Dora Code Enforcement Violated the Fourteenth Amendment's Equal Protection Clause By Selectively Enforcing the Sign Code Against the Plaintiffs

A plaintiff can assert a "class of one" equal protection violation a where she "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006) (recognizing "class of one" claims in the zoning context). To be "similarly situated" for purposes of a class of one equal protection claim, a plaintiff must use comparators that are "prima facie identical in all relevant respects." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006).

Within the residential area of Mount Dora, multiple houses are embellished with artwork and other adornments, including artistic, painted murals. Compl. ¶¶ 81-82. No other artistic mural within the Mount Dora residential zone has been similarly targeted as an unpermitted sign under the Sign Code. Compl. ¶ 83. At the September 29, 2017, hearing, code enforcement was unable to identify or articulate any meaningful difference between other painted designs and the Homeowners' mural. Transcript at 51-52.

In all relevant respects, the Homeowners' mural is indistinguishable from any other artistic design or mural within Mount Dora. Although the Homeowners' mural is physically larger than other similarly situated murals within Mount Dora, size difference is not a relevant consideration, since the City contends that an artistic mural does not fit within any permissible category of sign,

13

and is therefore prohibited within Mount Dora regardless of size. *See* Transcript at 116-17 ("these paintings on walls and houses, on the house, are not any type of permitted sign under the City's Code, so they are therefore non-permitted signs.").

The Defendant is unable to provide any rational basis for the disparate treatment of the Homeowners' mural under an otherwise facially neutral ordinance, except that it does not like it. Such selective enforcement against a single family violates the Fourteenth Amendment's guarantee of equal protection of the laws.

## E.   The Sign Code Is Unconstitutionally Vague Under the Fourteenth Amendment Due Process Clause

A statute that "does not give adequate notice of what conduct is prohibited and, because of its imprecision, may invite arbitrary and discriminatory enforcement" is unconstitutionally vague. *Brown v. State*, 629 So.2d 841, 842 (Fla. 1994); *see also Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964) (construction of a statute in a way that punishes an individual for conduct that was not criminal at the time they committed it violates due process). A vague law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Vagueness concerns are especially prevalent in the First Amendment context, because a vague statute "operates to inhibit the exercise of (those) freedoms." *Id.*

Mount Dora's sign code, especially as interpreted by the Code Enforcement Officer and Special Magistrate, is so broad and standardless as to be unconstitutionally vague under the Fourteenth Amendment. The construction of the ordinance adopted by the magistrate hinges solely on the word "attraction" within the sign code. Transcript at 115-116. The magistrate determined that definition of sign was met under the code so long as the design attracted attention. *Id.* Such a

14

construction of the statute is wholly subjective and imprecise, since there is no statutory definition or settled meaning of attraction.

As the enforcement hearing transcript makes clear, the sign code definition gave almost unlimited discretion to the enforcement officer to determine that murals within the city were or were not signs. *See supra* I.B-I.D. Nor does it inform the Homeowners—or any other ordinary homeowner within Mount Dora—as to what behavior is expected. Even if the Homeowners are to comply and paint over the artistic mural in a single flat color, it could arguably be considered "attractive" if the public took notice of it, and therefore be treated as a sign under the City's definition.

Vague laws chill activity by leaving citizens unsure of whether their behavior is lawful, and, as discussed above, those concerns are especially heightened when constitutionally protected freedom of speech or expression is at risk of being chilled. *See Grayned*, 408 U.S. at 108-09. The Homeowners therefore have a high likelihood of success on their claim of unconstitutional vagueness under the Due Process Clause of the Fourteenth Amendment.

**F.     The Plaintiffs Will Suffer Irreparable Harm If the Defendant Is Not Immediately Restrained From Enforcing the Sign Code During the Pendency of This Litigation**

If the Defendant is not enjoined from enforcing the Sign Code against the Homeowners, the Homeowners will be irreparably harmed. First, the Homeowners have been forced to halt work on the artistic mural they have commissioned due to the enforcement efforts of the Defendant. Not only does this deprive them of their First Amendment right to finish the mural, but left unfinished, and without its final protective coat, the mural is exposed to the elements and potential deterioration. Second, the Homeowners face potential further enforcement actions by the city, including the possibility that Defendant will attempt to enter the property and bring the property

15

into compliance with an unconstitutional code. *See* Fla. Stat. § 162.09(1). Finally, Homeowners are currently forced to choose between vindicating their constitutionally protected rights to free speech, equal protection, and due process; and the accrual of substantial and financially ruinous fines—currently over $10,000 and growing at $100 for each day that the mural remains.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This is because "chilled free speech . . . , because of [its] intangible nature, [can] not be compensated for by monetary damages." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Sheridan v. Garrison*, 415 F.2d 699, 706 (5th Cir. 1969) ("Where significant chilling effect on free speech is created by a badfaith prosecution, the prosecution will thus as a matter of law cause irreparable injury regardless of its outcome.") Further, "direct penalization, as opposed to incidental inhibition" of First Amendment rights cannot be remedied absent an injunction. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

The fact that Homeowners are unable to complete, or even take protective measures to protect the mural from the elements, is an irreparable injury. But what's worse is that the Defendant's actions threaten to permanently destroy the mural. After the initial Order of October 6, 2017, the Homeowners filed a notice of appeal in the Florida Circuit Court, intending to seek judicial review of the alleged code violation. Defendant scheduled an imposition of fines hearing. Before that hearing, the Homeowners were denied an emergency stay of any potential fines in state court. Defendant requested and was granted a $3,100 fine against the Homeowners. Defendant then requested rehearing, which was granted by the code enforcement special magistrate. On February 1, 2018, Defendant sought and obtained increased fines—including daily accruing fines

16

of $100 each day that the Homeowners did not paint over the mural. This fine now stands at over $10,000. Under state law and the Mount Dora Code of Ordinances, it could accrue up to the "just value, as determined by the Lake County Property Appraiser's Office as of the date of imposition of fines, of the property subject to the code enforcement action." Mount Dora Code of Ord. § 2.1361. *See also* Fla. Stat. Ch. 162. Facing potentially ruinous fines, and facing mounting pressure to paint over the mural, the Homeowners are left with no option but to abandon state court remedies and seek immediate relief and vindication of their constitutional rights in federal court.[3]

Absent an injunction, the Homeowners—and many other homeowners within the City of Mount Dora—will continue to suffer a loss of their free speech rights through the chilling effects of an unconstitutionally overbroad and vague sign code.

## II

### GRANTING TEMPORARY EQUITABLE RELIEF WILL NOT HARM THE DEFENDANT AND WILL SERVE THE PUBLIC INTEREST

The public is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions. *KH Outdoor*, 458 F.3d at 1272. Indeed, "[t]he public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional." *Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981). This is especially true with laws that potentially abridge First Amendment free speech rights. "[I]t is always in the public interest to

---

[3] Although the homeowners filed a notice of appeal of the magistrate's decision in Florida Circuit Court, no substantive motions as to the merits were filed and the merits of that appeal were never heard. The Homeowners instead filed a notice of voluntary dismissal on February 8, 2018, in order to pursue a Section 1983 challenge in this Court. Ex. G Notice of Voluntary Dismissal of Action.

17

protect First Amendment liberties." *KH Outdoor*, 458 F.3d at 1272 (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

Permitting the Homeowners to maintain the mural and preventing fines from accruing during this action harms nobody. The mural has existed in some form for over six months, and has not been added to or otherwise modified since the order of the code enforcement magistrate issued at the September 29, 2017, hearing. At present, the Homeowners seek only to maintain the status quo, in order to prevent the destruction of their cherished mural until the courts have an opportunity to rule on the important constitutional claims raised by this suit. Though the City may consider the mural an eyesore, it does not suffer from allowing the Homeowners to exercise their First Amendment rights. No one has been harmed, or will be harmed, by allowing the irreplaceable Starry Night mural to stand while the Homeowners pursue this civil rights lawsuit. And even if a TRO is issued, Defendant will remain free to continue enforcement of all codes and ordinances *other* than the Sign Code, including all codes and ordinances actually required to protect the public health and safety within Mount Dora.

The equities tip heavily in favor of preserving the mural during the course of litigation designed to vindicate the public interest in both free speech and private property rights. The sign code and its application to the mural raise numerous constitutional questions that deserve judicial resolution. That resolution would be significantly chilled, if not made impossible, by a continuing order that the mural be destroyed, backed by daily accruing fines.

## III

## THE BOND REQUIREMENT SHOULD BE WAIVED OR SET AT A NOMINAL AMOUNT

Federal Rule of Civil Procedure 65(c) requires that, before issuing an injunction, the Court require the movant to post a bond "in an amount that the court considers proper." But this Court

has discretion to issue a preliminary injunction without requiring the movant to give security. *See,*
*e.g., Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1339-40 (M.D. Fla. 2011)
("it is well-established that "the amount of security required by the rule is a matter within the
discretion of the trial court . . . and the court may elect to require no security at all."). Other circuits
have approved of dispensing with the bond requirement when an injunction is unlikely to result in
harm to the party enjoined, the exercise of constitutional rights is at issue, or when a suit is brought
in the public interest. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir.
1985) *and Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("requiring
nominal bonds is perfectly proper in public interest litigation."). *See also Occupy Fort Myers*, 882
F. Supp. 2d at 1340 (requiring a nominal $100 bond where an ordinance involving free speech
rights was challenged as unconstitutional).

Preliminary relief is unlikely to harm the Defendant or the public. There is no evidence that
the mural has caused a single traffic incident in the roughly six months it has existed on the wall,
including the four months since it was extended to the house behind the wall. Even if Defendant
could show "harm" resulting from the requested injunction, it would be impossible to quantify it
for purposes of a bond posting. *Bartels v. Biernat*, 405 F. Supp. 1012, 1019 (E.D. Wis. 1975) (bond
waiver appropriate where "the amount of any order for bond or security would be based on gross
speculation or conjecture.").

Requiring a bond, on the other hand, would significantly harm the Homeowners' ability to
vindicate the important constitutional rights raised by the Sign Code. To require a bond in this case
"would have the effect of discouraging suits to remedy more flagrant abuses" of individual rights
by government. *Bartels*, 405 F. Supp. at 1019. The Homeowners therefore respectfully request that

the Federal Rule of Civil Procedure 65(c) bond requirement be either waived or set at a nominal amount.

## CONCLUSION

This Court should issue the requested temporary restraining order and preliminary injunction.

DATED:  February 16, 2018.

Respectfully submitted,

JEREMY TALCOTT, Cal. Bar No. 311490*
E-mail:  JTalcott@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747
Service:  IncomingLit@pacificlegal.org

CHRISTINA M. MARTIN, FBN:  100760
E-mail:  CMartin@pacificlegal.org
Pacific Legal Foundation
8645 N. Military Trail, Suite 511
Palm Beach Gardens, FL  33410
Telephone:  (561) 691-5000
Facsimile:  (561) 691-5006

*Attorneys for Plaintiffs*

*\*Pro Hac Vice* Pending

# EXHIBIT A

Filing # 63708801 E-Filed 11/09/2017 10:11:17 AM

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT,
IN AND FOR LAKE COUNTY, FLORIDA

Case No.: 2017 CA 001815

NANCY NEMHAUSER, and
LUBOMIR JASTRZEBSKI,
     Appellants,

vs.

CITY OF MOUNT DORA,
     a municipal corporation,
     Plaintiff.

<u>NOTICE OF FILING TRANSCRIPT</u>

The appellants hereby give notice of the filing of the transcript from the lower tribunal, City of Mount Dora v. Nemhauser.

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy hereof has been furnished by electronic transmission this day, November 9, 2017, to: Ms. Jennifer Cockcroft, jdcockcraft@stenstrom.com; and Ms. Sherry G. Sutphen, ssutphen@bellroperlaw.com.

*/s/ James L. Homich*
JAMES L. HOMICH
Attorney for the Appellants
jhomich@earthlink.net
621 E. Fifth Avenue
Mt. Dora, Florida 32757
352.383.3031 (fac. 8833)
Fla. Bar No. 898848

BEFORE THE CODE ENFORCEMENT MAGISTRATE

OF THE CITY OF MOUNT DORA, FLORIDA

COMPLAINT NO.:  2017-0187

CITY OF MOUNT DORA,

FLORIDA, a municipal

corporation,

             Plaintiff,

vs.

NANCY NEMHAUSER and

LUBOMIR JASTRZEBSKI,


             Defendants.

_____/

TRANSCRIPT OF PROCEEDINGS

DATE:            FRIDAY, SEPTEMBER 29, 2017

TIME:            COMMENCED AT 9:00 A.M.

                 CONCLUDED AT 12:05 P.M.


PLACE:           MOUNT DORA CITY HALL

                 510 NORTH BAKER STREET

                 MOUNT DORA, FLORIDA  32757


STENOGRAPHICALLY

REPORTED BY:     MARY SNIPES SAMUEL, RPR, FPR

                 COURT REPORTER AND NOTARY PUBLIC

2

A P P E A R A N C E S:

    DAVID TEGELER, ESQUIRE, Code Enforcement Magistrate

    CLAUD NELSON, III, ESQUIRE, Assistant City Attorney

    VINCE SANDERSFELD, Planning Manager

    CINDY SOMMER, Code Enforcement Officer


JAMES L. HOMICH, ESQUIRE

OF:  James L. Homich, P.A.

    621 East Fifth Avenue

    Mount Dora, Florida  32757


    APPEARING ON BEHALF OF THE DEFENDANTS

3

I N D E X

|  | PAGE |
|---|---|
| PROCEEDINGS | 5 |
| Testimony of:  CINDY SOMMERS | |
|     Direct Examination by Mr. Nelson | 7 |
|     Cross-Examination by Mr. Homich | 29 |
|     Redirect Examination by Mr. Nelson | 64 |
|     Recross Examination by Mr. Homich | 66 |
|     Direct Examination by Mr. Homich | 73 |
|     Cross-Examination by Mr. Nelson | 85 |
| Testimony of:  NANCY NEMHAUSER | |
|     Direct Examination by Mr. Homich | 88 |
|     Cross-Examination by Mr. Nelson | 92 |
| CERTIFICATE | 121 |

- - - - -

4

E X H I B I T S

                                                    ADMITTED

Number 1                                              10

Number 2                                              11

Number 3                                              14

Number 4                                              16

Number 5                                              18

Number 6                                              19

Number 7                                              20

Number 8                                              21

Number 9                                              22

Number 10                                             23

Number 11                                             24

Number 12                                             25

Number 13                                             26

Number 14                                             27

Number 15                                             28

Number 16                                             36

Number 17                                             36

Number 18                                             40

Number 19                                             40

Number 20                                             55

Number 21                                             78

Number 22                                             82

Number 23                                             84

Number 24                                             96

5

```
1                    P R O C E E D I N G S
2              MAGISTRATE TEGELER:  Is everybody ready to
3         proceed?
4              MR. NELSON:  The City is ready.
5              MR. HOMICH:  Yes, sir.
6              MAGISTRATE TEGELER:  All right.  We're going
7         to hear the case of the City of Mount Dora versus
8         Nemhauser, Case Number 2017-0187.  And I believe
9         the full names of the respondents are Nancy
10        Nemhauser and Lubomir Jastrzebski.  Sorry if I
11        pronounced that wrong.
12             Does the City have an opening statement?
13             MR. NELSON:  Yes.  Thank you.  Claude Nelson
14        on behalf of the City.
15             This is a matter that was originally scheduled
16        for September 14th.  It was continued to today.  It
17        arises from a Notice of Violation originally for
18        Section 22.960 for maintenance requirements, and
19        Section 6.7 of the Land Development Code for an
20        unpermitted sign.  The City currently will only be
21        moving forward with the unpermitted sign violation.
22        After much contemplation, it's determined that that
23        is the clearest and most concise way to move
24        forward, so that's what the City will be moving
25        forward on today.
```

6

1          The City's first witness will be Code

2     Enforcement Officer Cindy Sommer.

3          MAGISTRATE TEGELER:  Before we take the first

4     witness, do the respondents have an opening

5     statement?

6          MR. HOMICH:  Well, based upon their opening

7     statement, I would request that the charge be

8     dismissed with prejudice about the issue of

9     graffiti, since they've abandoned it.

10          But the issue of signage, now that we've

11     jumped to that, the artwork is not signage under

12     the definition of the code.  The evidence will show

13     that, and there's no regulations in the City of

14     Mount Dora to regulate how, what color, what type

15     of painting you can do on your home.  So at this

16     point I'll let the City proceed with their

17     evidence.

18          MAGISTRATE TEGELER:  I will reserve ruling on

19     the request to dismiss the charge.  Does the City

20     have any response to that?

21          MR. NELSON:  I just am not sure that that's

22     the appropriate motion to be made at a hearing of

23     this type.  The City will be requesting that you

24     find a violation Section 6.7 of the Land

25     Development Code.  We're not seeking a violation on

7

1       anything else.  I'm not sure that the charges --

2       that it's appropriate to dismiss charges when it is

3       the Special Magistrate's to determine whether or

4       not there's been a violation.

5           MAGISTRATE TEGELER:  All right.  The City may

6       present its first witness.

7           MR. NELSON:  The City calls Code Enforcement

8       Officer Cindy Sommer.

9           MAGISTRATE TEGELER:  Would you stand, ma'am,

10      and raise your right hand.  Do you solemnly swear

11      that the testimony you will give in this proceeding

12      shall be the truth, the whole truth and nothing but

13      the truth?

14          MS. SOMMER:  I do.

15                      CINDY SOMMER,

16  having been first duly sworn, testified under oath as

17  follows:

18                  DIRECT EXAMINATION

19  BY MR. NELSON:

20      Q.   Ms. Sommer, can you please just briefly

21  describe what your role is as a code enforcement officer

22  with the City of Mount Dora?

23      A.   Good morning.  Code Enforcement Officer Cindy

24  Sommer, City of Mount Dora.  Most of my job that I do

25  here at the city is receive complaints through either

1    email, phone or residents walking into the lobby or

2    through the police department of any sorts, and I

3    address the complaints.

4        Q.   What are the types of complaints that you

5    receive?

6        A.   It can be anything from overgrown vegetation

7    to cars parking in the grass, illegal signage, dead

8    trees.  It could be anything in our ordinances.

9        Q.   And when you go to investigate a complaint,

10   what is it that you're determining?

11       A.   If there is a violation.  I look at the

12   violation and see if there is one.  And what I do is

13   normally if there's -- I just hang a door hanger to

14   inform the resident what the violation is and time to

15   cure it.

16       Q.   Specifically you mentioned violations.  What

17   types of violations?

18       A.   Again, it can be anything.  If it's overgrown,

19   if it's an illegal sign, if it's little -- we call them

20   snipe signs that you stick in the ground, I can remove

21   those if they're in the right-of-way.  Any type of

22   violation that we do address.

23       Q.   Is it a violation of a code on an ordinance?

24       A.   Both.  It's a violation of Code of Ordinances,

25   Land Development Code or International Property

9

1    Maintenance Code that we adopted.

2         Q.   Specifically turning your attention to this

3    matter, what brought this property to your attention?

4         A.   I received an email in reference to a

5    complaint that there was a type of graffiti or type of

6    painting on a wall, and I went out to inspect it on the

7    day I received the email.

8         Q.   What was the address of the property?

9         A.   306 West Sixth Avenue in Mount Dora.

10        Q.   And did you go inspect the property?

11        A.   I did.  I went out on July 26, 2017 at

12   approximately 2:50 in the afternoon.

13        Q.   You mentioned you received an email requesting

14   that you go and inspect the property.  Who was that

15   email from?

16        A.   The email came from our police chief, John

17   O'Grady.  He received the email from Vince Sandersfeld

18   from the Building Department.

19        Q.   And did it come with any attachments?

20        A.   It did.  It came with three photos, three

21   photos that are attached.  And I have to look, myself,

22   at the violation.  I don't go by somebody else's photos.

23   I have to go look at it and observe, myself.  And that's

24   what I did.  I saw those photos, and I went out to the

25   property on the 26th, that same day.

10

1       Q.    You referenced three photographs.  And I

2   understand you're not the individual who took those

3   photographs.  Are those fair and accurate

4   representations of the photographs that you received as

5   attachments to that email?

6       A.    Yes, they are.

7             MR. NELSON:  The City moves to move that email

8         with the three photos, three pages.

9             MR. HOMICH:  No objection.  I'm not going to

10        be objecting based on the liberal rules for these

11        proceedings.

12            MAGISTRATE TEGELER:  Thank you.  That will be

13        admitted as Exhibit 1, three pages.

14            (Exhibit Number 1 was admitted.)

15  BY MR. NELSON:

16      Q.    Ms. Sommer, you said you went out on

17  July 26th.  What did you do when you went out on

18  July 26th?

19      A.    I drove to the front of the property, and I

20  did not see any painting or anything on the front of the

21  property, so I drove around to the Fifth Avenue side,

22  where I could see that there was some -- some painting

23  on the wall and a sign that was by the wall.  And as you

24  can see, there are three photos attached.

25      Q.    What else did you do on the 26th?

11

1        A.   I hung a courtesy notice on the door.  It's a

2    door hanger.  And it stated their address, the time I

3    was there and the date, and I cited them for graffiti,

4    prohibited, and a business advertisement, prohibited,

5    that it must be covered and painted immediate -- covered

6    or painted immediately.  And I gave them five days to

7    get that done on July -- I asked them to have it done by

8    July the 31st.

9        Q.   Did you speak to the property owner at that

10   time?

11       A.   No, I did not.  No one was home.  I did knock

12   on the door, but no one was home.

13       Q.   So the only information you had prior to going

14   out to this property was the email indicating there

15   might be on issue with graffiti?

16       A.   That's correct.

17            MR. NELSON:  City moves to introduce the door

18       hanger and three photographs, four pages as an

19       exhibit.

20            MR. HOMICH:  No objection.

21            MAGISTRATE TEGELER:  Those will be admitted as

22       Exhibit 2.

23            (Exhibit Number 2 was admitted.)

24            MAGISTRATE TEGELER:  Four pages.

25   BY MR. NELSON:

12

1      Q.   Ms. Sommer, what did you do next?

2      A.   I received a call from Mrs. Nemhauser in

3  reference to the door hanger, and we discussed the wall.

4  And she, at that time, had told me that she contacted

5  the City, and three people told her she did not need

6  permitting to paint the wall.  But in the

7  interpretation, she did not say that she was going to be

8  painting a design.  We don't require permits to paint

9  your house or paint your wall.  And at that time she,

10  I'm assuming, told her -- the guy that was painting the

11  wall that he could paint it.  I don't know what her

12  contact was with the artist.  And we discussed the sign

13  that was out there.  She couldn't -- there was a sign

14  stuck in the ground that was -- maybe it was his

15  advertisement.  And we -- at that time I told her she

16  couldn't have that out there, and she said she would

17  remove it immediately, which she did.

18      Q.   Was there any follow-up to that conversation

19  that you had with Ms. Nemhauser?

20      A.   Yes, there was.  I sent her an email.  She had

21  tried to contact the City a few times.  And I guess

22  between her and her husband, who I never spoke to, had

23  tried to contract, I guess, the Building Department or

24  City Hall, trying to find out some information.  And I

25  sent an email to her in response to our conversation and

13

1  some questions that they may have had.

2      Q.   And what did you include in that email?

3      A.   In the email I discussed our -- referring to

4  our conversation and the definition of a sign and what

5  the sign -- determined in our code, the definition of a

6  sign is attached and just -- we talked about, you know,

7  just to be clear of our conversation on the 26th, that,

8  you know, she had talked with the staff and was told

9  that she didn't need a permit, and then, you know, I

10  told her had she stated in the conversation she was

11  doing a painting or a mural or whatever it would have

12  been, that we would have discussed with her that it was

13  not permitted.

14      Q.   You mentioned that you included the definition

15  of a sign under the Land Development Code?

16      A.   That is correct.

17      Q.   What is the definition of a sign, Ms. Sommer?

18      A.   The definition of a sign, this is what is in

19  our Code.  It says: "Any letter, figure, character,

20  mark, plane, point, marquee sign design, poster,

21  pictorial, picture, stroke, stripe, line, trademark,

22  reading matter, inflatable device or illuminated service

23  which shall be so instructed, placed, attached, painted,

24  erected, fastened or manufactured in any manner

25  whatsoever, so that the same shall be used for the

14

1   attraction of the public to any place, subject, person,

2   firm, corporation, public performance, article, machine

3   or merchandise whatsoever, which is displayed in any

4   manner whatsoever."

5         Q.   And in your opinion, as a code enforcement

6   officer, does the painting on the wall at the time -- it

7   was just the wall on Fifth Avenue -- Sixth Avenue?

8         A.   Fifth Avenue.

9         Q.   In your opinion, does that painting fall into

10  the definition of a sign?

11        A.   Yes, it does.

12             MR. NELSON:   The City moves to introduce the

13        email written by Cindy Sommer to the respondent,

14        Nancy Nemhauser.

15             MR. HOMICH:   No objection.

16             MAGISTRATE TEGELER:   That will be admitted as

17        Exhibit 3, one page.

18             (Exhibit Number 3 was admitted.)

19  BY MR. NELSON:

20        Q.   Ms. Sommer, what did you do next?

21        A.   As I stated in the notice that I hung on the

22  door, my inspection date was July 31st, I believe.  Yes,

23  July 31st.  And on that date, July 31st, I went and

24  visited the property to see if the wall had been painted

25  over.  When I got there, the wall had not been painted.

15

1    The -- the -- at that point, what I do is I take photos

2    to show that it still remained in violation.  And I took

3    on that day, when I was there on the 31st -- well,

4    actually, I didn't go out until August 1st.  I beg your

5    pardon.  I went out the next day.  Instead of July 31st,

6    I went out on August 1st, and I took photographs.  And

7    there are four photographs included to show the wall was

8    still in violation.

9        Q.   When you saw that the wall was still in

10   violation, what did you do?

11       A.   At that point I sent a Notice of Violation to

12   the property owner citing them for Section 22.960, which

13   is maintenance requirements, and 6.7, unpermitted sign

14   within the R-3 zoning district, and then Chapter 8, Land

15   Development Codes, definition for signs, I included that

16   in there, so that they would see what the sign

17   definition was, as well as included in there the Section

18   22.960 maintenance requirements, Subsection B.

19       Q.   And how did you send that Notice of Violation

20   with those attachments?

21       A.   It was mailed out U.S. Mail and certified mail

22   to make sure we had good service.  We required the green

23   card to be returned, which it was returned, signed by

24   Mrs. Nemhauser.

25       Q.   On what date was the violation to have been

16

1   corrected?

2        A.   By the Notice of Violation, it should have

3   been corrected on August the 15th, 2017.

4             MR. NELSON:  The City moves to introduce the

5        Notice of Violation with the two attachments and

6        the return of service.

7             MR. HOMICH:  No objection.

8             MR. NELSON:  Five pages.

9             MAGISTRATE TEGELER:  Those will be admitted as

10       Exhibit 4, five pages.

11            (Exhibit Number 4 was admitted.)

12   BY MR. NELSON:

13       Q.   Ms. Sommer, you mentioned that you, on

14   August 1st, went out and took some photographs.  You

15   mentioned there were four of them.  What do those

16   photographs depict?

17       A.   The photographs showed that the wall that I

18   first went out to see in the first photos on my visit

19   out there, showed that it was not in compliance.  The

20   first -- I took a photograph kind of back, and you could

21   see in the first photograph the wall -- it kind of

22   angles a little bit, and you could see that remained on

23   the wall, but you could also see to the left of it by

24   the tree.

25       Q.   You say "remained on the wall."  What

17

1    remained?

2         A.    The painting that I originally saw.

3         Q.    Okay.

4         A.    And then I noticed to the left of the wall,

5    the painting continued, and it went along Fifth Avenue,

6    more towards the frontage of the road.  And there was a

7    different design being painted.  It was kind of in

8    progress, and I wasn't sure what it was.  It was just

9    kind of a scattered amount of painting.  And then as the

10   time went on, it appeared to be a lighthouse and some

11   houses, apparently.

12        Q.    Was the additional painting that was done --

13   not the painting that was there the first time.  Was the

14   additional painting on the wall when you first went out

15   to the property in July?

16        A.    No, it was not.

17        Q.    So this painting had been done after you had

18   posted the property with the violation?

19        A.    That's correct.

20             MR. NELSON:  The City moves to introduce

21        those -- I apologize.

22   BY MR. NELSON:

23        Q.    Are those four photographs a fair and accurate

24   representation of the property on August 1st?

25        A.    Yes.

18

1          MR. NELSON:   The City moves to introduce those

2     four photographs, four pages.

3          MAGISTRATE TEGELER:   Any objection?

4          MR. HOMICH:   No objection.

5          MAGISTRATE TEGELER:   Those will be admitted as

6     Exhibit 5, four pages.

7          (Exhibit Number 5 was admitted.)

8   BY MR. NELSON:

9     Q.   Ms. Sommer, what did you do next?

10     A.   Mr. Jastrzebski -- I'm sorry -- Mr. J, he

11   apparently had been contacting the City to find

12   direction to what they could do to possibly appeal

13   what -- the violation.  And I think he was asking the

14   City office, the City Manager's Office.  And then the

15   police chief, John O'Grady, had asked me to send an

16   email to Mr. J in reference to what would happen.  He

17   wanted to know what's next, what are the next steps.

18          And I sent him an email to inform him of what

19   the process was.  And, you know, I just kind of did

20   bullets and told him he was notified about the violation

21   and he was given time to comply.  And I told him the

22   next step is an official Notice of Violation, which was

23   mailed to them.  Same thing, giving you time -- a time

24   frame to comply about.  And then I told him if it was

25   not complied by in the time frame of the Notice of

19

1    Violation, the next step would be to go to our Special

2    Magistrate Code Enforcement Hearing, which is where we

3    are today.  And then after the Magistrate hears the

4    case, then he would make a decision as to the outcome of

5    the law.  And I sent the email, and I never did get a

6    response back.

7         Q.   When did you send that email?

8         A.   That was dated August the 3rd, 2017.

9              MR. NELSON:  The City moves to move that one

10        email to Mr. Jastrzebski, the respondent in the

11        matter.

12             MR. HOMICH:  No objection.

13             MAGISTRATE TEGELER:  I would like to ask.  I

14        see some carbon copies on this email.  Who is

15        John O'Grady?

16             MS. SOMMER:  That's our police chief.

17             MAGISTRATE TEGELER:  And who is

18        Kenneth Hinman.

19             MS. SOMMER:  He is my lieutenant, my immediate

20        supervisor.

21             MAGISTRATE TEGELER:  That will be admitted as

22        Exhibit 6, one page.

23             (Exhibit Number 6 was admitted.)

24   BY MR. NELSON:

25        Q.   Ms. Sommer, what did you do next?

20

1      A.   I went out to the property on August the 7th

2  and took some updated photos of the continuance of that

3  other section of the wall that was being painted.  And I

4  took three photos, as you can see, that are attached.

5      Q.   And, again, what do those photos indicate?

6      A.   It's indicating -- it looks like a water scene

7  of some sort, a lighthouse, maybe a storm.  I'm not sure

8  what it is.

9      Q.   Does it show any progress from --

10      A.   Yes.

11      Q.   -- the prior time you were at the property?

12      A.   Yes.  From the photo, when I took it on, I

13  believe it was August 1st to the 7th, yes, there was

14  much more paint on the wall.

15      Q.   And those three photographs taken on

16  August 7th, 2017, are a fair and accurate representation

17  of the property on that day?

18      A.   Yes.

19           MR. NELSON:  The City moves to introduce those

20      three photographs, three pages.

21           MR. HOMICH:  No objection.

22           MAGISTRATE TEGELER:  Those will be admitted as

23      Exhibit 7, three pages.

24           (Exhibit Number 7 was admitted.)

25  BY MR. NELSON:

21

1      Q.   Ms. Sommer, what did you do next?

2      A.   The next step in the process would be to send

3   a Notice of Hearing, which I did on -- dated

4   August 15th, 2017.  I sent a Notice of Hearing to the

5   property owner, as well as the attorney that's

6   representing them, and sent it U.S. Mail and certified

7   mail.  And I did receive confirmation that both received

8   the mail by the cards that were returned, signed by both

9   Ms. Nemhauser and Mr. Homich.

10     Q.   What day was that hearing originally set for?

11     A.   That original hearing was set for

12   September 14th, 2017.

13          MR. NELSON:  The City moves to introduce the

14          Notice of Hearing as well as the return receipts,

15          two pages.

16          MR. HOMICH:  No objection.  And I'll stipulate

17          that we received proper notice.

18          MAGISTRATE TEGELER:  That will be admitted as

19          Exhibit 8, with two pages.

20          (Exhibit Number 8 was admitted.)

21   BY MR. NELSON:

22     Q.   Ms. Sommer, what did you do next?

23     A.   Also that same day I took photos to be sure

24   that the property was either in compliance or not, and I

25   took photos.  There is three pages of photos.  There's

22

1    two photos on the first page, so there's a total of four

2    photos depicting that the violation still remains.

3         Q.   And those four photos on three pages, taken on

4    August 15, 2017, are a fair and accurate representation

5    of the property on that day?

6         A.   Yes, they are.

7              MR. NELSON:  The City moves to introduce those

8         four photographs, three pages.

9              MR. HOMICH:  No objection.

10             MAGISTRATE TEGELER:  Those will be admitted as

11        Exhibit 9, with three pages.

12             (Exhibit Number 9 was admitted.)

13   BY MR. NELSON:

14        Q.   Ms. Sommer, what happened next?

15        A.   We received a request for production from

16   Ms. Nemhauser's attorney, James Homich, in reference to

17   anything in the case file pertaining to the violation.

18        Q.   And, to your knowledge, was that request for

19   production honored?

20        A.   Yes, it was.

21        Q.   All right.  What happened next?

22        A.   Then I received a memo from Vince Sandersfeld,

23   our planning director, in reference to the City having

24   zoning jurisdiction over the -- it's a memo stating,

25   "The city has zoning jurisdiction over the captioned

23

1    property.  This memorandum will acknowledge the property

2    is zoned R-3, multiple family residential district, with

3    a high-density residential future land use designation.

4    The use of the property is classified as a single-family

5    residential dwelling."  And then it goes on with the

6    legal description.

7        Q.    And that's in reference to what address?

8        A.    The property at 306 West Sixth Avenue,

9    indicating the parcel ID and the alternate key.

10       Q.    So, Ms. Sommer, it's your position that the

11   property at 306 West Sixth Avenue is zoned R-3?

12       A.    That is correct.

13             MR. NELSON:  The City moves to introduce that

14       memo note to file.

15             MR. HOMICH:  No objection.

16             MR. NELSON:  One page.

17             MR. HOMICH:  No objection.

18             MAGISTRATE TEGELER:  That would be admitted as

19       Exhibit 10, with one page.

20             (Exhibit Number 10 was admitted.)

21   BY MR. NELSON:

22       Q.    Ms. Sommer, what did you do next?

23       A.    In my daily inspections out and about in the

24   city, if I go by a property that's still in violation,

25   I'll snap a picture.  And I did that on September 13th.

24

1   I took a photograph -- there's two photographs showing

2   the violation still remains, with the painting on the

3   wall.

4       Q.   And that was the day before the scheduled

5   hearing?

6       A.   That's correct.

7           MR. NELSON:  The City moves to introduce those

8       two photographs, one page.

9           MR. HOMICH:  No objection.

10  BY MR. NELSON:

11      Q.   What happened next, Ms. Sommer?

12          MAGISTRATE TEGELER:  Excuse me.

13          MR. NELSON:  I apologize.

14          MAGISTRATE TEGELER:  Those two photos will be

15      admitted as Exhibit 11, with one page.

16          (Exhibit Number 11 was admitted.)

17  BY MR. NELSON:

18      Q.   Ms. Sommer, what happened next?

19      A.   We received -- we did come to the hearing.

20  And we discussed it briefly at the hearing, and there

21  was a Motion for Continuance from Mr. Homich.

22      Q.   And so the matter was continued at that time?

23      A.   That is correct.  We discussed to have the

24  matter moved to today.

25      Q.   All right.  What did you do after the

25

1  continuance?

2      A.   I sent another Notice of Hearing to both

3  Ms. Nemhauser and Mr. Homich, showing -- I mailed that

4  out on the date of the hearing that we had two weeks

5  ago, with a date of September 14th.  I mailed it U.S.

6  and certified mail to both Mr. Homich and Ms. Nemhauser.

7  Both were returned signed green cards by both of them

8  with good service.

9      Q.   And that was the notice for today's hearing?

10     A.   That is correct.

11          MR. NELSON:  The City moves to introduce the

12     Notice of Hearing with the return receipts, two

13     pages.

14          MR. HOMICH:  No objection.

15          MAGISTRATE TEGELER:  That will be admitted as

16     Exhibit 12, with two pages.

17          (Exhibit Number 12 was admitted.)

18  BY MR. NELSON:

19     Q.   Ms. Sommer, what did you do next?

20     A.   I also took a ride out to the property that

21  day, that afternoon.  And I did go on the Sixth Avenue

22  side, and I observed there was painting on the inside of

23  the wall.  Looks like airplanes were painted on the

24  wall, which is -- which can be seen from the Sixth

25  Avenue side in plain view from my truck.  I was sitting

26

1    in my truck, as you can see, and I took photos of --

2    there's -- on that date I took four photos.  There's two

3    pages, including four photos, showing the painting on

4    the inside of the wall.

5        Q.    And that can be seen from the right-of-way?

6        A.    That is correct.

7        Q.    And those four photos on two pages are a fair

8    and accurate representation of the property, as seen,

9    from that view at least, on September 14th?

10       A.    Yes.

11            MR. NELSON:  The City moves to move those four

12       photographs, two pages.

13            MR. HOMICH:  No objection.

14            MAGISTRATE TEGELER:  Those will be admitted as

15       Exhibit 13, with four pages.

16            (Exhibit Number 13 was admitted.)

17   BY MR. NELSON:

18       Q.    Ms. Sommer, what did you do next?

19       A.    I received information from anonymous calls,

20   or just employees that came by and told me that the

21   property owner had continued to paint the structure now

22   with the same type of paintings.  I included on -- I

23   went out on September 25th.  And there are seven photos

24   showing the continuation of the painting.  Now it's

25   going onto the structure.  It appears to be a two-story

27

1    structure.  And the side of it has been painted all the

2    way to the top, and then the front part on the Fifth

3    Avenue side, the deck of the porch appears to be

4    painted.  And it's being painted with some sort of

5    design.

6         Q.   Does the design appear to be consistent, in

7    your opinion, to the design that was on the wall?

8         A.   Yes, it does.

9         Q.   Is it a fair and accurate representation of

10   the property, those seven photographs that were taken on

11   September 25th, 2017?

12        A.   Yes, that is correct.

13             MR. NELSON:  The City moves to introduce those

14        seven photographs, seven pages.

15             MR. HOMICH:  No objection.

16             MAGISTRATE TEGELER:  Those will be admitted as

17        Exhibit 14, seven pages.

18             (Exhibit Number 14 was admitted.)

19   BY MR. NELSON:

20        Q.   Ms. Sommer, what did you do next?

21        A.   As I always do, the day before a hearing, I go

22   to take pictures of the violation to see if it's been

23   cured on not.  And I did go out yesterday morning, and I

24   took ten photos showing the extent of the wall painting

25   and the structure -- the building painting.  There's ten

28

1   photos showing what I saw yesterday.

2       Q.   And do those photos indicate that the painting

3   had progressed between September 25th and the day you

4   were out there, September 28th?

5       A.   That is correct.

6       Q.   Is that a fair and accurate -- are those ten

7   photographs a fair and accurate representation of the

8   property as of September 28th, 2017?

9       A.   That is correct.

10          MR. NELSON:   The City moves to introduce those

11       ten photographs, ten pages.

12          MR. HOMICH:   No objection.

13  BY MR. NELSON:

14      Q.   Ms. Sommer --

15          MAGISTRATE TEGELER:   Slow down.

16          MR. NELSON:   Yes, I apologize.

17          MAGISTRATE TEGELER:   Those photos will be

18       admitted as Exhibit 15, with ten pages.

19          (Exhibit Number 15 was admitted.)

20          MAGISTRATE TEGELER:   You may proceed.

21  BY MR. NELSON:

22      Q.   Ms. Sommer, if this is found to be a

23  violation, what is the City's recommendation as far as

24  curing the violation?

25      A.   The City would recommend ten days to cover and

29

1   paint the wall.

2           MR. NELSON:  The City has no further questions

3       for this witness.

4           MAGISTRATE TEGELER:  The wall?

5           MS. SOMMER:  And the building.  The wall and

6       the house itself.  Both inside and outside of the

7       wall, being that it can be seen from public view.

8           MR. NELSON:  I have no further questions for

9       Ms. Sommer.

10          MAGISTRATE TEGELER:  Mr. Homich, do you wish

11      to cross-examine Ms. Sommer?

12          MR. HOMICH:  Yes, I do.

13                  CROSS-EXAMINATION

14  BY MR. HOMICH:

15      Q.   Ms. Sommer, going back to the beginning, you

16  said you received an email from Vince Sandersfeld, which

17  was introduced into evidence as Exhibit Number 1, or

18  your chief did, and he passed that along to you; is that

19  accurate?

20      A.   That is correct.

21      Q.   And you said that someone had complained to

22  Mr. Sandersfeld; is that it?

23      A.   I would assume so, yes.

24      Q.   You weren't told that or you don't know

25  whether a complaint --

30

1       A.    No.   This is exactly what the email says.   He

2   stated the property was zoned residential.   Would this

3   activity fall under graffiti?   And then the chief sent

4   it to me to address it.   So I don't know where that came

5   from, from his department.   I don't know.

6       Q.    After the chief sent it to you -- this was

7   July 26th -- you went out.   Did you consult with anyone

8   with regards to the code for the potential violations

9   before you went out?

10      A.    No, sir.

11      Q.    And so you came to the decision that it was

12  both graffiti, and in your Exhibit Number 2 you came to

13  the conclusion when you went out there that it was --

14  you cited for graffiti, prohibited, and -- graffiti and

15  business advertisement, prohibited; is that correct?

16      A.    That is correct.   That was my interpretation.

17      Q.    No one else had given you that?

18      A.    No.

19      Q.    What business advertisement were you referring

20  to?

21      A.    If you'll look at the next photograph in your

22  packet, there's a sign that shows "painter, artist," a

23  phone number, "airbrush, faux finish and murals."

24      Q.    Right.

25      A.    So that would be advertisement.

31

1    Q.   That was the sign you were referring to when

2  you put this Notice of Violation on her door, correct?

3    A.   That would be both, yes.

4    Q.   You're saying that the business -- so the

5  business advertisement was both what?

6    A.   Business advertisement was -- I cited them for

7  the business advertisement and the wall as being

8  signage.

9    Q.   Okay.  What about the wall is signage?

10    A.   As it depicted in our --

11    Q.   Well, let me ask:  What business is that wall

12  advertising, as you cited in your Notice of Violation?

13    A.   In my interpretation, it would be advertising

14  whatever he does, whatever the artist paints, would be

15  my interpretation of what that --

16    Q.   And you told Ms. Nemhauser to remove -- that

17  she needed to remove that sign, correct?

18    A.   That is correct.

19    Q.   Are there temporary signs allowed in the City

20  of Mount Dora?

21    A.   At some times.  During election time, those

22  are temporary signs, yes.

23    Q.   Any other temporary signs allowed?

24    A.   What are you referring to?  Can you be more

25  specific?

32

1     Q.    Construction signs, are they allowed as

2   temporary signage?

3     A.    Yes.   If somebody's putting up a roof, yes.

4     Q.    And the contractor can put up or the painter

5   or the mason or the roofer or the contractor, they can

6   put up temporary construction signs; can they not?

7     A.    To my knowledge, yes.

8     Q.    So if the painter put up a temporary

9   construction sign and you told him to get rid of that

10  temporary construction sign, you would be contrary --

11  telling them to do something contrary to code, wouldn't

12  you?

13    A.    Repeat that, please.

14    Q.    Okay.   Construction signs are allowed; we've

15  determined that, right?

16    A.    During construction, yes.

17    Q.    Okay.   The painting was actively going on?

18    A.    Not at that time, no.   It was completed, from

19  what I could see at that time.

20    Q.    Okay.   So you thought it was completed then?

21    A.    That's how it appeared.

22    Q.    Was it completed then?

23    A.    I'm sorry?

24    Q.    Was it completed at the time you cited her?

25    A.    I thought it was.   So to my understanding,

33

1    yes.

2         Q.   But it wasn't actually completed?

3         A.   Not afterwards.  When I went back, there was

4    more.

5         Q.   So she removed that sign immediately; did she

6    not?

7         A.   That is correct.

8         Q.   Okay.  At your request?

9         A.   Yes.

10        Q.   Did you speak to her about -- did you tell her

11   that you had received several complaints about the

12   painting?

13        A.   Yes, I believe I did.  If I recall, I know I

14   had received some complaint, yes, through phone calls,

15   yes.

16        Q.   Who did you receive complaints from?

17        A.   I don't know at this time.  I had some

18   anonymous calls stating that they didn't like what they

19   saw.  And some people don't give me their name.  They

20   don't want to say their name.

21        Q.   Do you have a private line, or do they call

22   the police station?

23        A.   I have -- both.  I have a direct line to my

24   desk, or they can go through dispatch.

25        Q.   Did you receive it on your private line or

34

1    through the --

2          A.    It was on -- I don't recall.  I don't recall.

3          Q.    Do you have -- what was the complaint?

4          A.    That -- specifically they were complaining

5    about the hideous work on the wall or whatever was being

6    painted, how horrific it looked.  Different -- several

7    different people, or I'd be stopped by different people

8    in the community.

9          Q.    And you don't remember anybody who told you

10   that?

11         A.    Specifically, in person?  There was a -- I can

12   remember getting a call from Nancy Howell.  She

13   complained about it.  I spoke with her a few times.

14   She's a resident and business owner in the City.

15         Q.    With regards to the graffiti issue, why have

16   you -- you haven't dropped it -- you haven't dismissed

17   it.  Why did you claim it was graffiti?

18         A.    I did not know what it was.  I had no idea

19   what it was.  It appeared to be some kind of a

20   juvenile-type painting of some sort.  I had no idea what

21   it was.

22         Q.    So based on not knowing what it was, you

23   called it graffiti?

24         A.    Yes.

25         Q.    Do you know what the definition of graffiti

35

1    is?

2         A.   Yes, I do.

3         Q.   Is graffiti a crime in the state of Florida?

4         A.   It would be if it was painted on somebody's

5    private property without their knowledge.  It would be a

6    misdemeanor, I would think.

7         Q.   Okay.  Was the painting being done with their

8    knowledge?

9         A.   Yes, it was.  At the time I did not know that,

10   but I do know that now.

11        Q.   Okay.  So is that why you're dropping the

12   graffiti complaint?

13        A.   Yes.

14        Q.   Okay.  So the City admits it is not graffiti?

15        A.   It doesn't appear to -- that was my

16   interpretation, that it was graffiti.  And it's

17   specifically a sign violation.

18        Q.   Are you aware of where the graffiti section is

19   within the Code of the City of Mount Dora?

20        A.   Yes.

21        Q.   What chapter?

22        A.   Off the top of my head, no.  I'd have to look

23   it up.  I don't know it off the top of my head.  It

24   would be Section 22.960, maintenance requirements.

25        Q.   And what's the title of that chapter?

36

1      A.    Maintenance requirements; is that what you're

2  speaking of?

3      Q.    No.  The chapter.  Chapter 7, I believe it is.

4      A.    Yes, Chapter 7.  No.  Sorry.  No, I don't

5  know.  I don't see that.

6          MR. HOMICH:  I'd like to offer in Chapter --

7      part seven, abandoned real and personal property as

8      the code section that applies that they're talking

9      about, and also the ordinance implementing that

10     code section.

11         MR. NELSON:  It's code.  I don't need to see

12     it.  It is code.  The City doesn't have any

13     objection to the introduction of the City Code.

14         MR. HOMICH:  And I'm also offering the

15     ordinance implementing that code.

16         MR. NELSON:  There's no objection.

17         MR. HOMICH:  Okay.

18         MAGISTRATE TEGELER:  I will admit the section

19     of the code as Exhibit 16, and a copy of the

20     ordinance as Exhibit 17.

21         (Exhibit Numbers 16 and 17, respectively, were

22     admitted.)

23  BY MR. HOMICH:

24     Q.    Let me show you what's been admitted into

25  evidence as Exhibit 16, and ask you what is the title of

37

1   that code section?

2       A.   Abandoned real and personal property.

3       Q.   Okay.  And what is the purpose of that, the

4   intent, the first paragraph?

5       A.   Section 22.870 says, "Purpose and intent.  It

6   is the purpose and intent of the City to specifically

7   establish an abandoned residential property program as

8   mechanism to protect residential neighborhoods from

9   becoming blighted through the lack of adequate

10  maintenance and security to abandoned properties."

11      Q.   So the code section you cited her for in

12  graffiti was under that abandoned real and personal

13  property code section?  That was a question.

14      A.   Yes.

15      Q.   Okay.  Do you know why the abandoned real and

16  personal property code section was implemented?

17      A.   Do I know why?

18           MR. NELSON:  At this time the City objects to

19      this inquiry, given the fact the City is not

20      pursuing a violation under this section.  It is --

21           MR. HOMICH:  They haven't dismissed it with

22      prejudice, and it's still noticed for hearing

23      today, and her unfamiliarity with the code is

24      relevant to her conclusions and opinions.

25           MAGISTRATE TEGELER:  Overruled.

38

BY MR. HOMICH:

Q.   Do you know why this section of the code was implemented in 2010?

A.   No, I do not.

Q.   Okay.  If you look at the bottom -- or the second paragraph of the second page of the ordinance, could you read that for me, please?

A.   Under definitions?

Q.   No.  On the ordinance.  On the second page. This whereas clause.

A.   "Whereas, the City Council finds it necessary and in the best interest of the public health, safety and wealth to adopt procedures whereby the City can control abandoned real and personal property within the City of Mount Dora."

Q.   Is Ms. Nemhauser's property abandoned?

A.   No, it is not.

Q.   Were you aware that that graffiti section you cited her for was in that code section?

A.   No, not specifically.

Q.   You just found the graffiti code and applied it to her?

A.   It didn't appear to -- at the time when I was there, as I said, I didn't understand what the painting was, so that's what it appeared to me.

39

    1       Q.   I'm jumping through all my graffiti evidence.

    2           Let me ask you about the City Code with regard

    3  to paint.  Is there any regulation regarding how a

    4  person -- the colors, the pallet, the style, anything to

    5  do with how a person paints their house?

    6       A.   There is nothing in ordinance that states what

    7  color you can paint your house, no.

    8       Q.   There's no color pallet required by the City?

    9       A.   No, there's not.

   10       Q.   Could I paint my house pink with purple polka

   11  dots?

   12       A.   We'd have to look into that.  You could paint

   13  it pink, but I'm not sure about putting a design on it.

   14       Q.   Is there anything in the code that says

   15  anything about the design you put on the house?

   16       A.   Not that I'm aware of.

   17       Q.   Is there anything in the code that says that

   18  you can't put a graphic design on the house?

   19       A.   Not that I'm aware of.

   20       Q.   Okay.  So your -- the City's sole complaint at

   21  this time is that you believe that this painting is a

   22  business advertisement?

   23       A.   No.  We think it looks as a sign.  That's what

   24  the code says, that it's cited as a sign, if you read

   25  the definition of a sign.

40

1          MR. HOMICH:  At this point I'd like to go

2      ahead and introduce into evidence the Sign Code,

3      6.7 of the Florida Code.

4          MR. NELSON:  Thank you.

5          MR. HOMICH:  I didn't know if you had it.

6          MR. NELSON:  Thank you.  There's no objection.

7          MAGISTRATE TEGELER:  This will be admitted as

8      Exhibit 18.

9          (Exhibit Number 18 was admitted.)

10         MR. HOMICH:  And I also have Chapter 8, which

11     is definitions and portions of the relevant

12     section.  That's the definition she read earlier.

13         MR. NELSON:  That's fine.  And there's no

14     objection to that.

15         MR. HOMICH:  That wasn't in your package.

16  BY MR. HOMICH:

17     Q.  At the top there is the definition.  So you

18  were relying upon that definition, first of all?

19         MAGISTRATE TEGELER:  Excuse me.  I will admit

20     this as Exhibit 19.

21         (Exhibit Number 19 was admitted.)

22         MR. HOMICH:  Sorry.

23  BY MR. HOMICH:

24     Q.  So your first step was concluding that it was

25  a sign; is that accurate?

41

1      A.    Correct.

2      Q.    Based upon the definition in Chapter 8 of the

3  code, Mount Dora Code, correct?

4      A.    That's correct.

5      Q.    And I think more specifically, the Land

6  Development Code.

7           Now, you came to that conclusion on your own;

8  is that accurate?

9      A.    That is correct.

10     Q.    Have you discussed your determination that

11 this is a sign with anyone else in the City?

12     A.    Mr. Sandersfeld.

13     Q.    When did you discuss that with him?

14     A.    I don't have a specific date, but it would

15 have been within the time we opened the case and

16 discussed it with him.

17     Q.    Okay.  At the time you cited her for business

18 advertisement, your original Notice of Violation, what

19 section of the Sign Code was she violating?

20     A.    It would be 6.7, under signs, and off-site

21 signage, or -- not specifically -- well, it would be of

22 specifically off-site, but it would be advertising from

23 a residential zone, advertising a business.

24     Q.    Okay.  Do you have a section number of the

25 code that it's in violation of?

42

1     A.   I'd have to read through it.  Our sign

2  ordinance, as you know, is lengthy.  Well, 6.7.3, you

3  have here as off-site signage, which there would be

4  that.

5     Q.   Well, let me help you out.  6.7.1 states that,

6  "The following signs shall be allowed if they only

7  indicate the name of the enterprise located on the

8  premises or the products or services for sale thereon."

9          Would you agree that that section of the code

10  is not applicable to this situation?

11     A.   State that again.  6.7.1?

12     Q.   Okay.  The first paragraph of 6.7.1, it says,

13  "The following types of signs shall be allowed under the

14  conditions indicated.  Additionally, except for

15  temporary and public signs, the following signs shall be

16  allowed if they only indicate the name of the enterprise

17  located on the premises or the products or service for

18  sale thereon."

19     A.   Yes, I agree.

20     Q.   So six-point -- she's not violating 6.7.1

21  because she's not advertis- -- is there a business going

22  on in the home?  She hasn't been cited for conducting

23  business in the home?

24     A.   Well, yeah, I would not know that, but that's

25  how it appeared when I was there, that it was

43

1    advertising a business.  It may not have been in that

2    home.

3        Q.    Based upon the painter's contemporary

4    construction sign, correct?

5        A.    Yes.

6        Q.    That's what the basis of your -- which I

7    believe is in Exhibit Number 2?

8        A.    Yes.

9        Q.    Okay.  So once that was removed, the issue of

10   a business being conducted on the property was no longer

11   an issue?

12       A.    For that specific sign, yes.

13       Q.    Okay.  So -- I mean, obviously it's not a

14   community center sign; it's not a directional sign; it's

15   not a directory sign; it's not an occupant

16   identification sign; it's not a public sign; it's not a

17   shopping office center sign; it's not a subdivision or

18   apartment center sign; it's not a menu sign; and with

19   the one removed, it's no longer a temporary sign or a

20   subdivision -- excuse me -- a historic monument sign?

21       A.    That's correct.

22       Q.    Okay.  So assuming that the painting, the

23   rendition on the home is a sign, how is the signage in

24   violation of the code?  Which section?

25       A.    It would be under section -- under the

44

1  definition of a sign, if you read the definition of a

2  sign in Chapter 8, definitions, it tells what a sign

3  defines.

4       Q.   Yes.   I mean, we're assuming it's a sign right

5  now --

6       A.   Correct.

7       Q.   -- for purposes of this question.  Let's

8  assume it's a sign.  I'm asking you which section of the

9  Sign Code does it violate?

10      A.   You can interpret it as Section 6.7.4, nine

11 would be any type of a sign which would be a

12 distraction -- excuse me -- public utility or similar

13 agency concerned with protection of the public and

14 health and safety.  It could be a distraction of people

15 driving.  You could look at any of these to try to fit

16 it in.

17      Q.   I asked you what you used to determine it was

18 in violation --

19      A.   I told you what I used.

20      Q.   -- of the sign --

21      A.   Yeah, I told you --

22      Q.   You just said --

23      A.   -- under the sign definition.  And at the time

24 and place, that advertising of the sign, which that one

25 was removed, but the definition of a sign remains.

45

1    Q.   Right.

2         So you don't know which section of 6.7?  You

3    didn't have any knowledge of what section of that code

4    that she was violating, assuming, first of all, that it

5    is a sign?

6    A.   Under my interpretation, it's under 6.7 and

7    the sign definition.

8    Q.   Did you have any discussions with anyone other

9    than Mr. Sandersfeld with regards to the -- this sign

10   issue?

11   A.   Basically just -- well, with our attorney here

12   and just the chief passing in the hallway, asking what's

13   going on with it.  Other than that, not talking

14   specifically about it.  Just what's next, what's

15   happening next.  Other than that...

16   Q.   So let me go back to the definition, Exhibit

17   19.  I've highlighted, "words used for the attraction of

18   the public to any place, subject, person, firm,

19   corporation, public performance, article, machine or

20   merchandise whatsoever, which is displayed in any manner

21   whatsoever."

22        Are you aware of that portion?

23        MAGISTRATE TEGELER:  Excuse me.  I need some

24        clarification.  This exhibit that you've submitted

25        is not an exact reproduction of the code?

46

1      You've --

2           MR. HOMICH:  No, it is.

3           MAGISTRATE TEGELER:  You've highlighted some

4      parts of it?

5           MR. HOMICH:  Yes, that --

6           MAGISTRATE TEGELER:  The bold?

7           MR. HOMICH:  The bold, yes.

8           MAGISTRATE TEGELER:  Thank you.

9           And is this an edited version of Chapter 8?

10          MR. HOMICH:  No.  Well, I didn't put all the

11     definitions in.

12          MAGISTRATE TEGELER:  Right.  So you've left

13     out part of Chapter 8?

14          MR. HOMICH:  Yeah.  All the other definitions,

15     I assumed that you would have that available to

16     you.  I mean, it's -- you can --

17          MAGISTRATE TEGELER:  I just need to understand

18     what this is.

19          MR. NELSON:  And just for clarification,

20     Chapter 8 does not include 6.7.  That is Chapter 6.

21     Chapter 8 is a list of definitions.  There are no

22     sections.  Chapter 8 is list of definitions.  So

23     what has been included before you by Mr. Homich is

24     two different sections of the code, Chapter 8 and

25     Chapter 6.

47

1      MAGISTRATE TEGELER:  I'm thoroughly confused.

2      MR. HOMICH:  Okay.  The codes -- there's one

3   section, which is Chapter 8, which is nothing but

4   definitions.  I think there's probably about a

5   hundred of them in there.  I don't know.

6   Mr. Sandersfeld probably has it right there.  That

7   is the sign definition, which I believe Ms. Cindy

8   Sommer is using to determine whether or not the

9   painting is a sign.  And she has determined, based

10  upon her evidence, that it is a sign, based upon

11  this.  That's what she read to you earlier when she

12  gave --

13     MAGISTRATE TEGELER:  Yeah, I recognize what

14  she read earlier.  I just am trying to understand

15  what the other parts and pieces of this Exhibit 19

16  were.

17     MR. HOMICH:  Well, the assumption was that

18  they were citing her as an off-site sign, by my

19  part.  Now that she can identify which section of

20  the code -- that's why I put the 6.7.3 in there.

21     MR. NELSON:  And for the record, that is a

22  legal argument I am prepared to make when the

23  appropriate time comes for that, to address

24  Mr. Homich's --

25     MR. HOMICH:  That's fine.

48

1          MR. NELSON:   I'm sorry.

2          To address the magistrate's concerns, Chapter

3     8 is titled -- Chapter 8 of the Land Development

4     Code is titled definitions, and it includes the

5     definitions for the entire Land Development Code.

6     Chapter 6.7 of the Land Development Code is

7     specifically for signs.  So the sign definition in

8     Chapter 8 would apply to all of the Land

9     Development Code, of which 6.7 is a part of, which

10     specifically discusses which signs are permissible

11     and which signs are not permissible in the City of

12     Mount Dora.

13          MAGISTRATE TEGELER:   Thank you.  You may

14     proceed with your questions.

15  BY MR. HOMICH:

16     Q.   So, again, calling your attention to the

17  highlighted -- and I'm sorry I did not point out that

18  that was highlighted -- "used for the attraction of the

19  public to any place, subject, person, firm, corporation,

20  public performance, article, machine or merchandise

21  whatsoever, which is displayed in any manner

22  whatsoever."  You're aware of that portion of the

23  section, right?

24     A.   Yes.

25     Q.   Okay.  What place is she trying to attract the

49

1   public to, or is she trying to attract the public to

2   anything, under your definition?

3          A.   Anybody that's going by can see it.  That's

4   public attraction.

5          Q.   All right.  So is she advertising any business

6   with the painting?

7          A.   Not at this time.

8          Q.   Is she advertising any specific place with the

9   painting?

10         A.   The lighthouse is on one end.

11         Q.   All right.

12         A.   Airplanes are on the other side.  I don't know

13   what that means, and I don't know if she's implying to

14   advertise anything.  I don't know what she's thinking.

15         Q.   But I'm asking you.  You're the one that said

16   it was a sign.

17         A.   Right.

18         Q.   So I'm asking you, what is it a sign for?

19         A.   Well, I see the lighthouse on there, and I see

20   whatever -- I don't know what all the stuff is on there.

21   I'm not into that type of artwork, so I don't know.

22   It's just -- it's an attraction of people driving by.

23   That's the complaints I get and how horrendous it

24   looked.  And so I would have to address those type

25   things.

50

1    Q.   So you're basing your decision solely upon

2    people's opinions of whether it's good art or bad art?

3        A.   No.   It's a signage, and that's what I'm

4    addressing under is signage.

5        Q.   All right.   And that's why I'm asking --

6        A.   And the complaints I received.

7        Q.   And that's why I'm asking, what is it

8    advertising?

9        A.   It doesn't appear to be advertising anything,

10   other than a lighthouse or airplanes.

11       Q.   But the lighthouse isn't a business?

12       A.   No.

13       Q.   It's an operational navigational signal,

14   correct?   A seaplane is not advertising any business?

15       A.   Not that I'm aware of.

16       Q.   We have seaplanes flying overhead all the time

17   here in Mount Dora, don't we?

18       A.   From time to time.

19       Q.   Okay.   I have a set of photographs here that I

20   want to first show Ms. Sommer and ask her if she can

21   identify that photograph.   Do you know where that mural

22   is painted?

23       A.   No, I do not.   It looks to me like it's in the

24   downtown area.   I don't know of specifically what wall.

25   This looks like it could be downtown.

51

1    Q.   And let me ask, is that signage?

2    A.   I would say it is, yes.

3    Q.   And how about this mailbox with artwork on it,

4  is that signage?

5    A.   I don't know what that is.  I don't know.  Is

6  that a flower.

7    Q.   It's artwork.

8    A.   I don't know what it is.

9    Q.   I'm asking if that's signage on the mailbox?

10   A.   I would say --

11   Q.   So someone painted their --

12   A.   -- it's a mailbox, and you can paint a

13  mailbox.  There's nothing that says you can't paint a

14  mailbox.

15   Q.   Okay.  But that would be signage, under your

16  definition?

17   A.   I don't know if I would call that signage on a

18  mailbox.

19   Q.   Painting on a mailbox, painting on a house,

20  what's the difference?

21   A.   It's just a design on a mailbox.  I don't know

22  if I would call that signage.

23   Q.   Okay.  What about that mailbox; is that

24  signage?

25   A.   Same thing.  It's on the mailbox.  It's --

KERR & ASSOCIATES, INC.
1-800-246-1753

52

1  people decorate their mailboxes and have covers over

2  their mailboxes.   We don't determine what they can do to

3  a mailbox.

4       Q.   You determine what people can do to their

5  houses?

6       A.   In signage, yes.

7       Q.   Why is --

8       A.   Residential.

9       Q.   Why is painting a house signage versus

10  painting a mailbox not signage?

11       A.   I don't have an answer for that.

12       Q.   I mean, if they painted Go Gators on there, do

13  you think they were advertising the University of

14  Florida?

15       A.   I would be all for it if they had Go Gators on

16  there.

17       Q.   That's fine.   But are they advertising?   Would

18  that be signage, under your definition?

19       A.   And I don't believe it would be --

20       Q.   Okay.

21       A.   -- on a mailbox.   I don't believe it would be.

22       Q.   Are you familiar with that --

23       A.   I am, yes.

24       Q.   -- painting?

25       A.   Uh-huh.

53

1      Q.   Okay.  That's a mural painted on Segway

2  building?

3      A.   Right.  In the business district.  Yes, it is.

4      Q.   Well, I understand.

5          But that's not signage; it's a mural, right?

6      A.   I would say, yeah, a mural.

7      Q.   Okay.  Next door, do you recognize that,

8  Mr. Atkins' property?

9      A.   I don't think I do, but okay, if you say it's

10  so, yes, I guess it would be on his -- in the business

11  district.

12      Q.   Is that a mural?

13      A.   Yes.  Business, yes.

14      Q.   And you're familiar with that?

15      A.   Yes.  That would be their signage that they're

16  permitted to have on a business, yes.

17      Q.   And what about this?

18      A.   That appears to be, I'm guessing, a garage.

19      Q.   Okay.  Do you know where that's located?

20      A.   I'm not sure whether that is painted windows.

21  No, not specifically.  Bed and breakfast, possibly.

22      Q.   Is that on the Christopher Inn?

23      A.   Yes.

24      Q.   And that's in a residential neighborhood,

25  correct?

54

1      A.   Possibly, yes.  Yes, it is.

2      Q.   And you know about that painting, right?

3      A.   Yes.

4      Q.   You've been by that many times?

5      A.   Right.

6      Q.   Have you ever cited them for that painting of

7   the garage?

8      A.   No.  That's been there a long time, and I

9   would have to say that's probably --

10      Q.   But they still have to comply?  You know, we

11   don't have --

12      A.   I would say that's --

13      Q.   If it's nonconforming signs had a grandfather

14   period, could they not, to bring them up to code, 6.7

15   point --

16      A.   If they were to do work, yes.

17      Q.   Do you know where that is?

18      A.   Yes.  That's --

19      Q.   Is that the --

20      A.   Right, uh-huh.

21      Q.   That's not signage, is it?

22      A.   That's private property in the business

23   district.  I'm not quite sure what you would call that.

24   Is this visible from the road?

25      Q.   I'm asking, is that signage?

55

1      A.   I would say it's signage or a mural.

2      Q.   Requiring a permit?

3      A.   I'm not sure what they're required as their

4   frontage.   It's calculated by the size of their building

5   and their frontage.

6      Q.   How about a flag on a home that's flying a

7   design?

8      A.   Flags are okay to have.

9      Q.   Is that a sign, I'm asking?

10      A.   A flag a sign?   I wouldn't think so, no.

11      Q.   Okay.

12      MR. HOMICH:   I would offer in these as a

13      composite exhibit.   The examples of the signage

14      around town.

15      MR. NELSON:   There's no objection.   The City

16      would like to state that this hearing is not about

17      any other property.   It is about the property

18      that's before the Magistrate today, but there's no

19      objection to the introduction of these photos.

20      MAGISTRATE TEGELER:   They will be admitted as

21      Exhibit 20.

22      (Exhibit Number 20 was admitted.)

23   BY MR. HOMICH:

24      Q.   During your review of those paintings on the

25   mailbox and the paintings on -- murals on some of the

56

1   businesses, and you said that they're in the business

2   district.  Why is that a distinction for a mural?

3       A.    Residential is prohibited to have signage like

4   that, and business district is exempt from that.  They

5   can have the signage or the murals or whatever they're

6   depicted as.

7       Q.    What code section is that in?

8       A.    It will take a moment for me to find it.  Your

9   question you're asking me where does it say business --

10      Q.    I'm asking you -- you made a distinction, you

11  said murals are okay in the business district, but not

12  in the residential district.  And I'm asking you --

13      A.    Well, let me rephrase that.  It is not

14  permitted in the residential district.

15      Q.    Okay.  Where does it say that murals are not

16  permitted in the residential district?

17      A.    It's considered under the definition of

18  signage, 6.7, under signs.  The definition would be

19  under Chapter 8, definitions.

20      Q.    The City's position is that a mural is a sign;

21  is that correct?

22      A.    It could be.  It could be determined as that

23  under sign.  It doesn't say mural in there, but a mural

24  would consist of any letter, figure, characters and so

25  on, that's specific to the definition of a sign.

57

1   Businesses are allowed to have a certain amount of

2   signage on their walls, as determined by the size of

3   their building.  And that is determined by the planning

4   and Zoning Department as to how much signage they can

5   have.

6        Q.   But the murals indicated in the business area

7   are not permitted signs, they are murals; is that

8   accurate?

9        A.   I do not know.  I don't know --

10       Q.   Did you check that out?

11       A.   Did I?  I haven't had a complaint to go check

12  any of them out.

13       Q.   So the murals or the painted mailboxes in the

14  residential areas, the flags in the residential areas,

15  the garage doors painted in the residential areas, that

16  you've never enforced, you're saying that the entire

17  reason that you've cited Ms. Nemhauser is because of the

18  definition of sign?

19       A.   And because I received a complaint about what

20  was painted on there.

21       Q.   So what section, specific section of the code

22  is my client in violation of, so I can address that

23  section of the code?

24       A.   6.7.1.

25       Q.   You testified earlier that she's not

KERR & ASSOCIATES, INC.
1-800-246-1753

58

1    advertising the name of the enterprise or the premises

2    or the product.  You already received that 6.7.1 doesn't

3    apply to my client.

4              MR. NELSON:  At this point the City would

5         object.  Ms. Sommer is being asked to make legal

6         distinctions.  She is not a lawyer.  Those are

7         legal distinctions that will be made in argument.

8         Her testimony is what it has been.  She's been

9         asked this question and answered this question.

10             MAGISTRATE TEGELER:  She can testify as to her

11        understanding of code sections.  Overruled.

12   BY MR. HOMICH:

13        Q.   I mean, someone has to be in violation of a

14   certain section of a code in order to cite them,

15   correct?

16        A.   Correct.

17        Q.   What is that section that you are citing for

18   Ms. Nemhauser?

19        A.   6.7 of the Sign Code.

20        Q.   Okay.  What portion of 6.7?  Because the whole

21   section doesn't apply; you would agree to that?

22        A.   I agree to that.

23        Q.   So which specific section is she in violation

24   of?

25        A.   6.7.1.

59

1      Q.   So you're saying that she is a community

2  center?

3      A.   No.

4      Q.   At 6.7.1.1, community center?

5      A.   "Sign medium location.  The following types of

6  signs shall be allowed under the conditions indicated.

7  Additionally, except for temporary and public signs, the

8  following signs shall be allowed if they only indicate

9  the name of the enterprise located on the premise or

10  products or services for sale thereon."

11      Q.   Right.  And you've already testified she's not

12  conducting any business there that she's advertising?

13      A.   As far as I know, she's not.

14      Q.   Do you have any evidence that she is

15  advertising a business on the premises?

16      A.   No.

17      Q.   And is the business -- you're allowed to have

18  signs that advertise your business, correct?

19      A.   Yes.

20      Q.   If you have a business?

21      A.   Correct.

22      Q.   And so 6.1.7, as we went through earlier,

23  applies to businesses putting up their signs for

24  business, correct?

25      A.   That's correct.

60

1      Q.    It tells you what types of signs are allowed,

2   when they're allowed.   It even has the section 6.7.1.9,

3   temporary signs, that you didn't know about when you

4   told Mr. -- the painter to remove the -- his paint sign,

5   while he was painting?

6      A.    It didn't appear that he was painting at the

7   time.   It appeared to be completed at that time.   And,

8   again, the temporary sign consists of campaign,

9   construction, real estate and subdivision development.

10     Q.    And that temporary sign for construction --

11     A.    And construction signs do require a permit.

12     Q.    So you're saying there's a violation of 6.7.1,

13  and that's the section that you claim my client is in

14  violation of?

15     A.    Yes, that is correct.

16     Q.    There's no other sections to which she's in

17  violation?

18     A.    Not at this time.

19     Q.    So you would agree she's not advertising some

20  other place?

21     A.    She's advertising some other place?

22     Q.    Yeah.   I mean, with the painting, is she

23  advertising another business, another location, another

24  event, anything like that?

25          MR. NELSON:   I would object to these lines of

61

1    questions too, as well.  He's asking Ms. Sommer to

2    speculate about the intent of the respondent, of

3    which she could have no understanding of, unless

4    she's been told by the respondent.

5           MAGISTRATE TEGELER:  I do think that's been

6    covered previously in questions during

7    Cross-Examination.  I will overrule it at this

8    time.

9    BY MR. HOMICH:

10   Q.   Under the definition -- let me be more

11   specific.  Under the definition, the sign has to be used

12   for the attraction of the public to any place, subject,

13   person, firm, corporation, public performance, article,

14   machine or merchandise whatsoever, which is displayed in

15   any manner whatsoever.  What is she trying to -- I mean,

16   obviously you came to the conclusion she's attracting

17   someone to something, advertising something.  What was

18   your conclusion that she was advertising with a

19   rendition of Starry Nights on their home?

20   A.   I don't conclude that she's advertising

21   anything.

22   Q.   Okay.  Thank you.

23          So she's not using it for the attraction of

24   anything?

25   A.   She specifically might not be, but there's got

KERR & ASSOCIATES, INC.
1-800-246-1753

62

1    to be a reason why she put that up there, for people to

2    see, which is an attraction.   I don't know what her

3    intent is on the attraction.

4        Q.   So you would also agree that it's not off-site

5    signage under 6.7.3, correct?

6        A.   The little sign is gone.   That little ground

7    sign is gone, so that's not a violation at this time,

8    because the sign has been removed.   That would be

9    off-site signage.   So it's been removed.

10       Q.   Okay.   So the entire basis for the City's

11   claim that the house being painted is a sign advertising

12   her business, and she hasn't got the proper signage

13   permitted under 6.7.1?

14       A.   Well, under 6.7.7, a building permit is

15   required.   And would you like me to read that?

16       Q.   I'm not asking about a building permit.   You

17   said she was in violation of 6.7.1.

18            So I'm asking, if she's not advertising -- if

19   she doesn't have a business and is not advertising a

20   business in the home, then it doesn't meet the

21   definition of signage under 6.7.1?

22       A.   Because she removed the small sign.

23       Q.   Okay.   So she came into compliance when she

24   removed the small sign?

25       A.   Except for the definition of signage.   And

63

1    then 6.7.7 says a building permit is required.

2       Q.   Okay.  Did you talk to anyone about the

3    process she went through to obtain permission to do what

4    she was doing?

5       A.   Again, repeat your question.

6       Q.   Are you aware of whether or not Ms. Nemhauser

7    sought permission from the City prior to painting?

8       A.   Just per our phone conversation, she -- when

9    she called me, she said she spoke to three different

10   people in the city, and they -- one person transferred

11   her to another and to another and told her that a permit

12   was not required to paint your wall.  She didn't say

13   what she was painting it.  But they do get those type of

14   questions often, as I do in code enforcement, and the

15   building department gets those questions asked of them

16   often.

17      Q.   And when they advised her properly that there

18   are no permits required for painting your house, that

19   would be accurate?

20      A.   Yes, it would be.

21      Q.   Now --

22        MR. HOMICH:  I have no further questions at

23      this point.  I have some on my Direct.  It's not an

24      issue we covered so far, but we'll wait to see if

25      it's necessary.

64

1         MAGISTRATE TEGELER:  Any Redirect?

2         MR. NELSON:  Just briefly.  Thank you.

3              REDIRECT EXAMINATION

4    BY MR. NELSON:

5         Q.   Ms. Sommer, that you recall, how many

6    complaints have you received about other painted walls

7    in the city?

8         A.   I've not received any that I'm aware of, that

9    I can recall.

10        Q.   So this is the first complaint that you've

11   received for a painting on a wall or side of a house?

12        A.   That's correct.

13        Q.   So this is the first one that you've

14   investigated?

15        A.   That's correct.

16        Q.   There's been some talk about temporary signs

17   and construction signs.  Do you know if a construction

18   sign would require a permit?

19        A.   As far as my understanding is, yes, they

20   require a permit.

21        Q.   Ms. Sommer, are you on the City Council?

22        A.   No, I am not.

23        Q.   Have you ever been a member of the City

24   Council?

25        A.   No, I have not.

65

1    Q.   Do you participate in the decision making of

2   the City Council?

3    A.   Absolutely not.

4    Q.   Were you a part of any committee that drafted

5   any ordinances with the City Council?

6    A.   No.

7    Q.   Did you have anything to do with drafting the

8   Land Development Code or any amendments to it?

9    A.   No.

10    Q.   Does the Notice of Violation that has been

11   introduced anywhere indicate business advertisement?

12   Not the door hanger.  I'm talking about the Notice of

13   Violation that you mailed.

14    A.   Oh, no it does not.

15    Q.   It doesn't say advertisement anywhere on it?

16    A.   No.

17    Q.   In the definition of the Land Development

18   Code, under Chapter 8 for signs, does that definition

19   anywhere include the word for advertisement?

20    A.   No, it does not.

21    Q.   To your knowledge, does any part of the Land

22   Development Code include the definition of mural?

23    A.   Not that I'm aware of.

24    MR. NELSON:   I have nothing further for

25   Ms. Sommer.

66

1          MAGISTRATE TEGELER:  Any Recross?

2          MR. HOMICH:  Just one quick question.

3                  RECROSS EXAMINATION

4  BY MR. HOMICH:

5      Q.    The word mural appears nowhere within the Code

6  of the City of Mount Dora; is that correct?

7      A.    You're asking me -- not that I'm aware of.

8      Q.    So you're aware of no regulation anywhere

9  within the City Code of Mount Dora that addresses

10 murals?

11     A.    Not that I'm aware of.

12          MR. HOMICH:  No further questions.

13          MAGISTRATE TEGELER:  Any Redirect.

14          MR. NELSON:  No.

15          MAGISTRATE TEGELER:  I have a few questions.

16     Can you provide Ms. Sommer with a copy of the code?

17     Just for my own understanding, I want to ask some

18     questions about that.  Now, we've talked a lot

19     about Section 6.7, signs.  Do you have that?

20          MS. SOMMER:  I do.

21          MAGISTRATE TEGELER:  Do you have the entire

22     portion of it?

23          MS. SOMMER:  I do.

24          MAGISTRATE TEGELER:  Okay.  Now, in 6.7,

25     signs, read for me the first paragraph.

67

1          MS. SOMMER:   Under 6.7, signs, "The purpose

2     and intent of this section is to establish

3     regulations for the fabrication, erection and use

4     of signs in outdoor advertising displays within the

5     city.   These regulations are hereby established and

6     ordered to promote the overall economic well-being

7     of the businesses in the city, while at the same

8     time providing for the health, safety and welfare

9     of its citizens by reducing the adverse effects of

10    signs and displays on highway safety, building

11    safety, property value and the enjoyment of the

12    scenic beauty of the city."

13         Do you want me to continue?

14         MAGISTRATE TEGELER:   No.   Let's stop there.

15    Now, you said in your earlier testimony that this

16    painting on the wall, and now the structure, at the

17    subject property, is visible from -- is it Fifth

18    Avenue?

19         MS. SOMMER:   Yes.

20         MAGISTRATE TEGELER:   Is that the road by the

21    lake?

22         MS. SOMMER:   That's correct.   It's Fifth

23    Avenue.   It's considered also Old 441.

24         MAGISTRATE TEGELER:   And does the view from

25    Fifth Avenue for vehicles traveling along Fifth

68

1    Avenue attract it to the painting on this wall?

2         MS. SOMMER:  Yes.

3         MAGISTRATE TEGELER:  Read for me the next

4    paragraph in Section 6.7, signs.

5         MS. SOMMER:  "In no event shall any signs be

6    erected within the City of Mount Dora, except in

7    conformance with this section."

8         MAGISTRATE TEGELER:  So this section, 6.7,

9    identifies which signs are permitted?

10        MS. SOMMER:  That is correct.

11        MAGISTRATE TEGELER:  And what you just read

12   says no other signs are permitted except the ones

13   listed here?  It says, "In no event shall any signs

14   be erected within the City of Mount Dora, except if

15   conformance with this section."

16        MS. SOMMER:  That is correct.

17        MAGISTRATE TEGELER:  And you all have been

18   talking about 6.7.9 and some other things.  And

19   just for my own understanding, I want to go through

20   that.  So starting with 6.7.1, read that to me.

21   Just the first sentence.

22        MS. SOMMER:  6.7.1, "Sign medium location.

23   The following types of signs shall be allowed under

24   the conditions indicated."

25        MAGISTRATE TEGELER:  All right.  And then I

1    believe it has ten types of signs.  Let's go

2    through them.  Number one, community center.  The

3    sign we're talking -- or let's call it the painting

4    on the wall we've been discussing here in this

5    case, is that, in your interpretation of the code,

6    a community center sign.

7         MS. SOMMER:  No, it is not.

8         MAGISTRATE TEGELER:  In your interpretation,

9    is it a number two, directional sign?

10        MS. SOMMER:  No, it is not.

11        MAGISTRATE TEGELER:  Is it a number three,

12   directory sign?

13        MS. SOMMER:  No, it is not.

14        MAGISTRATE TEGELER:  Is it a number four,

15   occupant identification sign?

16        MS. SOMMER:  No.

17        MAGISTRATE TEGELER:  Is it a number five,

18   public sign?

19        MS. SOMMER:  No.

20        MAGISTRATE TEGELER:  Is it a number six,

21   shopping, office center sign?

22        MS. SOMMER:  No.

23        MAGISTRATE TEGELER:  Is it a number seven,

24   subdivision and apartment sign?

25        THE WITNESS:  No.

70

1          MAGISTRATE TEGELER:  Is it a number eight,

2     menu sign?

3          THE WITNESS:  No, it is not.

4          MAGISTRATE TEGELER:  Is it a number nine,

5     temporary sign?

6          THE WITNESS:  No.

7          MAGISTRATE TEGELER:  Is it a number ten,

8     historic monument sign?

9          THE WITNESS:  No, it is not.

10          MAGISTRATE TEGELER:  So the painting on the

11     wall is not any of the allowable types of signs?

12          THE WITNESS:  That is correct.

13          MAGISTRATE TEGELER:  And is that part of the

14     basis of your Notice of Violation for this painting

15     on the wall?

16          THE WITNESS:  That is correct, 6.7, under

17     signs.

18          MAGISTRATE TEGELER:  So it's not so much that

19     this painting on the wall is a violation of a

20     particular type of sign; it's just not a permitted

21     type of sign?

22          THE WITNESS:  Correct.

23          MAGISTRATE TEGELER:  And, therefore, is, I

24     guess, a nonconforming sign?

25          MR. NELSON:  It would be a 6.7.4, prohibited

71

1     sign.

2          MAGISTRATE TEGELER:   Okay.

3          MR. NELSON:   Any sign not specifically allowed

4     in 6.7.1, which is number 18 under 6.7.4.

5          MAGISTRATE TEGELER:   Just let me see it.

6     Well, looking at 6.7.4 in the code entitled

7     prohibited signs, I see 20 categories.

8          MR. NELSON:   Eighteen was the one I was

9     directing your attention to.

10          MAGISTRATE TEGELER:   What is that?

11          MR. NELSON:   It's number 18, "Any sign not

12     specifically allowed in subsection 6.7.1, 6.7.2 and

13     6.7.3 above."

14          MAGISTRATE TEGELER:   All right.  All right.

15     That's all I have for now.

16          Do you wish to make any further questions of

17     Ms. Sommer, based on what I just talked about?

18          MR. HOMICH:   I have a whole line of

19     questioning dealing with 6.7.3, which is one of the

20     prohibited signs that I need to do in my case in

21     chief and not --

22          MAGISTRATE TEGELER:   All right.  Does anybody

23     have anything further for Ms. Sommer?

24          MR. NELSON:   I do not.

25          MAGISTRATE TEGELER:   All right.  Does the City

72

1    have any other witnesses?

2        MR. NELSON:  The City would request a brief

3    recess before determining whether we have one more

4    witness or we'll be resting.

5        MAGISTRATE TEGELER:  All right.  You can take

6    a short break.

7        MR. NELSON:  Thank you.

8        (Brief recess.)

9        MR. NELSON:  Are we back on the record?

10       MAGISTRATE TEGELER:  We are now.

11       MR. NELSON:  All right.  The City at this time

12   rests.

13       MAGISTRATE TEGELER:  All right.  Mr. Homich,

14   would you like to call a witness.

15       MR. HOMICH:  Yes, sir.  I would call -- well,

16   first I'd request a ruling that the City hasn't

17   proven its case, first of all, with graffiti, that

18   that violation be dismissed with prejudice.  I'd

19   also request that the signage violation be

20   dismissed with prejudice, because they haven't

21   proved or carried their burden of proof that the

22   mural or painting of a house is a sign under the

23   code.

24       MAGISTRATE TEGELER:  I'm going to reserve

25   ruling on such motions at this time.

73

1          MR. HOMICH:  Okay.

2          MAGISTRATE TEGELER:  You may proceed.

3          MR. HOMICH:  So I would call Ms. Sommer again.

4          MAGISTRATE TEGELER:  Ms. Sommer, I will remind

5     you that you are still under oath.

6          MS. SOMMER:  Yes.

7                    DIRECT EXAMINATION

8     BY MR. HOMICH:

9          Q.   Ms. Sommer, I guess at the end of the last

10    discussion, the City's position that -- as I had

11    discussed earlier, it's not a violation of 6.7.1; it

12    doesn't meet any of those categories, so it can't be

13    permitted under that section, correct?  I mean, your

14    Notice of Violation says unpermitted sign?

15         A.   Correct.

16         Q.   Okay.  So in order to get a permit, they

17    wouldn't be able to get one under 6.7.1, if it were a

18    sign, correct?

19         A.   Correct.

20         Q.   Okay.  Because it doesn't meet any of those

21    categories; is that accurate?

22         A.   Accurate.

23         Q.   Now, the next section, 6.7.2, which deals with

24    sign construction, that's a fairly lengthy section on

25    how to do signs, and that really -- we would have to

74

1   agree that it's painted on the wall, so I won't talk

2   about frontage or all the other aspects to the signs

3   regulations.  But since you have no evidence that

4   there's a business ongoing in the premises, the most

5   likely signage it could be is off-site signage, correct?

6       A.   Correct.

7       Q.   6.7.3 would be off-site signage for like

8   putting up a Marlboro old billboard; that's off-site

9   signage, right?

10      A.   Not necessarily.  Off-site signage would be if

11  you have a business -- let's say you have a flower shop

12  downtown, and you have an area in front of your shop you

13  can advertise and you go put a sign down on a corner or

14  down two blocks away, that would be considered off-site

15  signage, or on an opposite block.  That's off-site.

16      Q.   All right.  Have you recently got a complaint

17  for off-site signage in the City of Mount Dora not

18  involving this property?

19      A.   I don't know, but if I do go collect signs and

20  I see them, I will retrieve those signs if they're

21  off-site and return them and tell them they can't put

22  them out on different areas that would be in front of

23  their business.

24      Q.   You don't recall in July running around town

25  doing hangers on everyone's door about off-site signage?

75

1       A.   Oh, yes.  I'm sorry.  Correct.  I did go

2  downtown.  And I was instructed to go downtown about

3  excessive off-site signage, people advertising in

4  businesses for other businesses going on downtown.

5       Q.   Okay.  So do you recall the complaint that you

6  received for that off-site signage?

7       A.   Yes.

8       Q.   Was it an email?

9       A.   No.

10      Q.   You're saying the City did not receive an

11  email regarding the off-site signage?

12      A.   If they did, I don't know about it.

13      Q.   Okay.

14      A.   I was directed by my chief.

15      Q.   Okay.  Who -- what did your chief say?

16      A.   To address the excessive off-site signage

17  downtown.  He approached me with, can a business -- can

18  a business advertise for another business at their

19  business?  And I told him, no, they can only advertise

20  for their own business.  So I did cite about 14, 15

21  people for off-site signage or excessive signage.

22      Q.   Okay.  And have all those violations been

23  corrected?

24          MR. NELSON:  Objection.  I don't understand

25      the relevance of violations at other properties

76

1    when --

2        MR. HOMICH:  It's called selective

3    enforcement.

4        MR. NELSON:  That's not something that this

5    Magistrate has anything to do with.  This

6    Magistrate will not been deciding whether or not

7    there's been selective enforcement of violations.

8    This Magistrate's only duty is to determine whether

9    or not the violation that's before the Magistrate

10    is in fact a violation.

11        MR. HOMICH:  To prevail on a selected

12    enforcement claim, the City's Ordinance was applied

13    to them and not others.  Plaintiff must show that

14    they were treated differently from other

15    similarly-situated and that defendant unequally

16    applied a facially-neutral ordinance for the

17    purposes of discriminating against the plaintiff.

18    He can rule that if there is a violation, that it's

19    being selectively enforced in this case, and the

20    City cannot move forward.  He has that.  I also

21    have to take that up on appeal, if he rules in

22    favor of the City, to the Circuit Court.  So I need

23    to address this here, because the Circuit Court can

24    only hear what's heard today.  So in order to cover

25    this evidence, we have to do it here, now.

77

1          MAGISTRATE TEGELER:  Overruled.

2     BY MR. HOMICH:

3          Q.   Let me show you a Notice of Violation and ask

4     you, do you recognize that Notice of Violation?

5          A.   I do.

6          Q.   Okay.  And what is that violation for?

7          A.   Off-site excessive window signs.

8          Q.   Did you file a Notice of Violation for that

9     person?

10         A.   No.

11         Q.   Is the signage still there?

12         A.   I have to see which one this is.  Yes, I

13    believe some of those signs are, to my knowledge.

14         Q.   So you filed the Notice of Violation on

15    7/11/17 for 523 Donnelley Street, citing off-site

16    excessive window signs, and that's your signature at the

17    bottom?

18         A.   Yes, it is.

19         Q.   Okay.  And that's a true and accurate

20    representation of the Notice of Violation and the

21    documents you provided regarding them?

22         A.   Yes.

23              MR. HOMICH:  I'd offer that into evidence.

24              MR. NELSON:  No objection, other than the

25         objection that was made earlier.

78

1    BY MR. HOMICH:

2         Q.    Do you recall when you cited --

3               MAGISTRATE TEGELER:  Can you just hold on for

4         one moment?

5               This will be admitted as Exhibit 21.

6               (Exhibit Number 21 was admitted.)

7    BY MR. HOMICH:

8         Q.    Now, to be clear, those -- this was a

9    violation you noticed on July 11th; is that --

10              MR. HOMICH:  Are you okay?

11        A.    That's correct.

12              MR. HOMICH:  That's her medical device, Judge,

13        sir.

14   BY MR. HOMICH:

15        Q.    Okay.  What was the date of the violation you

16   served my client?

17        A.    I think it said July 11th; is that correct?  I

18   don't have it in front of me.  Oh, I'm sorry.  Your

19   client.

20        Q.    My client.

21        A.    I'm sorry.  Yes.  July 26.

22        Q.    Okay.  So that's two weeks -- more than two

23   weeks after this violation you cited?

24        A.    Approximately.  I agree.

25        Q.    You haven't filed a Notice of Violation or set

KERR & ASSOCIATES, INC.
1-800-246-1753

79

1    a hearing in that case yet, have you?

2         A.   No, I have not.

3         Q.   It has -- those off-site signage problems have

4    not been corrected, have they?

5         A.   Not to my knowledge today.  No, not to my

6    knowledge.

7         Q.   So why are you enforcing that section of the

8    code against Ms. Nemhauser and not against Main Street

9    Leasing?

10        A.   Because I was asked at the time to drop the

11   downtown, because the merchants were contacting the City

12   Manager, and she asked at that time we do a little

13   reprieve on it, so I backed off of it and was waiting

14   for direction.

15        Q.   So you backed off enforcing Code 6.7.3 at the

16   request of the City Manager?

17        A.   My directive came from the chief.

18        Q.   The chief.  Okay.  Did he say it came from the

19   City Manager?

20        A.   That's correct.

21        Q.   So the City's decided to only enforce this

22   off-site signage against my client for what reason?

23        A.   They were looking too it further through the

24   downtown merchants, through the business district.  They

25   were looking through downtown further, for me to wait

80

1    for direction.  And this is a residential area that

2    we're talking about today.  Not downtown business

3    district.

4         Q.   But 6.7.3 applies to everybody, except for

5    industrial zoning; is that not correct?

6         A.   That is correct.

7         Q.   It applies to commercial, C2, C3, residential,

8    everywhere in the city except industrial; is that

9    correct?

10        A.   To my knowledge, yes.

11        Q.   Okay.  So the downtown merchants have no more

12   right to have off-site signage than residents do, do

13   they?

14        A.   No, not under the code.

15        Q.   Okay.  So would you say the City has selected

16   who they will enforce this against?

17        A.   No, I would not.  I would say they're waiting

18   to discuss it to see how they wanted me to approach it.

19        Q.   Are you aware of the City Council addressing

20   this issue of the mural?

21        A.   No.

22        Q.   Has there been a request to do it?

23        A.   I would have no idea.  I'm not involved in

24   that.

25        Q.   Okay.  Do you know if the City has made any

81

1    decision to postpone any decision based on that issue

2    pending the outcome of this hearing?

3        A.    No.  I would have no way of knowing that.

4        Q.    Okay.  Let me go ahead and show you -- this is

5    all of the documents in response to my request for

6    production for that off-site signage issue, and ask you

7    if you recognize these documents.

8        A.    Yes, I do.  I cited these business owners

9    downtown, yes.

10       Q.    How many Notice of Violations did you send out

11   for 6.7.3 in July -- early July?

12       A.    I did not mail out any notices.  This was --

13       Q.    Did you hand out?

14       A.    -- a visit downtown to advise them, an

15   educational-type thing to advise them that they cannot

16   do this.  So I handed them the door hangers.  It's a

17   courtesy notice.  Do you want me to count how many?

18       Q.    Sure.  Count how many.

19       A.    I see eight here.

20       Q.    Eight.

21             Is that a true and accurate copy of the

22   violations and the documents you sent me --

23       A.    Yes, it is.

24       Q.    -- regarding all those violations?

25       A.    Yes, it was.

82

1      Q.   And all those violations were for 6.7.3 of the

2   code; is that accurate?

3      A.   Correct.

4           MR. HOMICH:   I'd offer that into evidence.

5           MR. NELSON:   The City objects on the relevance

6      basis that we've objected on before.   This is the

7      first time we've heard of the in-equal prosecution

8      of these violations.

9           MR. HOMICH:   Well, this is the first day I

10      heard that you were dropping the graffiti, so we're

11      all learning something new.

12           MAGISTRATE TEGELER:   This will be admitted as

13      Exhibit 22.

14           Overruled.

15           (Exhibit Number 22 was admitted.)

16           MR. NELSON:   Thank you.

17   BY MR. HOMICH:

18      Q.   Let me show you a picture.   Is that the way

19   the 523 Donnelley building currently looks or the last

20   time you passed by?

21      A.   I have to agree.   I believe they are still up

22   like that, yes.

23      Q.   Okay.   Is that -- to be clear, that's an

24   advertisement for 1921, is it not --

25      A.   Yes.

83

1       Q.    -- the restaurant in town?

2       A.    Yes.  Yes, it is.

3       Q.    And the building it's located -- those posters

4  are located are not on site, correct?

5       A.    That is correct.

6       Q.    Okay.  So currently, that building is in

7  violation of Code 6.7.3 of the City Code, correct?

8       A.    Correct.

9       Q.    What are you doing about it, as a code

10  enforcement officer?

11      A.    I just told you what I was doing about it.

12  Awaiting to get direction from the chief to find out

13  what they're going to do about this.

14      Q.    So nothing would be the correct --

15      A.    Oh, I'm sure they'll do something.

16      Q.    I'm not asking -- I'm asking what you are

17  doing as code enforcement officer at this time?

18      A.    Nothing at this time, until I get directive.

19           MR. HOMICH:  And I'd offer is that into

20      evidence as Exhibit Number 23.

21           MAGISTRATE TEGELER:  Any objection?

22           MR. NELSON:  Same objection that has already

23      been stated.

24           MAGISTRATE TEGELER:  Overruled.

25           This will be admitted as Exhibit 23.

84

1           (Exhibit Number 23 was admitted.)

2           MR. NELSON:  And for the record, I do believe

3      that a representative of that property owner is

4      present and would like to speak.  I would defer to

5      the Magistrate about the most appropriate way of --

6           MAGISTRATE TEGELER:  If someone calls them as

7      a witness.

8           MR. HOMICH:  And I'd be obviously object to

9      relevancy.

10          MR. NELSON:  Which has been my objection the

11     whole time.

12          MAGISTRATE TEGELER:  We'll deal with it when

13     we're presented with it.

14          MR. HOMICH:  Okay.

15   BY MR. HOMICH:

16     Q.   And so you are aware that the City received a

17   complaint about off-site signage, according to your

18   chief, correct?

19     A.   Correct.

20     Q.   And you went out and cited people for that

21   off-site signage?

22     A.   That is correct.

23     Q.   And then did nothing about it since July 11th?

24     A.   No.  I went back and inspected others.  I

25   didn't stop until I was given the directive.  And when I

85

1   visited -- I visited all those business owners and

2   discussed it with them.  Some of them were happy about

3   it, and some weren't, but they understood the code, and

4   they complied or not.

5        Q.   But -- so the -- but you were stopped from

6   further enforcement of 6.7.3, based upon direction of

7   the City Manager, correct?

8        A.   Correct, until they could look into it

9   further.

10            MR. HOMICH:  I have no further questions.

11            MAGISTRATE TEGELER:  Anything from the City?

12            MR. NELSON:  Just briefly.

13            MAGISTRATE TEGELER:  Go ahead.

14                      CROSS-EXAMINATION

15   BY MR. NELSON:

16        Q.   Of the eight notices, door hangers, that

17   Mr. Homich has brought up that have been admitted, do

18   you recall how many have complied?

19        A.   No, I don't recall.

20        Q.   Have you been told by anyone at the City that

21   this is something that has been dropped?

22        A.   No.

23        Q.   Have you been told from anyone at the City,

24   any of your superiors, that you will not be enforcing

25   these violations?

86

1    A.   No.

2    Q.   Have you been in discussion with the property

3 owners of these locations?

4    A.   When this was going on, yes, but to date --

5    Q.   And --

6    A.   -- nothing since then.

7    Q.   When you were in contact with them, what did

8 those discussions entail?

9    A.   About the off-site signage they had in their

10 windows, advertising for others or events that were

11 coming up; those were considered off-site.  And most

12 were happy to remove them, because they didn't want them

13 in the windows anyway.  They were just doing it as

14 kindness to other business owners.

15    Q.   So I realize you haven't been out, personally,

16 to inspect these properties as of today, but is it your

17 understanding that many of them have complied?

18    A.   Yes, I believe so.  Many have.

19         MR. NELSON:  Okay.  I have nothing further.

20         MAGISTRATE TEGELER:  Any Redirect?

21         MR. HOMICH:  No.

22         MAGISTRATE TEGELER:  You may call your next

23    witness.

24         MR. HOMICH:  I have no further witnesses.

25         MAGISTRATE TEGELER:  You have no further

87

1  witnesses?

2       MR. HOMICH:  Or I'll go ahead and call my

3  client.

4       MAGISTRATE TEGELER:  All right.

5       MR. NELSON:  If I may just have one moment --

6  I apologize --

7       MAGISTRATE TEGELER:  All right.

8       MR. NELSON:  -- to confer before we begin.

9       MAGISTRATE TEGELER:  Go ahead.

10      (Discussion off the record.)

11      MR. NELSON:  Thank you.  I'm ready to proceed.

12  Thank you.

13      MAGISTRATE TEGELER:  All right.  Ma'am, would

14  you raise your right hand?

15      MS. NEMHAUSER:  Yes.

16      MAGISTRATE TEGELER:  Do you solemnly swear

17  that the testimony you give in this proceeding

18  shall be the truth, the whole truth and nothing but

19  the truth?

20      THE WITNESS:  Yes, I do.

21      MAGISTRATE TEGELER:  Thank you.

22                NANCY NEMHAUSER,

23  having been first duly sworn, testified under oath as

24  follows:

25                DIRECT EXAMINATION

88

1   BY MR. HOMICH:

2       Q.   Could you please state your name?

3       A.   Nancy Nemhauser.

4            MAGISTRATE TEGELER:  And I would ask that you

5       speak up a little.

6            MS. NEMHAUSER:  Okay.

7            MAGISTRATE TEGELER:  Go ahead.

8   BY MR. HOMICH:

9       Q.   And you own the property in question?

10      A.   Yes.

11      Q.   When did you decide to start painting your

12  property?

13      A.   We'd been considering it for quite some time.

14      Q.   And why did you start painting your property?

15      A.   It needed to be painted.

16      Q.   And why did you select the artist to paint

17  this?

18      A.   Richard came to us and suggested artwork, and

19  it sounded like a lovely idea.

20      Q.   When you started this procedure of painting,

21  did he put up that little sign that's in evidence, when

22  he started painting?

23      A.   I don't know when he put that up.  The first

24  time I was made aware of it was when I spoke with

25  Ms. Sommer.

89

1    Q.    And when she asked you to remove it, did you

2    remove it?

3    A.    Immediately.

4    Q.    Now, are you --

5    A.    May I say something?

6    Q.    Sure.

7    A.    In fact, I was a bit surprised, because I

8    asked her which sign.  Was it the sign that was on top

9    of the wall?  And she said she hadn't seen that sign.

10   And that was from a prior contractor, and that sign was

11   still there and much larger and much more obvious.  That

12   was the one I thought she initially was referring to.

13   So she told me it was the small one in the front on the

14   ground, so I did go and remove that.

15   Q.    Now, prior to starting painting your house,

16   did you contact anyone from the City?

17   A.    Yes.  First, when I spoke with the artist, he

18   told me he had spoken with people and that he needed my

19   permission, our permission.  And so I did call the City.

20   I called the main number and spoke with Gwen initially,

21   and she said she didn't think I needed a permit.  I was

22   asking if I needed a permit.  And she transferred me to

23   someone named Stacey.  And I told her that I was

24   interested in doing painting on the wall.  And she said

25   that there was no permitting needed and that there were

90

no restrictions.   I said -- I asked her if that applied

to historic district, because I thought we were in the

historic district.   And so she transferred me to someone

named John.   And I also asked him if there was any

permitting required for painting.   And he, too, said

that there were no restrictions.

     Q.   And then you started painting.   How long had

the painting been going on before Ms. Sommer came by; do

you know?

     A.   I don't know exactly.   He's -- the painter is

very quiet, and he doesn't cause any kind of disruption

at all.

     Q.   Was the purpose of the painting aesthetic?

     A.   Yes.   And because it needed to be painted.

     Q.   Do you know when the last time that wall had

been painted?

     A.   No, sir, I do not.

     Q.   What was the condition it was in when you

painted it?

     A.   It was in -- in my opinion, it was in poor

condition, bad condition.

     Q.   Did you paint the -- did you commission the

artist to attract the public to your home?

     A.   No.

     Q.   Did you commission the artist to attract the

91

1  public to any particular subject?

2      A.   No.

3      Q.   Did you commission the artist to attract

4  someone to a particular person?

5      A.   No.

6      Q.   Did you commission the artist to attract

7  someone to a firm, a corporation, a public performance,

8  an article, a machine, or a merchandise?

9      A.   No.

10     Q.   Now, with regard to painting the wall, did

11 Ms. Sommer ever give you any directions as to where you

12 could paint, where you couldn't paint, things like that?

13     A.   Yes.  I had spoken with her, and we talked

14 about the exterior of the wall.  She said that was

15 graffiti.  I mentioned to her that this was Starry

16 Night, and I was surprised that this was considered

17 graffiti.  And she said she would look into it and get

18 back to me.  She did get back to me, as she said she

19 would.  And she said, yes, it is graffiti.  And she said

20 that because it was the exterior of the wall, that

21 couldn't be painted there, but the interior of the wall

22 we could paint.  And when I had spoken with the people

23 at the City offices, I had mentioned that this was Old

24 441, the wall facing Old 441.  So she was saying that

25 that painting can't be there, but it could be on the

92

1    interior.

2         Q.   Did she give you any other directions with

3    regards to painting your house, about matching colors or

4    anything?

5         A.   Yes.   She said that the wall had to be the

6    same color as the house.

7         Q.   Did she tell you why that had to be?

8         A.   I think she read the part of the code that is

9    somewhere in here, in that abandoned property

10   information.   She didn't say anything about abandoned

11   property at the time.

12            MR. HOMICH:   I have no further questions.

13            MAGISTRATE TEGELER:   Does the City have any

14       Cross-Examination?

15            MR. NELSON:   Just very briefly.

16                   CROSS-EXAMINATION

17   BY MR. NELSON:

18        Q.   Good morning, Ms. Nemhauser.

19        A.   Good morning.

20        Q.   You mentioned that you spoke to several

21   different individuals with the City of Sanford --

22        A.   Mount Dora.

23        Q.   Sorry.   I apologize.   Mount Dora.

24            During those conversations, did you indicate

25   to them what the scope of or the subject matter of the

93

1  painting was going to be?

2      A.   No.  I said a painting.

3      Q.   Okay.  You didn't say Starry Night --

4      A.   No.

5      Q.   -- in -- okay.  And you didn't give them a

6  picture of it or anything like that?

7      A.   No.

8      Q.   It was just a conversation?

9      A.   That is correct.

10      Q.   Okay.

11      A.   And they did both say, as I said, there were

12  no restrictions, so I didn't find it necessary to make

13  any more inquiry.

14      Q.   And you didn't call it a mural; you said a

15  painting?

16      A.   That is correct.

17      Q.   Okay.

18      A.   I wasn't sure if a mural required certain

19  dimensions, so I, you know, was clear that it was a

20  painting.

21      Q.   Stuck with painting.

22          All right.  You mentioned the artist a few

23  times when you were talking to Mr. Homich.  And you

24  mentioned that his name was Richard?

25      A.   Yes.

94

1    Q.    What is Richard's last name?

2    A.    I can do Jastrzebski, but Barrenechea,

3    B-A-R-R-E-N-E-C-H-E-A.

4    Q.    Okay.  And are you aware that -- and I'm going

5    to call him Richard, because I don't want to attempt to

6    pronounce his last name either.  Are you aware that he

7    has a website for his work?

8    A.    Yes.

9    Q.    And that he posts pictures of his work on that

10   website?

11   A.    I don't know what he -- I'm not big on that,

12   but I do know that he has a website.

13   Q.    I have some printouts from his website that

14   I'd like to show you.  This is my only copy.  Sorry.  If

15   you can just take a look at those briefly.

16   A.    Yes.

17   Q.    And several of those images, you would agree,

18   are of the painting on your wall?

19   A.    I'm not sure I would say several.  It appears

20   as though there are two.

21   Q.    Two.  Okay.

22         And I'm showing you some more photos that are

23   not of your mural, but are of two other Starry Night

24   photos.  And there's a caption there.  Can you please

25   read that caption?

95

1      A.   Starry Night at Mount Dora in progress.  Once

2  the I feel is -- I suppose it should be once that I feel

3  it's done, I'll apply a few epoxy coats on it, resulting

4  in a deep, colorful and shiny piece, 20-by-30 on canvas.

5      Q.   All right.  And just one last question about

6  these.  On the next page, it appears there are some more

7  paintings for artwork --

8      A.   Please don't ask me to read that.  It's too

9  small.

10     Q.   No, I'm not asking you to read what it says.

11  But it says sold, correct --

12     A.   Yes.

13     Q.   -- above some of the art?

14     A.   Yes.

15     Q.   For the record, none of those are of your

16  wall?

17     A.   That is correct.

18         MR. NELSON:  Okay.  I move to introduce these

19      photographs from the website.

20         MR. HOMICH:  I have no objection.

21         MR. NELSON:  It's four pages.

22  BY MR. NELSON:

23     Q.   So you would agree, Ms. Nemhauser, that --

24         MAGISTRATE TEGELER:  Hold on a moment.

25         MR. NELSON:  I apologize.

96

1          MAGISTRATE TEGELER:  This will be admitted as

2      Exhibit 24.

3          (Exhibit Number 24 was admitted.)

4  BY MR. NELSON:

5      Q.    You'd agree that it at least appears by the

6  website that Richard sells his artwork?

7      A.    Yes.

8      Q.    And he posts pictures of his artwork to show

9  people what he's doing and what his esthetic is,

10  correct?

11      A.    That is what I believe to be the case, yes.

12      Q.    Okay.

13          MR. NELSON:  If I may have just one moment.

14          (Discussion off the record.)

15  BY MR. NELSON:

16      Q.    Just one more thing.  When Ms. Sommer -- when

17  you were speaking to Ms. Sommer about the painting on

18  the front of the wall versus the painting on the back of

19  the wall, you mentioned that she said that it could be

20  on the back of the wall as long as it was on the back of

21  the wall, correct?

22      A.    That's what she --

23      Q.    You don't recall her telling you that it could

24  be on the back of the wall as long as it couldn't be

25  seen by the public?

97

1      A.   No, I do not.

2      Q.   You don't recall that statement?

3      A.   No, I do not.  And I believe I would have

4   recalled it, because most of the wall can be seen by the

5   public.

6      Q.   Okay.

7           MR. NELSON:  I have nothing further.

8           MAGISTRATE TEGELER:  Any Redirect?

9           MR. HOMICH:  No.

10          MAGISTRATE TEGELER:  I have a few questions

11      for Ms. Nemhauser.  Do you live in the house which

12      is the subject of this case?

13          MS. NEMHAUSER:  That's one of our residences,

14      yes.

15          MAGISTRATE TEGELER:  Do you live there?

16          MS. NEMHAUSER:  No.

17          MAGISTRATE TEGELER:  Where do you live?

18          MS. NEMHAUSER:  Across the street, 601.

19          MAGISTRATE TEGELER:  Do you rent out the house

20      which is the subject of this case?

21          MS. NEMHAUSER:  No.  No.

22          MAGISTRATE TEGELER:  So no one really lives

23      there right now?

24          MS. NEMHAUSER:  We are in both places.  We're

25      redoing it.

98

1    MAGISTRATE TEGELER:  You're redoing which one?

2    MS. NEMHAUSER:  We're redoing both, actually.

3    MAGISTRATE TEGELER:  But primarily you live

4    across the street?

5    MS. NEMHAUSER:  Primarily.

6    MAGISTRATE TEGELER:  Which of your properties

7    do you claim as a homestead?

8    MS. NEMHAUSER:  601 Mount Dora -- actually, I

9    don't claim it as a homestead.

10   MAGISTRATE TEGELER:  You don't claim any

11   property as a homestead?

12   MS. NEMHAUSER:  I do not claim a property as a

13   homestead.

14   MAGISTRATE TEGELER:  Did you have some sort of

15   contract with painter for painting on the wall?

16   MS. NEMHAUSER:  Yes.

17   MAGISTRATE TEGELER:  Is it in writing?

18   MS. NEMHAUSER:  Yes.

19   MAGISTRATE TEGELER:  And what is the scope of

20   the painting work in that contract; is it just the

21   wall?

22   MS. NEMHAUSER:  It was just the wall, and now

23   he is doing the house.

24   MAGISTRATE TEGELER:  It's been -- the contract

25   has been added to, to include the whole house?

99

1    MS. NEMHAUSER:  Yes, sir.

2    MAGISTRATE TEGELER:  Okay.  When did you enter

3  into the contract to paint the wall?

4    MS. NEMHAUSER:  I expect it was July.  I don't

5  recall exactly.

6    MAGISTRATE TEGELER:  And are you paying the

7  painter -- under that contractor, did you agree to

8  pay the painter compensation to paint the wall?

9    MS. NEMHAUSER:  Yes, sir.

10    MAGISTRATE TEGELER:  And at that time it was

11  only the wall?

12    MS. NEMHAUSER:  Yes, sir.  We opted to paint

13  the house when Ms. Sommer said the house had to

14  match the wall -- or the wall had to match the

15  house.

16    MAGISTRATE TEGELER:  You believe that

17  Ms. Sommer directed you to paint the house blue,

18  like the wall?

19    MS. NEMHAUSER:  No.  She said that the wall

20  had to match the house.  So in order to have the

21  wall match the house, the house had to be the same

22  color as the wall, so that's why it's painted as it

23  is now.

24    MAGISTRATE TEGELER:  When you received the

25  Notice of Violation from the City, the first one,

100

1    the smaller one that's called a door hanger, why

2    did you not stop the painting of the wall?

3          MS. NEMHAUSER:  Well, I called her -- and I

4    notified the painter.  I called her.  And when she

5    explained to me that it was graffiti, it didn't

6    make sense to me that it would be graffiti on the

7    outside of the wall and not graffiti on the inside

8    of the wall.  So that's when I looked into it and

9    determined that that was something that -- I spoke

10   to my husband about it, and we decided to appeal

11   it.

12         MAGISTRATE TEGELER:  But my question is, why

13   didn't you stop painting at that time until the

14   resolution of the Notice of Violation?

15         MS. NEMHAUSER:  Because we felt that it was

16   appropriate to continue.  We did not feel that we

17   were in violation.

18         MAGISTRATE TEGELER:  When did you decide to

19   add to the contract with the painter to also paint

20   the entire house?

21         MS. NEMHAUSER:  I believe it was early in

22   September.  Might have been mid-September.  I'm not

23   a hundred percent sure, with the hurricane.

24         MAGISTRATE TEGELER:  Well, we were all here,

25   intending to have a hearing on September 14, 2017.

101

1   Did you decide to paint the rest of the house in

2   blue and other colors before or after the date of

3   that hearing?

4        MS. NEMHAUSER:  I believe it was before.

5        MAGISTRATE TEGELER:  You said earlier that it

6   wasn't your intention to attract awareness of the

7   public to your home with this painting.  Are you

8   aware that it has had that effect to date?

9        MS. NEMHAUSER:  Yes.  I am now, yes.

10        MAGISTRATE TEGELER:  Before the painter

11   started painting the wall, did he show you some

12   sketches or plans for his painting design?

13        MS. NEMHAUSER:  No.  He directed me to his

14   website, and we had a long discussion.  I've given

15   him a lot of latitude, because he is the artist,

16   and I feel that artists do their best work when

17   they have the ability to do what they feel is

18   right, rather than having me micromanage.

19        MAGISTRATE TEGELER:  Did you know it would be

20   similar to the Starry, Starry Night paintings?

21        THE WITNESS:  Yes, sir.

22        MAGISTRATE TEGELER:  Did you know it would

23   have a portrait of Van Gogh on it?

24        MS. NEMHAUSER:  Yes.  I did not know which

25   portrait, but yes.

102

1        MAGISTRATE TEGELER:  I have no further

2    questions for Ms. Nemhauser.

3        Does either party have any follow-up to what I

4    just asked?

5        MR. HOMICH:  No.

6        MR. NELSON:  Nothing from the City.

7        MAGISTRATE TEGELER:  Does the Defense have any

8    other witnesses?

9        MR. HOMICH:  No, sir.  I would have witnesses

10    with the graffiti issue, but that's gone.

11        MAGISTRATE TEGELER:  All right.  So if no one

12    has any more evidence to present at the hearing or

13    witnesses' testimony of any sort, I will give the

14    City an opportunity for a closing argument.

15        MR. NELSON:  Thank you.

16        I would first like to start with the claim of

17    unequal prosecution of violations or

18    discrimination.  That's not something that I have

19    seen, to date, a written claim of, nor a cause of

20    action filed for.  I understand Mr. Homich's

21    reasons for presenting that information today at

22    the hearing.  However, I would state that his

23    burden has not been met in showing that there has

24    been an in-equal prosecution of violations.  He

25    brought up one example of eight properties in the

103

1   business district that which had window fliers,

2   which were quite small, many of which have been

3   addressed.  There's no information about the

4   specific intent or reasoning about why they haven't

5   been further addressed, which would be required

6   under his claim.  And so for those reasons, I'd ask

7   that you find there has not been any sort of

8   unequal prosecution or systemic discrimination of

9   Ms. Nemhauser and her property.

10      With regard to the sign issue, I do ask that

11  you find that there has been a violation of the

12  code.  First, that the image on the wall and the

13  side of the house is a sign; and, second, that it

14  is a prohibited sign under the code.

15      Going back to the definition of signs once

16  more, it's a very broad definition of.  "Any

17  letter, figure, character, mark," et cetera,

18  "design, poster, pictorial, picture, stroke,

19  stripe, line," et cetera.  Clearly, the images that

20  have been presented to you today fall into several

21  of those categories.

22      It goes on to say that "It's constructed,

23  placed, attached, painted, erected, fastened or

24  manufactured in any manner whatsoever so that the

25  same shall be used for the attraction of the public

104

1    to any place, subject, person, firm, corporation,

2    public performance, article, machine, merchandise,

3    or whatsoever, which is displayed in any manner

4    whatsoever."

5        That can apply to many different facets of

6    what you've heard today.  The first being

7    Ms. Nemhauser's art statement on the side of her

8    home, which obviously has attracted attention,

9    which is why we're here today.  It has attracted

10   the attention of the public to bring complaints to

11   code enforcement.  It has brought attention to the

12   artist, who has even posted these on his website,

13   photos of this.  It's brought the attention of the

14   news, who's present here today.  It has certainly

15   attracted the public's attention to some subject

16   matter.

17       The definition doesn't require an intent.  It

18   doesn't require that it be for the news to be here.

19   It doesn't say that.  It just says for the

20   attraction of the public to any place, any subject,

21   any person, any firm, et cetera.

22       I'd also turn your attention to the website,

23   which was one of the later exhibits that's been

24   introduced today, which clearly includes similar

25   subject matter as well as the subject matter that's

105

1    included on this wall.  And this wall has clearly

2    attached attention to the artist.

3         I take no position on the content of the work

4    or on the message of the work or on the quality of

5    the work or the materials of the work.  The fact is

6    that this design or pictorial or picture or stroke

7    or stripe has attracted the attention of the public

8    to Ms. Nemhauser, to Ms. Nemhauser's home,

9    certainly to the artist in this case.  And so for

10   those reasons, I ask that you find, under the Land

11   Development Code, Chapter 8, that this is a sign.

12   Secondly, I'd ask that you find that it is a

13   violation of the Land Development Code, Section 6.7

14   with regard to signs.

15        Mr. Homich brought up a lot of information

16   today about whether it was a sign or whether it was

17   advertising.  The definition doesn't require it to

18   be advertising.  And, in fact, Section 6.7 of the

19   Land Development Code reads, "The purpose and

20   intent of this section is to establish regulations

21   for the fabrication, erection and use of signs and

22   advertising displays within the city."

23        Clearly when this was enacted, the idea was

24   that a sign was not necessarily for the purpose of

25   advertising, because it is provided for both signs

106

1    and advertising displays.  I think this sign has

2    advertised.  It's advertised for the artist,

3    certainly.

4        The purpose of the section is to reduce the

5    adverse effects of signs and displays on highway

6    safety, building safety, property value and the

7    enjoyment of the scenic beauty of the city.  It

8    goes on to say as Ms. Sommer read earlier, "In no

9    event shall any signs be erected within the City of

10   Mount Dora, except in conformance with this

11   section."

12       And there was some confusion and some talk

13   around Section 6.7.1.  This property is zoned R-3.

14   R-3 does not show up as a proper zoning designation

15   for any sign within the city.  However, there are

16   four types of signs that can be placed in any

17   zoning.  Those four places are the community center

18   signs, which this is not; a public sign, which this

19   is not, but if it were, would have to be approved

20   at the direction of City Council; a subdivision or

21   apartment sign, which it is not; and a temporary

22   sign.  Temporary signs are campaign signs,

23   construction signs, real estate signs and

24   subdivision development signs.  None of these fall

25   into that category.

107

1        As was mentioned earlier, Section 6.7.4, part

2    18 reads, "Prohibited signs.  The following signs

3    are prohibited within the City of Mount Dora:  Any

4    sign not specifically allowed in Subsection 6.7.1,

5    6.7.2 and .3."

6        Mr. Homich talked earlier about artwork and

7    whether or not the code includes murals.  And it

8    doesn't.  In fact, if the code included a

9    definition for a mural, it would be much easier.

10   We would be able it to apply that definition, or

11   arguably apply that definition.  But because it

12   doesn't exist, what we have is a property that's

13   allegedly violating the code, and we have to use

14   what definitions we have in the code to see if that

15   violation fits into that definition.  And that

16   brings it back to the definition of a sign.

17       This depiction on the side of the building, it

18   is the City's position, is clearly a design or

19   pictorial or picture or stroke or stripe or line

20   that has attracted the attention of the public to

21   the artwork itself, to the artist who created the

22   artwork, which he is displaying on his own website,

23   and to the public in general.

24       And for those reasons, because it does not

25   confirm to any of the signs -- any of the allowable

108

1    signs under Section 6.7, and it is a sign under the

2    definition of signs, I'd ask that you find that the

3    property is in violation, and that you require the

4    violation to be corrected within ten days.

5         Thank you.

6         MAGISTRATE TEGELER:  The Defense may make a

7    closing argument.

8         MR. HOMICH:  Yes, sir.

9         First I'd request that you find that there was

10   no violation of graffiti code, A, because they

11   haven't presented any evidence that it was a

12   violation; and the code section applies to

13   abandoned property.  So I would request that you

14   find against the City on that count.

15        With regard to the signage issue, the first

16   question is, is it a sign?  The City is arguing

17   about attracting and all sorts of things.  In

18   evidence today are pictures of a mailbox that's

19   painted.  There's a flag hanging on a house.  Under

20   their definition of a sign, all the City has to do

21   is say, I don't like that, that's a sign, take it

22   down.  Because maybe it's a Seminole fan, not a

23   Gator fan.  I don't know.  But that's where they're

24   at.

25        If you look closely at the definition, which

109

1    has to be strictly construed against the drafter,

2    which is the City, the definition says -- and this

3    is probably the most important point -- "is used

4    for."  That implies a purpose.

5        There is no evidence in the record today that

6    there was any purpose in this to attract attention

7    for a particular place.  They haven't identified

8    anyone, subject, person, firm, corporation, public

9    performance, article, machine or merchandise.  You

10   read that sentence as a whole, and they can say it

11   doesn't mean advertising, but advertising is a

12   synonym for that section.

13       And when they go back to say the section --

14   and I'm looking for it -- on any sign at the

15   beginning of 6.7, any sign and advertising display,

16   which covers crazy men, you know, the blowup dolls,

17   the balloons, it covers everything.  That's what

18   they're talking about.  But it's about advertising.

19   Not about aesthetics.

20       There was -- the only evidence today is that

21   this was done for aesthetic purposes.  It was used

22   for aesthetic purposes.  It was not used for

23   attracting anyone to anything.  The fact that it

24   does doesn't meet the definition.

25       I also note that the City has admitted there

110

1      is no regulation of murals in the city.  The

2      definition of a mural, I think, would fit this

3      category.  The City has permitted murals to exist

4      in the city, as the evidence shows, without any

5      qualification as to where, when, how, what, why.

6      Perhaps they want it to get into that, but they

7      haven't.

8          If the City regulated a color pallet, they

9      could do that.  But, again, the testimony is that

10     there is no regulation regarding how you paint your

11     house.  If I wanted to paint my house neon purple

12     and trim it with some other crazy color, or paint

13     optical illusions or whatever I wanted to do on the

14     house, I could.  That's because it's not regulated.

15         Their -- under the City -- the definition the

16     City wants you to apply allows them to go after

17     anything.  If Cindy Sommers is driving by and sees

18     a hanging on the wall of someone's house, and it's

19     a, you know, a painting -- let's just say someone

20     hangs an outdoor painting, take one of those and

21     they hang it on their front porch.  Visible from

22     the street.  It's a sign, under the City's

23     definition.  And if they don't like it, they can

24     come up to that resident, cite them for displaying

25     a sign and have them take it down, or perhaps

111

1    even -- whatever they put on their front porch.

2    They can say it's trying -- it's a sign.  So you

3    can't even get past the definition of signage in

4    this case in order to apply 6.7 to my client's

5    situation.

6         Whether or not the City should regulate

7    murals, that's up to the City.  That's a policy

8    decision of City Council.  That's their domain.

9    Not the code enforcement's domain.

10        With regards to violation of the code,

11   presuming it's a sign, the only possible violation

12   of the Sign Code is that it's an off-site sign,

13   6.7.3.  Okay.  That is the only possible section of

14   the statute that directly applies, it's a sign.  It

15   is not attracting to a business located within the

16   house.  There is no business.  No evidence that

17   there's a business.  So it has to be an off-site

18   sign.

19        If it's an off-site sign, the City is not

20   enforcing that section, as admitted by the City.

21   They've decided to let everybody skate in the

22   downtown on that code, but they want to use it to

23   enforce it against my client.  That's the

24   definition of selected enforcement.

25        We have a property owner right around the

112

1    corner here that has -- is in violation of 6.7.3 at

2    this very moment, according to the testimony of the

3    City, and they've done nothing about it.

4          Whether or not the City wants to address it as

5    a whole and put murals in on it, that's fine.  But

6    I have the case of Zuccarelli versus Barfield,

7    199 -- I've got a copy for you -- So.3d 399.  And

8    it says, "To prevail on a selective enforcement

9    claim that a City's Ordinance was applied to them

10   and not others, plaintiff must show that they were

11   treated differently from other similarly-situated

12   individuals and that the defendant unequally

13   applied a facially-neutral ordinance."

14         Right now they are not enforcing it against

15   some of the residents or some of the buildings, and

16   they're enforcing it against my client.  That code,

17   6.7.3 applies to everybody in town.  Everybody

18   except for industrial, WP-1 and WP-2, I believe it

19   is, workplace.

20         That means that the building over there and --

21   which is about a block -- two blocks from my

22   client's property, is currently in violation of

23   6.7.3, and they're doing nothing about it.  But

24   they're trying to enforce it against her.

25         So I don't believe you can get past the

113

1   threshold question of saying her house painting is

2   being used for advertising or for the attraction of

3   other things.  It's used for aesthetic purposes

4   only.  And, therefore, I'd request that you find

5   that she is not in violation of the code, and that

6   if the City wants to address the issue of murals,

7   they should do so, but not regulate it -- try to

8   regulate it by shoving a definition -- trying to

9   squeeze a round definition in a square hole, just

10  so that they can do what they want.

11          Thank you.

12          MAGISTRATE TEGELER:  All right.  Thank you.

13          First I want to ask if any party wishes to

14  submit a post-hearing brief?

15          MR. HOMICH:  I believe -- I just have this

16  one.

17          MAGISTRATE TEGELER:  Do you want to provide me

18  with a copy of the case you just cited?

19          MR. HOMICH:  (Complies.)

20          MAGISTRATE TEGELER:  Do you have a copy of

21  this for the City?

22          MR. HOMICH:  Yeah, I have it.

23          MR. NELSON:  Thank you.

24          MAGISTRATE TEGELER:  So as I understand it,

25  the selective enforcement argument that you were

114

1    making in your reference to this case or portion of

2    it that you read, is really based on a U.S.

3    constitutional violation under the 14th amendment?

4         MR. HOMICH:  Yes.  I mean, that's selected

5    enforcement, yes, sir.

6         MR. NELSON:  And I would just, again, state

7    for the record that this is talking about a claim

8    in a lawsuit, which is not before us today.  I

9    understand the reasons why he is raising the

10   issues, but this is not the proper forum for a

11   claim of selective prosecution to be heard.  The

12   proper forum would be through a lawsuit in a court

13   of competent jurisdiction.  That's my objection for

14   the record.

15        MAGISTRATE TEGELER:  He has raised that as an

16   argument of his defense.

17        MR. NELSON:  Yes.

18        MAGISTRATE TEGELER:  Well, let me speak to

19   that first.  Selective enforcement of the code by

20   the City has not been proven by the evidence here

21   today.  There is no evidence of similarly-situated

22   conditions.  Mailboxes, I believe, are governed by

23   the federal law.  You showed a picture of a flag

24   and some paintings on walls and I think a sidewalk,

25   but they were all in a different zone, in business

115

1   districts.  So there really has been no evidence of

2   selective enforcement of the City of this type or a

3   similar type of painting of graphic designs on a

4   wall or a structure, like a house.  So that is not

5   an effective defense to the violation claimed by

6   the City in this case.

7        The paintings on the owner's walls, and now

8   the house itself, as a structure, are not off-site

9   signs under Section 6.7.3 of the code.  They're

10  on-site.  They're on the subject property itself.

11  So I don't find that there's any relevance of that

12  section of the code.

13       The paintings on the owner's walls and the

14  house/structure are pictorial displays that fall

15  within the definition of a sign in the code.  And

16  the main issue beyond that -- I mean, they are

17  designs, pictorials, pictures, that are placed,

18  painted on the wall or walls and on the house

19  structure.

20       The main issue as to the definition of sign in

21  the code is whether those designs, painted, are

22  used for the attraction of the public to a place or

23  a person.  And there is no intent or purpose in

24  that definition.  It's the actual fact of its use.

25  And the effect of these designs on the wall and the

116

1    house structure is that they are being used and are

2    attracting the attention of the public to that

3    place, to that house and that wall on that

4    property.  Whether that was the purpose or an

5    intention, it's the effect and the actuality of

6    what's happened.

7        We have three TV cameras here.  We have

8    newspaper reporters here.  It is certainly

9    attracting the attention of the public to that

10   place.  And with the evidence regarding the

11   painter's website, it's also attracting attention

12   to that person, of the painter.

13       So I find that the paintings on the owner's

14   wall and house structure are signs under the City's

15   Code.  And I do find that they are not a permitted

16   sign.

17       We looked at Section 6.7, 6.7.1, which allows

18   particular types of signs.  And it says, any other

19   type of sign is not permitted.  The code says that.

20   This sign, these paintings on walls and houses, on

21   the house, are not any type of permitted sign under

22   the City's Code, so they are therefore

23   non-permitted signs.  Or actually the phrase -- the

24   term used in the code is a nonconforming sign.

25   They are nonconforming, because they are not any

117

1   type of sign that's allowed.  And regardless of

2   whether it's in the R-3 zone or not, it's not any

3   type of sign that is allowed under the code.

4       And I think it's fairly obvious -- and there

5   was evidence -- that the paintings on the wall and

6   the house structure, given their proximity to Old

7   Highway 441, especially as a heavily-traveled road,

8   are likely to have an adverse effect on roadway

9   safety.  It can be very distracting.  People's

10  attention is drawn to the side, at that bold

11  colorful design on the wall and now the house.

12      And given the evidence of the painter's

13  website where he's selling paintings, some of which

14  have a similarity to the designs on the wall and

15  the house, and showing actual photographs of this

16  particular painted wall and house -- painted wall

17  at that moment, I think -- they appear -- these

18  paintings appear to be intended to benefit the

19  economic interests of the painter, and in that

20  sense are a form of advertising of the painter's

21  services as a painter and an artist.

22      I am going to find that there is no violation

23  of Section 22.960(b) of the City Code, which refers

24  to graffiti.

25      I feel like there was an argument made in the

118

1    respondent's closing that somehow the City Code is

2    overly broad or vague in some sense.  There was

3    some talk about there's nothing in there about

4    murals, specifically, but I do not find that the

5    City Code is vague or overbroad.  It's actually

6    quite specific and clear as to what types of signs

7    are permitted and says any other type of sign is

8    not permitted or is non-confirming.  So that seems

9    to be clearly stated.

10       I believe that the City has a legitimate and

11   significant governmental interest in regulating

12   these types of signs in the interest of roadway

13   safety within the city, if nothing else.

14       The City Code sections regarding signs --

15   well, this is just a prohibited sign, so the

16   content or the viewpoint or, you know, the

17   aesthetic meaning of this type of sign is not at

18   issue.  It's not regulated by the City Code.  It's

19   not an issue that is taken into consideration.

20       Well, therefore, I am -- as I said, I'm

21   finding that there's no violation of 22.960(b) of

22   the City Code, but I am finding that there is a

23   violation of Section 6.7 of the City Code; that the

24   paintings on the walls and the house structure of

25   the subject property are in violation.  And I am

119

1    going to order that the violation be corrected

2    within 30 days, which means paint over it in a

3    solid color.  No graphics.  No design.  Nothing

4    that is going to end up attracting attention of the

5    public.

6         That's all I have.

7         MR. NELSON:  Will you be issuing written

8    findings?

9         MAGISTRATE TEGELER:  Yes, I will issue a

10   written findings of fact, conclusions of law in the

11   near future.

12        MR. NELSON:  Thank you.

13        MR. HOMICH:  I would move for a stay of the

14   order, pending appeal.

15        MAGISTRATE TEGELER:  It would seem that you

16   would need the order to appeal.

17        MR. HOMICH:  What's that?

18        MAGISTRATE TEGELER:  It would seem that you

19   would need a written order to appeal from.

20        MR. HOMICH:  Well, I didn't want to call you

21   back here to address that issue.  I didn't know if

22   you wanted to do it now or I'll file a motion for

23   stay.

24        MAGISTRATE TEGELER:  I -- if you made a move

25   to stay my order, that's denied.  I will issue a

120

1          written order in the very near future.

2                   MR. NELSON:  All right.  Thank you.

3                   MAGISTRATE TEGELER:  And we're adjourned.

4                   (The proceedings adjourned at 12:05 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

121

# C E R T I F I C A T E

STATE OF FLORIDA    )

COUNTY OF LAKE      )

       I, MARY SAMUEL, Registered Professional Reporter and Notary Public, certify that I was authorized to and did stenographically report the foregoing proceedings and that the transcript is a true and complete record of my stenographic notes.

      DATED this 27th day of October 2017.

MARY SAMUEL, RPR

Notary Public - State of Florida

My Commission No. FF90180

Expires:  July 21, 2019

# EXHIBIT B

BEFORE THE CODE ENFORCEMENT MAGISTRATE
FOR THE CITY OF MOUNT DORA, FLORIDA

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation,

        Petitioner,

vs.                                             CASE NO.: 2017-0187

NANCY NEMHAUSER and
LUBOMIR JASTRZEBSKI,

        Respondents.

_____/

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter was heard on September 29, 2017, by the undersigned Magistrate, after due notice to the Respondents and public hearing. The undersigned, having received evidence, heard testimony and being otherwise fully advised in the premises, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER:

    1.    The property which is the subject of this code enforcement action is located at 306 West Sixth Avenue, Mount Dora, Florida ("Subject Property") and is more particularly described as:

    ALTERNATE KEY: 2720697

    2.    The Code Enforcement Officer, Cindy Sommer, testified at the hearing that she received a complaint about painting on a wall at the Subject Property on July 26, 2017 and that she then inspected the Subject Property on that date.

    3.    Photographs of the Subject Property taken by the Code Enforcement Officer on July 27, 2017 were admitted into evidence at the hearing without objection, and showed that graphic designs in mostly blue and yellow colors had been painted on a wall at the Subject Property, and that an advertising sign for a "Painter Artist" with a telephone number was placed

in the ground adjacent to the painted wall.

4.      The Code Enforcement Officer testified that she place a courtesy Notice of Violation on the door of the Subject Property on July 27. 2017, which stated that the painting on the wall must be covered/painted immediately.

5.      The Code Enforcement Officer also testified that she later spoke to one of the owners of the Subject Property, Nancy Nemhauser, and told her that the painting on the wall and the advertising signs were in violation of City Codes.

6.      The Code Enforcement Officer testified that she sent the owner of the Subject Property an email on July 31, 2017 to explain that the painting on the wall was a "sign" under the definition in the City's Land Development Code and was not permitted in the R-3 residential zone, and that the painting on the wall was disallowed "graffiti" under Section 22.960(b) of the City's Code of Ordinances.

7.      The Code Enforcement Officer also testified that she spoke to one of the owners of the Subject Property, Nancy Nemhauser, on July 27, 2017 and told her that the painting on the wall and the advertising sign were in violation of City Codes.  One of the owners of the Subject Property, Nancy Nemhauser, testified that she immediately removed the advertising sign.

8.      Nancy Nemhauser testified that the painter, Richard Barrenechea, had come to her and suggested painting the graphic designs on the walls, and that she entered into a written contract with the painter for the painting of graphic designs on the walls with compensation to the painter.

9.      Photographs of the Subject Property taken by the Code Enforcement Officer on August 1, 2017 were admitted into evidence at the hearing without objection, and showed that the graphic designs were still painted on the wall at the Subject Property, and that additional

graphic designs had been painted on another wall at the Subject Property facing Old Route 441. The photographs also showed that the advertising sign was no longer on the Subject Property.

10.     The Code Enforcement Officer testified that she mailed a Notice of Violation on August 1, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757.  A return receipt admitted into evidence at the hearing without objection showed that N. Nemhauser received the Notice of Violation on August 9, 2017.  Counsel for the Respondents stipulated that the Notice of Violation had been received by the Respondents.  The Notice of Violation stated that the painting on the walls was in violation of Code Section 22.960 as "graffiti," and in violation of Code Section 6.7 as an unpermitted "sign" within the R-3 zoning district.   The Notice of Violation directed the Respondents to correct the violation by August 15, 2017.

11.     The Code Enforcement Officer testified that she sent an email to the owner of the Subject Property on August 3, 2017 to explain the City's Code Enforcement procedures.

12.     Photographs of the Subject Property taken by the Code Enforcement Officer on August 7, 2017 were admitted into evidence at the hearing without objection, and showed that the graphic designs were still painted on the walls at the Subject Property, and that additional graphic designs had been painted on the wall at the Subject Property facing Old Route 441.

13.     The Code Enforcement Officer testified that she mailed a Notice of Hearing on August 15, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to their counsel.  Return receipts admitted into evidence at the hearing without objection showed that Nancy Nemhauser and the Respondents' counsel received the Notice of Hearing.  Counsel for the Respondents stipulated that the Notice of Hearing had been received by the Respondents.

14.     Photographs of the Subject Property taken by the Code Enforcement Officer on August 15, 2017 were admitted into evidence at the hearing without objection, and showed that the graphic designs were still painted on the walls at the Subject Property.

15.     A memorandum from the City's Interim Planning Director on August 23, 2017 was admitted into evidence at the hearing without objection, which stated that the Subject Property is zoned R-3 multiple-family residential district.

16.     Photographs of the Subject Property taken by the Code Enforcement Officer on September 13, 2017 were admitted into evidence at the hearing without objection, and showed that the graphic designs were still painted on the walls at the Subject Property.

17.     At the hearing on September 14, 2017 for this case, counsel for the Respondents orally made a motion for continuance, which was granted by this Magistrate.  The parties then stipulated to a new hearing date of September 29, 2017.

18.     The Code Enforcement Officer testified that she mailed a Notice of Hearing on September 14, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to their counsel.  Return receipts admitted into evidence at the hearing without objection showed that the Respondents and their counsel received the Notice of Hearing.  Counsel for the Respondents stipulated that the Notice of Hearing had been received by the Respondents.

19.     Photographs of the Subject Property taken by the Code Enforcement Officer on September 14, 2017 were admitted into evidence at the hearing without objection, and showed that the graphic designs were still painted on the exterior sides of the walls at the Subject Property, and that additional graphic designs had been painted on the interior side of the wall at the Subject Property facing Old Route 441.

20.     The Code Enforcement Officer testified that she received telephone calls complaining that graphic designs were "horrendous," and that they were now being painted on the house structure at the Subject Property, and she also testified that she again inspected the Subject Property on September 25, 2017.

21.     Photographs of the Subject Property taken by the Code Enforcement Officer on September 25, 2017 were admitted into evidence at the hearing without objection, and showed that the graphic designs were still painted on the walls at the Subject Property, and that additional graphic designs had been painted on the house structure.

22.     The Magistrate did not find the testimony of Nancy Nemhauser to be credible that she entered into an additional contract with the painter to also paint graphic designs on the house structure because she understood that the City wanted the house painted to match the walls.

23.     Photographs of the Subject Property taken by the Code Enforcement Officer on September 28, 2017 were admitted into evidence at the hearing without objection, and showed that the graphic designs were still painted on the walls at the Subject Property, and that additional graphic designs had been painted on the side of the house structure facing Old Route 441.

24.     The beginning of Section 6.7 entitled "Signs" in Chapter VI of the City's Land Development Code states as follows:

> The purpose and intent of this section is to establish regulations for the fabrication, erection and use of signs and outdoor advertising displays within the City. These regulations are hereby established in order to promote the overall economic well being of the businesses in the city, while at the same time providing for the health, safety and welfare of its citizens by reducing the adverse effects of signs and displays on highway safety, building safety, property value, and the enjoyment of the scenic beauty of the city.

25.     The Code Enforcement Officer testified that the graphic designs painted on the

walls and house structure of the Subject Property and clearly visible from the adjacent streets distract the drivers of vehicles on Old Route 441, which is heavily traveled.

26.    It was stipulated by the parties that the definition of "Signs" in Chapter VIII of the City's Land Development Code is as follows:

> Any letter, figure, character, mark, plane, point, marquee sign design, poster, pictorial, picture, stroke, stripe, line, trademark, reading matter, inflatable device, or illuminated surface, which shall be so constructed, placed, attached, painted, erected, fastened, or manufactured in any manner whatsoever, so that the same shall be used for the attraction of the public to any place, subject, person, firm, corporation, public performance, article, machine, or merchandise, whatsoever, which is displayed in any manner whatsoever.

27.    At the hearing, Nancy Nemhauser testified that the painter has an internet website which shows two photographs of the graphic designs painted on the walls of the Subject Property, and which advertises for sale smaller paintings with designs similar to those on the walls of the Subject Property, one of which is marked "Sold."

28.    At the hearing, the Respondents introduced photographs of graphic designs on walls, windows, sidewalks, and mailboxes in other areas of the City.

29.    The evidence of graphic designs on walls, windows, sidewalks, and mailboxes in other areas of the City are not relevant to the Subject Property in the R-3 residential zone because those areas are not similarly situated conditions, and do not support the Respondents' argument that the City has practiced selective enforcement against the Subject Property.

30.    The City's counsel stated at the hearing that the City does not wish to further pursue the allegation that the painting on the walls and house structure at the Subject Property are disallowed "graffiti" under Section 22.960(b) of the City's Code of Ordinances.

31.    The City requested the Magistrate to find that the Respondents are in violation of Section 6.7 of Chapter VIII of the City's Land Development Code because the graphic designs

painted on the walls and the house structure at the Subject Property are "signs" as defined in the Code and are not a type of signs which are permitted in an R-3 residential zone, and to order the Respondents to cover all of the graphic designs with solid color paint within 10 days.

32.     The graphic designs painted on the walls and house structure at the Subject Property are "signs" within the definition in Chapter VIII of the City's Land Development Code because they include the following: figures, a character, pictorials, and pictures, which are painted and displayed so that the same are used for the attraction of the public to a place.

33.     The graphic designs painted on the walls and house structure at the Subject Property are "signs" which actually have and continue to attract the attention of the public to the Subject Property and to the painter's advertisement of his commercial services.

34.     The graphic designs painted on the walls and house structure of the Subject Property have an adverse effect on roadway safety by distracting drivers of vehicles on Old Route 441.

35.     The City's Code regulations of signs are not vague or overbroad, but are specific and clear as to what signs are permitted and are not permitted.

36.     The City has a legitimate and significant governmental interest in the preservation of roadway safety within the City.

37.     The City's Code regulations of painted signs are neutral regarding the intent, content and viewpoint of such signs and paintings.

38.     The painter advertises his professional services by using photographs of the graphic designs he painted on the walls of the Subject Property on his internet website, which also advertises for sale his paintings with designs similar to those on the walls of the Subject Property.

39.     The graphic designs on the walls and house structure of the Subject Property are intended to benefit the economic interests of the painter, and therefore constitute commercial speech which is permissible to be regulated by the City.

40.     The undersigned Magistrate finds that competent, substantial evidence was received at the hearing to prove that that the Respondents are in violation of Section 6.7 of Chapter VIII of the City's Land Development Code because the graphic designs painted on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone,

41.     The City presented competent substantial evidence at the hearing showing that as of September 13, 2017, the Respondent had not cured the established violations of Section 6.7 at the Subject Property.

42.     At the conclusion of the hearing on September 29, 2017 for this case, counsel for the Respondents orally made a motion to stay a written order by the Magistrate, which was denied by this Magistrate.

BASED ON THE FOREGOING, THE MAGISTRATE ANNOUNCED AT THE HEARING THAT IT IS ORDERED that:

43.     Within thirty (30) days of the date of this Order, the Respondents shall correct said violations of Section 6.7 of Chapter VIII of the City's Land Development Code by covering all of the graphic designs with solid color paint.

44.     Any violations by the Respondents of Section 6.7 at the Subject Property within five (5) years from the date of this Order may be prosecuted as a repeat violation in accordance with Chapter 162, Florida Statutes.

SIGNED on the 6th day of October, 2017.

David F. Tegeler
Code Enforcement Magistrate

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this Order has been mailed via first class mail and certified mail this _____ day of _____, 2017, to Nancy Nemhauser and Lubomir Jastrzebski, 601 N. McDonald Street #401, Mount Dora, Florida 32757; and to James L. Homich, Esquire, 621 East Fifth Avenue, Mount Dora, Florida 32757.

Mount Dora Police Department
Code Enforcement
1300 North Donnelly Street
Mount Dora, Florida 32757
(352) 735-7177

# EXHIBIT C

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR LAKE COUNTY, FLORIDA

NANCY NEMHAUSER, and                    Case No.: 2017CA001815AXXXXX
LUBOMIR JASTRZEBSKI,

      Appellants,

v.

CITY OF MOUNT DORA, a municipal
corporation of the State of Florida,

      Respondent.

_____/



## ORDER ON APPELLANTS' EMERGENCY
## MOTION FOR STAY PENDING REVIEW

THIS CAUSE having come before this Court on November 14, 2017, by way of Appellants' Emergency Motion for Stay Pending Review and the Court being fully advised in the matter, it is hereby:

**ORDERED AND ADJUDGED** that Appellants' Emergency Motion for Stay Pending Review is **DENIED**.

During the pendency of this appeal, the City may move forward with the fine imposition and fine accrual phases of its code enforcement process in Case # 2017-0187, *City of Mount Dora vs. Nancy Nemhauser and Lubmoir Jastrzebski*; however, the City shall not initiate foreclosure proceedings on any fines imposed and accrued until after the appeal has been closed.

**DONE AND ORDERED** in Tavares, Lake County, Florida this __7__ day of
November, 2017.

Honorable William G. Law
Circuit Court Judge

Conformed copies to:
Jennifer D. Cockcroft, Esquire
James Homich, Esquire
Sherry G. Sutphen, Esquire

Page 2 of 2

# EXHIBIT D

BEFORE THE CODE ENFORCEMENT MAGISTRATE
FOR THE CITY OF MOUNT DORA, FLORIDA

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation,

        Petitioner,

vs.                                    CASE NO.: 2017-0187

NANCY NEMHAUSER and
LUBOMIR JASTRZEBSKI,

        Respondents.

_____/

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter was heard on December 8, 2017, by the undersigned Magistrate, after due notice to the Respondents and public hearing. The undersigned, having received evidence, heard testimony and being otherwise fully advised in the premises, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER:

1.      The property which is the subject of this code enforcement action is located at 306 West Sixth Avenue, Mount Dora, Florida ("Subject Property") and is more particularly described as:

ALTERNATE KEY: 2720697

2.      At the hearing on December 8, 2017 for this case, counsel for the Respondents filed the Respondents' Motion to Stay Administration of Fines Pending Appeal, which was denied by this Magistrate.

3.      At the hearing on December 8, 2017 for this case, counsel for the Respondents filed the Respondents' Motion to Continue, which was denied by this Magistrate.

4.      On October 6, 2017, the undersigned Magistrate entered a Findings of Fact, Conclusions of Law and Order ("Order") finding Respondents in violation of Section 6.7 of

Chapter VIII of the City's Land Development Code because the graphic designs painted on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone, and ordering Respondents to cure said violation within thirty (30) days of the date of said Order by covering all of the graphic designs with solid color paint.

5.      The Code Enforcement Officer, Cindy Sommer, testified at the hearing that she mailed a copy of said Order on October 10, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to the Respondents' counsel. James L. Homich, Esquire.  Return receipts admitted into evidence at the hearing without objection showed that J. Homich received the Order on October 18, 2017, and that N. Nemhauser received the Order on October 21, 2017.

6.      Based on the evidence and testimony received at the hearing, the City properly served the Respondents with said Order.

7.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 7, 2017 were admitted into evidence at the hearing.

8.      The Code Enforcement Officer testified that she mailed a Notice of Hearing Imposition of Fines on November 13, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to their counsel, James L. Homich, Esquire.  Return receipts admitted into evidence at the hearing without objection showed that the Respondents' counsel and Nancy Nemhauser received the Notice of Hearing Imposition of Fines on November 17 and 24, 2017 respectively.

9.      Based on the evidence and testimony received at the hearing, the City properly served the Respondents with said Notice.

10.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 17, 2017 were admitted into evidence at the hearing.

11.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 21, 2017 were admitted into evidence at the hearing.

12.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 4, 2017 were admitted into evidence at the hearing.

13.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 5, 2017 were admitted into evidence at the hearing.

14.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 7, 2017 were admitted into evidence at the hearing.

15.      Photographs of said violation taken by the Code Enforcement Officer on September 28, 2017 and December 7, 2017 were admitted into evidence at the hearing, and showed that substantial areas of graphic designs had been painted on the walls of the house between those dates.

16.      The Code Enforcement Officer testified at the hearing that she had received complaints about traffic "near misses" caused by people distracted by the graphic designs painted on the Subject Property.

17.      The City requested the Magistrate to find that the Respondents failed to timely comply with said Order and to impose a fine in the amount of Two Hundred Fifty Dollars ($250.00) per each day into the future until the violation is corrected.

BASED ON THE FOREGOING, THE MAGISTRATE ANNOUNCED AT THE HEARING THAT IT IS ORDERED that:

18.      The undersigned Magistrate finds that competent, substantial evidence was

received at the hearing to prove that that the Respondents continue to be in violation of Section 6.7 of Chapter VIII of the City's Land Development Code because the graphic designs painted on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone,

19.     The City presented competent substantial evidence at the hearing showing that as of December 7, 2017, the Respondents had not cured the established violations of Section 6.7 at the Subject Property.

20.     The undersigned Magistrate finds that the Respondents have failed to timely comply with said Order and that, from November 7, 2017 through December 7, 2017, said violations continued.

21.     A total fine in the amount of Three Thousand One Hundred Dollars ($3,100.00) is hereby imposed for the Respondents' failure to timely comply with the Magistrate's Order dated October 6, 2017.  Said fine amount represents One Hundred Dollars ($100.00) per day of non-compliance with said Order for thirty-one (31) days from November 7, 2017 through December 7, 2017.  Upon recordation of a certified copy of this Order, said fine shall constitute a lien against the real and personal property of Respondents.

SIGNED on the 13th day of December, 2017.



David F. Tegeler
Code Enforcement Magistrate

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Order has been mailed via first class mail and

certified mail this _14th_ day of _December,_ 2017, to Nancy Nemhauser and Lubomir

Jastrzebski, 601 N. McDonald Street #401, Mount Dora, Florida 32757; and to Laura K.

Hargrove, Esquire, Gause & Hargrove, PLLC, 229 East Main Street, Tavares, Florida 32778.


Mount Dora Police Department
Code Enforcement
1300 North Donnelly Street
Mount Dora, Florida 32757
(352) 735-7177

# EXHIBIT E

BEFORE THE CODE ENFORCEMENT MAGISTRATE
OF THE CITY OF MOUNT DORA, FLORIDA
COMPLAINT NO.: 2017-0187

CITY OF MOUNT DORA,
FLORIDA, a municipal corporation,

      Petitioner,

vs.

NANCY NEMHAUSER and
LUBOMIR JASTRZENSKI,

      Respondents.
_____/

## CITY OF MOUNT DORA'S MOTION FOR
## REHEARING OR RECONSIDERATION OF FINDINGS OF FACT,
## CONCLUSIONS OF LAW AND ORDER DATED DECEMBER 13, 2017

Petitioner, City of Mount Dora, by and through its undersigned counsel and pursuant to City of Mount Dora Code, Section 2.1350, hereby files its Motion for Rehearing or Reconsideration of that Findings of Fact, Conclusions of Law, and Order dated December 13, 2017 and in support thereof says:

## PROCDURAL BACKGROUND

On September 29, 2017, the Code Enforcement Magistrate for the City of Mount Dora received evidence, heard testimony and made a determination that a violation of Section 6.7, Chapter VIII, City of Mount Dora Land Development Code existed on that property located at 306 West Sixth Avenue, Mount Dora,

Florida, as more particularly described by Alternate Key: 2720697, of the public records of Lake County, Florida (Property).   The Code Enforcement Magistrate issued his written Findings of Fact, Conclusions of Law, and Order on October 6, 2017, which clearly explained his determination and required that Respondents bring the Property into compliance within thirty (30) days of the date of the Order by covering all of the graphic designs on the structure located on the Property with a solid color paint.

A subsequent compliance hearing was held on December 8, 2017, wherein the Code Enforcement Magistrate determined that the violation on the Property continued to exist after the compliance deadline of November 5, 2017, had passed, and that the violation continued to remain on the Property through at least December 7, 2017.  The Magistrate's written Findings of Fact, Conclusions of Law and Order, attached hereto as **Exhibit "A"**, was issued on December 13, 2017, and assigned a total fine amount of Three Thousand One Hundred Dollars ($3,100.00), representing One Hundred Dollars ($100.00) per day for thirty-one (31) days (November 7, 2017 – December 7, 2017).  The fine was not imposed as a daily accruing fine despite the City's request to have the penalty imposed as a fine that would continue for each and every day into the future that the violation remained on the Property.  It is this written Order which the City seeks to have reheard or reconsidered by the Code Enforcement Magistrate.

## ARGUMENT

City of Mount Dora Code of Ordinances, Section 2.1350, Rehearing, provides that an aggrieved party, including the city council, may move for rehearing of an order entered by the special magistrate and that a rehearing may be held if the decision of the special magistrate is contrary to the law.  The Magistrate's Order dated December 13, 2017, was entered contrary to the law of Florida regarding imposition of fines in code enforcement proceedings and the City seeks to have the Order reconsidered and the appropriate law applied or to have the matter reheard.

It is the intent of Florida Statutes, Chapter 162 to promote, protect, and improve the health, safety, and welfare of the citizens of the counties and municipalities of this state by authorizing the creation of administrative boards with authority to impose administrative fines and other noncriminal penalties to provide an equitable, expeditious, effective, and inexpensive method of enforcing any codes and ordinances in force in counties and municipalities, where a pending or repeated violation continues to exist. Florida Statutes, Section 162.02.  With respect to fine and penalties, Florida Statutes, Section 162.09(1), provides that an Enforcement Board/Magistrate, upon notification by the code inspector that an order of the Enforcement Board/Magistrate has not been complied with by the time set, may order the violator to pay a fine in an amount not to exceed Two Hundred

Fifty Dollars ($250.00) *per day for each day the violation continues past the date set by the Magistrate for compliance* (emphasis added).   Furthermore, Florida Statutes, Section 162.09(3) states *that a fine imposed pursuant to this part shall continue to accrue until the violator comes into compliance or until judgment is rendered in a suit filed pursuant to this section, whichever occurs first* (emphasis added).   In the instant matter, by way of Order dated December 13, 2017, the Magistrate determined that the Respondent failed to comply with that Order dated October 6, 2017, and imposed a fine of One Hundred Dollars ($100.00) per day; however, without hearing any testimony of Property compliance, taking any evidence of Property compliance or making a determination that the Property had been brought into compliance, the Magistrate, in direct contravention with Florida Statutes, Section 162.09(3) stopped the fine from continuing to accrue past December 7, 2017, the day prior to the compliance hearing.

The severe prejudice to the City which stems from the Magistrate's December 13, 2017, Order is best demonstrated in State of Florida AGO 2009-20. In AGO 2009-20, the City of Lauderdale Lakes asked whether it may, "cite and prosecute an individual for a repeat code violation under section 162.06(3), Florida Statutes, where there is a prior adjudication of the same violation that has not been resolved or for which the violator has failed to comply?"   In his analysis of the aforementioned question, the Attorney General explained that there is a distinct

difference between a first violation and a repeat violation and that the plain language of Florida Statutes, Section 163.09(3), which states that "[a] fine imposed pursuant to this part shall continue to accrue until the violator comes into compliance or until judgment is rendered in a suit filed pursuant to this section, whichever occurs first," shows that it is the intent of the legislature that repeat fines may not be imposed while the fines imposed from the initial violation are still accruing. This is important because the statute clearly contemplates a governmental entity being able to have a fine run until compliance is achieved and then have the ability to bring a repeat violation case forward to the Enforcement Board/Magistrate if the same violation is found in the future. As a matter of fact, the clearly stated intent of the code enforcement process is to provide counties and municipalities with an equitable, expeditious, effective, and inexpensive method of enforcing any codes and ordinances in force, *where a pending or repeated violation continues to exist*. Florida Statutes, Section 162.02 (emphasis added).

By stopping a fine from continuing to accrue without having ensured compliance, as has occurred here, effectively renders the repeat violation portion of the statute useless to a governmental entity. For instance, in the case currently before the Magistrate, the Respondents could choose to pay the total fine of Three Thousand One Hundred Dollars ($3,100.00) for the sole purpose of removing the lien from their property and could, at the same time, continue refusing to otherwise

bring the property into compliance by painting over the offending designs, as ordered, and the City would have no additional and inexpensive recourse through the code enforcement statute. In this most likely scenario, the City would be without the ability to ever enforce the repeat violation statute against the Respondents because since they would have failed to bring the initial violation into compliance by painting the house, the repeat violation portion of the statute will never be triggered, resulting in the violation continuing to exist in perpetuity unless, of course, the City makes the choice to pursue other available and more expensive legal remedies. The Magistrate's Order dated December 13, 2017, which stops the fine before compliance is achieved, thwarts the City's ability to ever achieve and maintain compliance through the system that was designed by the legislature as the cost effective means for local governments to enforce their codes. Furthermore, if the Magistrate's Order dated December 13, 2017 is not corrected to impose the fine therein to accrue daily until the violation is brought into compliance, the City will be forced, to the detriment of its taxpayers, to incur an unknown amount of legal fees in order to achieve compliance with its code. This is clearly contrary to what was intended by the legislature.

WHEREFORE, based on the above, the City of Mount Dora respectfully requests that the Code Enforcement Magistrate either rehear the matter or

reconsider its Order dated December 13, 2017, and enter an order compliant with Florida Statutes, Section 162.09.

Respectfully submitted this 20th day of December, 2017.

**BELL & ROPER, P.A.**
2707 E. Jefferson Street
Orlando, Florida 32803
Telephone: (407) 897-5150
Primary Email: ssutphen@bellroperlaw.com
Secondary Email: kreed@bellroperlaw.com

 */s/ Sherry G. Sutphen*
Sherry G. Sutphen
Florida Bar No.: 399681
Counsel for City of Mount Dora

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of December, 2017, I electronically filed the foregoing with the clerk of the Code Enforcement Department for the City of Mount Dora and electronically served Laura Hargrove, Esquire, as counsel for Respondents at lhargrove@ghlaw.com.

 */s/ Sherry G. Sutphen*
Sherry G. Sutphen
Florida Bar No.: 399681
Counsel for City of Mount Dora

Exhibit "A"

BEFORE THE CODE ENFORCEMENT MAGISTRATE
FOR THE CITY OF MOUNT DORA, FLORIDA

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation,

        Petitioner,

vs.                            CASE NO.: 2017-0187

NANCY NEMHAUSER and
LUBOMIR JASTRZEBSKI,

        Respondents.

_____/

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

    This matter was heard on December 8, 2017, by the undersigned Magistrate, after due notice to the Respondents and public hearing. The undersigned, having received evidence, heard testimony and being otherwise fully advised in the premises, makes the following FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER:

    1.    The property which is the subject of this code enforcement action is located at 306 West Sixth Avenue, Mount Dora, Florida ("Subject Property") and is more particularly described as:

    ALTERNATE KEY: 2720697

    2.    At the hearing on December 8, 2017 for this case, counsel for the Respondents filed the Respondents' Motion to Stay Administration of Fines Pending Appeal, which was denied by this Magistrate.

    3.    At the hearing on December 8, 2017 for this case, counsel for the Respondents filed the Respondents' Motion to Continue, which was denied by this Magistrate.

    4.    On October 6, 2017, the undersigned Magistrate entered a Findings of Fact, Conclusions of Law and Order ("Order") finding Respondents in violation of Section 6.7 of

Chapter VIII of the City's Land Development Code because the graphic designs painted on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone, and ordering Respondents to cure said violation within thirty (30) days of the date of said Order by covering all of the graphic designs with solid color paint.

5.      The Code Enforcement Officer, Cindy Sommer, testified at the hearing that she mailed a copy of said Order on October 10, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to the Respondents' counsel. James L. Homich, Esquire.  Return receipts admitted into evidence at the hearing without objection showed that J. Homich received the Order on October 18, 2017, and that N. Nemhauser received the Order on October 21, 2017.

6.      Based on the evidence and testimony received at the hearing, the City properly served the Respondents with said Order.

7.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 7, 2017 were admitted into evidence at the hearing.

8.      The Code Enforcement Officer testified that she mailed a Notice of Hearing Imposition of Fines on November 13, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to their counsel, James L. Homich, Esquire.  Return receipts admitted into evidence at the hearing without objection showed that the Respondents' counsel and Nancy Nemhauser received the Notice of Hearing Imposition of Fines on November 17 and 24, 2017 respectively.

9.      Based on the evidence and testimony received at the hearing, the City properly served the Respondents with said Notice.

10.   Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 17, 2017 were admitted into evidence at the hearing.

11.   Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 21, 2017 were admitted into evidence at the hearing.

12.   Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 4, 2017 were admitted into evidence at the hearing.

13.   Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 5, 2017 were admitted into evidence at the hearing.

14.   Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 7, 2017 were admitted into evidence at the hearing.

15.   Photographs of said violation taken by the Code Enforcement Officer on September 28, 2017 and December 7, 2017 were admitted into evidence at the hearing, and showed that substantial areas of graphic designs had been painted on the walls of the house between those dates.

16.   The Code Enforcement Officer testified at the hearing that she had received complaints about traffic "near misses" caused by people distracted by the graphic designs painted on the Subject Property.

17.   The City requested the Magistrate to find that the Respondents failed to timely comply with said Order and to impose a fine in the amount of Two Hundred Fifty Dollars ($250.00) per each day into the future until the violation is corrected.

BASED ON THE FOREGOING, THE MAGISTRATE ANNOUNCED AT THE HEARING THAT IT IS ORDERED that:

18.   The undersigned Magistrate finds that competent, substantial evidence was

received at the hearing to prove that that the Respondents continue to be in violation of Section 6.7 of Chapter VIII of the City's Land Development Code because the graphic designs painted on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone,

19.     The City presented competent substantial evidence at the hearing showing that as of December 7, 2017, the Respondents had not cured the established violations of Section 6.7 at the Subject Property.

20.     The undersigned Magistrate finds that the Respondents have failed to timely comply with said Order and that, from November 7, 2017 through December 7, 2017, said violations continued.

21.     A total fine in the amount of Three Thousand One Hundred Dollars ($3,100.00) is hereby imposed for the Respondents' failure to timely comply with the Magistrate's Order dated October 6, 2017.  Said fine amount represents One Hundred Dollars ($100.00) per day of noncompliance with said Order for thirty-one (31) days from November 7, 2017 through December 7, 2017.  Upon recordation of a certified copy of this Order, said fine shall constitute a lien against the real and personal property of Respondents.

SIGNED on the 13th day of December, 2017.

*David F. Tegeler*

David F. Tegeler
Code Enforcement Magistrate

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Order has been mailed via first class mail and

certified mail this _____ day of _____, 2017, to Nancy Nemhauser and Lubomir Jastrzebski, 601 N. McDonald Street #401, Mount Dora, Florida 32757; and to Laura K. Hargrove, Esquire, Gause & Hargrove, PLLC, 229 East Main Street, Tavares, Florida 32778.


_____
Mount Dora Police Department
Code Enforcement
1300 North Donnelly Street
Mount Dora, Florida 32757
(352) 735-7177

**EXHIBIT F**

BEFORE THE CODE ENFORCEMENT MAGISTRATE
FOR THE CITY OF MOUNT DORA, FLORIDA

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation,

              Petitioner,

vs.                                           CASE NO.: 2017-0187

NANCY NEMHAUSER and
LUBOMIR JASTRZEBSKI,

              Respondents.

_____/

## AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter was heard on December 8, 2017 at a compliance hearing, and at a rehearing on February 1, 2018, by the undersigned Magistrate, after due notice to the Respondents and public hearing. The undersigned, having received evidence, heard testimony and being otherwise fully advised in the premises, makes the following AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER:

    1.      The property which is the subject of this code enforcement action is located at 306 West Sixth Avenue, Mount Dora, Florida ("Subject Property") and is more particularly described as:

    ALTERNATE KEY: 2720697

    2.      At the hearing on December 8, 2017 for this case, counsel for the Respondents filed the Respondents' Motion to Stay Administration of Fines Pending Appeal, which was denied by this Magistrate.

    3.      At the hearing on December 8, 2017 for this case, counsel for the Respondents filed the Respondents' Motion to Continue, which was denied by this Magistrate.

    4.      On October 6, 2017, the undersigned Magistrate entered a Findings of Fact,

Conclusions of Law and Order ("Order") finding Respondents in violation of Section 6.7 of Chapter VIII of the City's Land Development Code because the graphic designs painted on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone, and ordering Respondents to cure said violation within thirty (30) days of the date of said Order by covering all of the graphic designs with solid color paint.

5.      The Code Enforcement Officer, Cindy Sommer, testified at the hearing that she mailed a copy of said Order on October 10, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to the Respondents' counsel. James L. Homich, Esquire.   Return receipts admitted into evidence at the hearing without objection showed that J. Homich received the Order on October 18, 2017, and that N. Nemhauser received the Order on October 21, 2017.

6.      Based on the evidence and testimony received at the hearing, the City properly served the Respondents with said Order.

7.      Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 7, 2017 were admitted into evidence at the hearing.

8.      The Code Enforcement Officer testified that she mailed a Notice of Hearing Imposition of Fines on November 13, 2017 by both U.S. First Class Mail and U.S. Certified Mail to the Respondents at 601 N. McDonald Street #401, Mount Dora, Florida 32757, and to their counsel, James L. Homich, Esquire.   Return receipts admitted into evidence at the hearing without objection showed that the Respondents' counsel and Nancy Nemhauser received the Notice of Hearing Imposition of Fines on November 17 and 24, 2017 respectively.

9.      Based on the evidence and testimony received at the hearing, the City properly

served the Respondents with said Notice.

10.     Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 17, 2017 were admitted into evidence at the hearing.

11.     Photographs of the continuation of said violation taken by the Code Enforcement Officer on November 21, 2017 were admitted into evidence at the hearing.

12.     Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 4, 2017 were admitted into evidence at the hearing.

13.     Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 5, 2017 were admitted into evidence at the hearing.

14.     Photographs of the continuation of said violation taken by the Code Enforcement Officer on December 7, 2017 were admitted into evidence at the hearing.

15.     Photographs of said violation taken by the Code Enforcement Officer on September 28, 2017 and December 7, 2017 were admitted into evidence at the hearing, and showed that substantial areas of graphic designs had been painted on the walls of the house between those dates.

16.     The Code Enforcement Officer testified at the hearing that she had received complaints about traffic "near misses" caused by people distracted by the graphic designs painted on the Subject Property.

17.     The City requested the Magistrate to find that the Respondents failed to timely comply with said Order and to impose a fine in the amount of Two Hundred Fifty Dollars ($250.00) per each day into the future until the violation is corrected.

BASED ON THE FOREGOING, THE MAGISTRATE ANNOUNCED AT THE HEARING ON DECEMBER 8, 2017, AND ISSUED WRITTEN FINDINGS OF FACT,

CONCLUSIONS OF LAW, AND ORDER ON DECEMBER 13, 2017, ORDERING that:

18.    The undersigned Magistrate finds that competent, substantial evidence was received at the hearing to prove that that the Respondents continue to be in violation of Section 6.7 of Chapter VIII of the City's Land Development Code because the graphic designs painted on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone,

19.    The City presented competent substantial evidence at the hearing showing that as of December 7, 2017, the Respondents had not cured the established violations of Section 6.7 at the Subject Property.

20.    The undersigned Magistrate finds that the Respondents have failed to timely comply with said Order and that, from November 7, 2017 through December 7, 2017, said violations continued.

21.    A total fine in the amount of Three Thousand One Hundred Dollars ($3,100.00) is hereby imposed for the Respondents' failure to timely comply with the Magistrate's Order dated October 6, 2017. Said fine amount represents One Hundred Dollars ($100.00) per day of non-compliance with said Order for thirty-one (31) days from November 7, 2017 through December 7, 2017. Upon recordation of a certified copy of this Order, said fine shall constitute a lien against the real and personal property of Respondents.

22.    On December 20, 2017, the Petitioner filed a Motion for Rehearing or Reconsideration of Findings of Fact, Conclusions of Law and Order Dated December 13, 2017.

23.    On February 1, 2018, a rehearing was held on the Petitioner's Motion for Rehearing or Reconsideration of Findings of Fact, Conclusions of Law and Order Dated December 13, 2017.

24.     At the rehearing on February 1, 2018 for this case, counsel for the Respondents presented the Respondents' Stipulated Motion for Substitution of Counsel, which was granted by this Magistrate.

25.     At the rehearing on February 1, 2018 for this case, counsel for the Respondents presented the Respondents' Verified Motion for Admission to Appear Pro Hac Vice Pursuant to Florida Rule of Judicial Administration 2.510, which was granted by this Magistrate to allow Jeremy Talcott, Esquire to appear pro hac vice as co-counsel for the Respondents.

26.     At the rehearing on February 1, 2018, the Code Enforcement Officer, Angela Smith, testified that she inspected the Subject Property on January 31, 2018, and that the violation continued.

27.     Photographs of said violation taken by the Code Enforcement Officer on January 31, 2018 were admitted into evidence at the rehearing, and showed that the violation continued as of that date.

28.     At the rehearing on February 1, 2018, the Code Enforcement Officer testified that the $3,100.00 fine previously ordered by the Magistrate has not been paid.

29.     At the rehearing on February 1, 2018, co-counsel for the Respondents presented an ore tenus motion to stay any fine until all appeals are resolved, which is denied by this Magistrate.

BASED ON THE FOREGOING, THE MAGISTRATE ANNOUNCED AT THE REHEARING ON FEBRUARY 1, 2018 THAT IT IS ORDERED that:

30.     The undersigned Magistrate finds that competent, substantial evidence was received at the rehearing to prove that that the Respondents continue to be in violation of Section 6.7 of Chapter VIII of the City's Land Development Code because the graphic designs painted

on the walls and the house structure at the Subject Property are nonconforming "signs" as defined in the Code and are not a type of sign which are permitted in an R-3 zone,

31.     The undersigned Magistrate finds that the Respondents have failed to timely comply with the Order said Order dated October 6, 2017 and that, from November 7, 2017 through January 31, 2018, said violation continued.

32.     The undersigned Magistrate finds that, under Section 162.02(3), Florida Statutes, a fine imposed pursuant to Section 162.09 shall continue to accrue until the violator comes into compliance.

33.     A continuing fine in the amount of One Hundred Dollars ($100.00) per day is hereby imposed for the Respondents' failure to timely comply with the Magistrate's Order dated October 6, 2017.  Said fine shall continue at an amount of One Hundred Dollars ($100.00) for each day of non-compliance from November 7, 2017 into the future until the violation is corrected.  Upon recordation of a certified copy of this Order, said fine shall constitute a lien against the real and personal property of Respondents.

SIGNED on the 7th day of February, 2018.


David F. Tegeler
Code Enforcement Magistrate


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Order has been mailed via first class mail and certified mail this ___12___ day of February, 2018, to Nancy Nemhauser and Lubomir Jastrzebski, 601 N. McDonald Street #401, Mount Dora, Florida 32757; Sherry G. Sutphen,

Esquire, Bell & Roper, P.A., 2702 E. Jefferson Street, Orlando, Florida 32803; Christina M.

Martin, Esquire, Pacific Legal Foundation, 8645 N. Military Trail, Suite 511, Palm Beach

Gardens, Florida 33410; and Jeremy Talcott, Esquire, Pacific Legal Foundation, 930 G Street,

Sacramento, California 95814

Angela Smith
Mount Dora Police Department
Code Enforcement
1300 North Donnelly Street
Mount Dora, Florida 32757
(352) 735-7177

# EXHIBIT G

INSTRUMENT#: 2018015862 OR BK 5065 PG 217 PAGES: 3 2/8/2018 11:52:32 AM
NEIL KELLY, LAKE COUNTY CLERK OF THE CIRCUIT COURT
REC FEES: $0.00

Filing # 67727956 E-Filed 02/08/2018 05:01:11 PM

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR LAKE COUNTY, FLORIDA
CIVIL DIVISION

NANCY NEMHAUSER and                    CASE NO. 2017-CA-001815
LUBOMIR JASTRZEBSKI,
                                        Division: Circuit Appellate
    Appellants,

vs.

CITY OF MOUNT DORA,
FLORIDA, a municipal corporation

    Appellee.

_____/

### NOTICE OF VOLUNTARY DISMISSAL OF ACTION UNDER
### FLORIDA RULES OF APPELLATE PROCEDURE § 9.350(b)

COME NOW, the Appellants, Nancy Nemhauser and Lubomir Jastrzebski, by and through their undersigned counsel, and file their Notice of Voluntary Dismissal of Action Under Florida Rules of Appellate Procedure § 9.350(b). In support of the motion, the Appellants state the following:

1.    Appellants no longer wish to continue the above appeal to the Order dated October 6, 2017, issued by Mount Dora Code Enforcement.

2.    The Florida Rules of Appellate Procedure allow any plaintiff to file a notice of dismissal before a decision on the merits by filing a notice of dismissal with the clerk of the court Fla. Rule App. Proc. § 9.350(b).

1

Case 5:19-cv-00087-JSM-PRL Document 6 Filed 02/20/18 Page 186 of 238 PageID 461

3.     Such notice of dismissal serves as an automatic stay on the proceedings for which a dismissal is being sought, pending further order of the court. Fla. Rule App. Proc. § 9.350(d).

4.     Should this Court for some reason not recognize this voluntary dismissal, Appellants (in an abundance of caution) request a 14-day extension of time to file their opening brief in this matter.

DATED this 8th day of February, 2018.

/s/Christina M. Martin
CHRISTINA M. MARTIN, FBN 100760
Pacific Legal Foundation
8645 N. Military Trail, Suite 511
Palm Beach Gardens, FL  33410
Office: (561) 691-5000
Email: CMartin@pacificlegal.org

JEREMY TALCOTT, PHV #1005383*
*Pro Hac Vice Pending
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
Office: (916) 419-7111
Email: JTalcott@pacificlegal.org
Attorneys for Appellants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy hereof has been furnished by electronic mail and U.S. Mail to Sherry G. Sutphen, Esq., at SSutphen@bellroperlaw.com, Kreed@bellroperlaw.com, Bell & Roper, P.A., 2707 E. Jefferson Street, Orlando, FL 32803, on this 8th day of February, 2018.

/s/Christina M. Martin
CHRISTINA M. MARTIN

# EXHIBIT H

6.7. - Signs.

The purpose and intent of this section is to establish regulations for the fabrication, erection and use of signs and outdoor advertising displays within the city. These regulations are hereby established in order to promote the overall economic well being of the businesses in the city, while at the same time providing for the health, safety and welfare of its citizens by reducing the adverse effects of signs and displays on highway safety, building safety, property value, and the enjoyment of the scenic beauty of the city.

In no event shall any signs be erected within the City of Mount Dora except in conformance with this section.

Notwithstanding any other provision of this section to the contrary, any lawful sign erected hereunder may display a non-commercial message in lieu of a commercial message.

6.7.1.   *Sign medium/location.* The following types of signs shall be allowed under the conditions indicated. Additionally, except for temporary and public signs, the following signs shall be allowed if they only indicate the name of the enterprise located on the premises or the products or services for sale thereon.

1.   *Community center:*

   a.   Zoning district in which allowed—All.

   b.   Sign size—Thirty-two square feet maximum.

   c.   Other criteria:

      1.   No sign may be located in the front 50 percent of required front yard.

      2.   Maximum height of six feet if monument sign.

      3.   Monument signs must be set back five feet from the property line.

   d.   Construction type—All.

   e.   Historic community centers.

      In many instances, community centers established more than 50 years ago were constructed without regard to setbacks. Consequently, some community centers were built immediately adjacent to or within a few feet of the center's property line, and signs related to the center were often placed either wholly or partially within the right-of-way. Therefore, ground mounted community center signs for those community centers established more than 50 years ago, which centers are constructed in violation of the setbacks established for the zoning district in question, may be placed within the right-of-way by permission of the city council, its sole and absolute discretion, upon the following conditions being met:

      1.   The right-of-way is the only reasonable location where a ground mounted sign can be constructed;

      2.   The ground mounted sign will be set back as far from the edge of pavement as is reasonably possible;

      3.   The ground mounted sign will be a monument sign of no more than six feet in height; and,

      4.   The ground mounted sign is constructed in accordance with any other conditions established by the city council.

2.   *Directional:*

   a.   Zoning district in which allowed—RP, OP, C-1, C-2, C-2A, C-3, WP-1, WP-2, PLI.

   b.   Sign size—Four square feet per sign.

    c.   Other criteria:

        1.   One sign for each ingress point.

        2.   One sign for each egress point.

        3.   Three feet high maximum.

        4.   Monument signs must be set back five feet from the property line.

    d.   Construction type—Monument (internal illumination allowed).

3.   *Directory:*

    a.   Zoning district in which allowed—RP, OP, C-1, C-2, C-2A, WP-1, WP-2, PLI.

    b.   Sign size—Six square feet maximum.

    c.   Other criteria:

        1.   May only indicate:

            a.   The building name.

            b.   The address of the building.

            c.   The name of the tenants.

        2.   The building must have more than one occupant to be allowed a directory sign.

    d.   Construction type—Projecting or wall (illumination allowed).

4.   *Occupant identification:*

    a.   Zoning district in which allowed—RP, OP, C-1, C-2, C-2A, C-3, WP-1, WP-2, PLI.

    b.   Sign size:

| Zoning District | Size Copy Area |
|---|---|
| RP | Sign types: wall, projecting, awning, and swing: 1 sq. ft. per linear foot of building frontage. 20 sq. ft. maximum |
|  | Sign type (in addition to above copy area): Monument. Single Building maximum 15 sq. ft. copy area. Two or more Buildings maximum 30 sq. ft. copy area. |
| OP | 1 sq. ft per linear foot of building frontage. 100 sq. ft. maximum |
| C-1 | 1 sq. ft. per linear foot of building frontage. 35 sq. ft. maximum |
| C-2 | 1 sq. ft. per linear foot of building frontage. 100 sq. ft. maximum |

| C-2 (within downtown exempt district) | 1 sq. ft. per linear foot of building frontage. 50 sq. ft. maximum |
|---|---|
| C-2A | 1 sq. ft. per linear foot of building frontage. 100 sq. ft. maximum |
| C-3 (building setback <250 ft.) | 1 sq. ft. per linear foot of building frontage. 150 sq. ft. maximum |
| C-3 (building setback: 251—400 ft.) | 1.5 sq. ft. per linear foot of building frontage. 200 sq. ft. maximum |
| C-3 (building setback >401 ft.) | 2 sq. ft. per linear foot of building frontage. 250 sq. ft. maximum |
| WP-1 and WP-2 | 1 sq. ft. per linear foot of building frontage. 150 sq. ft. maximum |
| PLI | 1 sq. ft. per linear foot of building frontage. 100 sq. ft. maximum |

    c.    Other criteria:

        1.    Multiple signs allowed as long as it does not exceed maximum allowable copy area, unless otherwise specified herein.

        2.    Monument signs must be set back at least five feet in RP, OP, C-1, C-2 and C-2A zoning districts. Monument signs must be set back at least ten feet in C-3, WP-1, and WP-2 zoning districts with the exception of community center and directional signs.

    d.    Construction type:

        1.    RP (residential/professional).

            a.    Wall, projecting. awning, swing, and monument. Note: Monument copy area is in addition to the other types signs per subsection 6.7.1.4.b).

            b.    Illumination allowed, except for awning signs.

        2.    OP (office/professional).

            a.    Wall, projecting, awning, swing, monument, window.

            b.    Illumination allowed, except for awning signs.

        3.    C-1 (neighborhood commercial).

            a.    Wall, projecting, awning, swing, monument, window, marquee, integral.

            b.    Illumination allowed, except for awning signs.

4. C-2 (downtown commercial).

   a. Wall, projecting, awning, swing, monument, window, marquee, integral, sandwich, pedestal.

   b. Illumination allowed, except for awning signs.

5. C-2 within downtown exempt district.

   a. Wall, projecting, awning, swing, window, marquee, integral, sandwich, pedestal.

   b. Exterior illumination allowed, except for awning signs. Neon, fluorescent colors, and backlit signage, and signs using lights to form letters or images are prohibited.

6. C-2A (peripheral commercial).

   a. Wall, projecting, awning, swing, monument, window.

   b. Sandwich and menu—Along Highland Street only.

   c. Pedestal—along Highland Street only.

   d. Illumination allowed, except for awning signs.

7. C-3 (highway commercial).

   a. Wall, projecting, awning, swing, monument, window, marquee, integral.

   b. Illumination allowed.

8. WP-1 and WP-2 (workplace, heavy workplace).

   a. Zoning district in which allowed—C-2 downtown exempt district, C-2 downtown commercial, and C-2A along Highland Street only.

   b. Illumination allowed.

9. PLI (public lands and institutions).

   a. Wall, projecting, awning, swing, monument, window.

   b. Illumination allowed, except for awning signs.

   c. Maximum sign height—six feet.

   d. Setback from property lines—five feet.

5. *Public:*

   a. Zoning district in which allowed—All.

   b. Sign size—Unlimited.

   c. Other criteria:

      1. Must be either approved by or installed at direction of city council.

      2. Fifteen feet high maximum.

6. *Shopping/office center:*

   a. Zoning district in which allowed—C-3.

   b. Sign size:

| Gross Leasable | Sign Size Maximum |
|---|---|
| | |

| Area | Square Feet |
|------|-------------|
| <64999 | 50 |
| 65000—152999 | 100 |
| 153000—386999 | 150 |
| >387000 | 200 |

    c.    Other criteria:

        1.    Copy limited to name of shopping center and occupants of center.

        2.    No other signs may be located on the sign structure.

        3.    Individual elements shall be of uniform shape and size.

        4.    Ten feet high maximum.

        5.    One shopping center sign per site.

        6.    Does not count against other allowable copy.

    d.    Construction type—Monument.

    7.    *Subdivision and apartment:*

    a.    Zoning district in which allowed—All.

    b.    Sign size:

| | | |
|---|---|---|
| 1. | Residential subdivision: | 32 sq. ft. maximum |
| 2. | Nonresidential subdivision: | 64 sq. ft. maximum |
| 3. | Apartment: | 2 sq. ft. per unit, |
| | | 32 sq. ft. maximum signage |

    c.    Other criteria:

        1.    Residential subdivision.

            a.    Subdivision must be approved, platted and actively under development and sale.

            b.    No sign may be located closer than 15 feet to property under different ownership.

            c.    Eight feet high maximum.

        d.    Sign must be set back a minimum of five feet from right-of-way.

        e.    Sign may not be located within utility easement or area.

  2.   Nonresidential subdivision.

        a.    Not allowed if office center sign in place.

        b.    Subdivision must be approved, platted and actively under development and sale.

        c.    Sign may not be located no closer than 15 feet to property under different ownership.

        d.    Ten feet high maximum.

        e.    Set back ten feet from right-of-way.

        f.    No sign may be located within a utility easement or area.

        g.    Maximum of 150 square feet of sign area.

        h.    Interior parcels not fronting on the major accessway shall conform to C-2 sign regulations.

        i.    Signage for parcels located on the primary frontage must conform to C-3 (set back less than 250 feet) standards and be limited to occupant identification signs.

  d.   Construction type—Monument.

8.   *Menu:*

  a.   Zoning districts in which allowed—C-2 downtown exempt district, C-2 downtown commercial, and C-2A along Highland Street only.

  b.   Sign size:

    1.   Sandwich—Twelve square feet maximum.

    2.   Wall—Three square feet maximum.

    3.   Pedestal—Four feet in height by two feet in width by two feet in depth.

  c.   Other Criteria:

    1.   Sidewalk: (Sandwich board or pedestal sign).

        a.    Four feet high maximum.

        b.    Five feet walking area clearance must be maintained along sidewalks.

        c.    Access to adjacent structures may not be impeded.

        d.    Only allowed for retail sales and restaurants.

        e.    Only one sidewalk sign will be allowed per business.

        f.    Release and indemnification must be provided to city.

        g.    Does not count against other allowable sign area, unless the sidewalk sign is used as a menu board in which instance it will be counted against allowable menu board signs.

        h.    A sidewalk sign may be used as a menu sign, however, only one sandwich board or pedestal sign will be allowed per business.

        i.    A sidewalk sign must be positioned so that it is adjacent to the building's frontage in relation to the roadway neighboring the sidewalk.

        j.    Maximum sign area for sidewalk signs: Six square feet for business identification along with an additional six square feet for changeable copy. Signage area

allotted and used for business identification must be set as permanent copy and be permanently affixed to said sign.

    k.   No less than 50 percent of the area of a sidewalk sign shall consist of permanent copy for business identification purposes.

    l.   A business located above the first floor of a building may place one sidewalk sign on the ground level of the building in which the business is located.

  d.  Construction type—Sandwich, pedestal, menu.

9.   *Temporary:*

  a.  Campaign:

    1.  Zoning district in which allowed—All.

    2.  Sign size:

| Zoning District | Size Square Feet Per Side |
|---|---|
| Residential | 4 |
| Nonresidential | 16 |

    3.  Other criteria:

      a.  Signs must be removed no more than ten days after election.

      b.  Signs may not be placed prior to qualifying for the election in question.

      c.  One campaign sign per candidate per parcel will be allowed.

      d.  Campaign signs located on city property or rights-of-way shall be removed immediately.

    4.  Construction type, including all signs approved in subsection 6.7.2, with the addition of pole signs.

  b.  Construction sign:

    1.  Zoning district in which allowed—All.

    2.  Sign size:

| Zoning District | Size Square Feet One Side Only |
|---|---|
| Residential | 8 |

| Nonresidential | 32 |
|----------------|----|

3. Other criteria:

   a. Signage may only denote owner, architect, engineer, contractor, subcontractor, lending institution, and/or a statement related to the construction project.

   b. Signs must be removed no more than 15 days after construction activity has ceased.

   c. Signs must be set back ten feet from any property line.

   d. Only one sign per parcel will be allowed.

4. Construction type—All signs approved in subsection 6.7.2, and including pole signs.

c. Real estate:

   1. Zoning district in which allowed—All.

   2. Sign size:

| Zoning District | Size Square Feet Maximum |
|-----------------|--------------------------|
| Residential | 4 |
| RP, C-1, C-2, and C-2A | 8 |
| OP | 16 |
| Other nonresidential | 32 |

3. Other criteria:

   a. Signs must be set back 15 feet from side and five feet from the right-of-way in commercial, office and industrial areas.

   b. Traditional sign riders shall be allowed.

   c. Must be removed upon consummation of sale.

   d. Ten feet high maximum.

   e. Only one sign allowed per parcel of land.

4. Construction type—All signs approved in subsection 6.7.2, and including pole signs.

d. Subdivision development:

1. Zoning district in which allowed—All.

2. Sign size—Thirty-two square feet maximum, one side only.

3. Other criteria:

   a. The sign must advertise a subdivision which is approved, platted, and under active development and sale.

   b. Signs may not be located closer than 15 feet from any property under different ownership.

   c. Ten feet high maximum.

   d. Only one sign will be allowed per subdivision.

   e. One year approval only.

   f. Six-month extension by zoning official only if less than 50 percent developed.

4. Construction type—All signs approved in subsection 6.7.2, and including pole signs.

10. *Historic monument sign:* Individual sites listed on the National Register of Historic Places are allowed an off-site or on-site monument type sign with the conditions and criteria indicated below:

    a. Signs are restricted to individual sites listed on the National Register of the United States National Register of Historic Places (NRHP) located within the C-2 Downtown Commercial Zoning District.

    b. Signs may be located on private property or within the city's public right-of-way provided they do not conflict with utilities (above or underground), pedestrian or vehicle site visibility, or other physical features.

    c. Architectural design, materials, and exterior color scheme of the monument sign structure must be consistent with the historic character of the downtown area and in keeping with the architecture of the primary building.

    d. Landscaping consisting of shrubs is required around the sign structure.

    e. Exterior lighting is allowed.

    f. Maximum sign copy area shall not exceed 50 square feet.

    g. Maximum height shall not to exceed six feet.

    h. Sign height excludes decorative lighting fixtures, appurtenances, or similar design features that are integral part of the sign.

    i. Approval by the city council is required prior to issuance of a sign permit.

    j. The city council may impose various or additional design requirements, size limitations, height restrictions, or other features that are in keeping with the intent of the historical identification and scale of the surrounding area at the city's sole discretion.

6.7.2. *Sign construction.* No sign shall be constructed, installed, or erected within the City of Mount Dora unless the sign is included within one of the following construction classifications:

1. *Awning sign:* Information painted on, or imprinted on, awnings. An awning is defined as a sheltering screen, usually of canvas fabric, extending over or before any place which has windows, doors, outside walks or the like, and providing shelter or protection against the weather. Awning signs shall be calculated as a portion of the square footage allowed for on the site as outlined in this section.

2. *Illuminated sign:* Any sign illuminated in any manner by an artificial light source.

3. *Integral sign:* Memorial signs or tablets, names of buildings and date of erection when cut into any masonry surface or when constructed of bronze or other incombustible materials mounted on the face of a building. This definition shall include memorial plaques placed on city-placed benches for public seating. Integral signs shall not be computed in the total allowable signage on the site.

4. *Marquee sign:* Any sign attached to and made a part of a marquee. A marquee is defined as a permanent roof-like structure projecting beyond a building wall at an entrance to a building or extending along and projecting beyond the building's wall and generally designed and constructed to provide protection against the weather.

5. *Monument sign:*

   a. *C-3, WP-1, and WP-2 zoning districts:* A sign which has the vertical structure supports concealed in an enclosed base. The width of such enclosed base shall be equal to at least the horizontal width of the sign surface. A planter structure or alternative landscaping shall enclose the foot of the base. The planter shall be between two and three feet in height above the ground, with a minimum length equal to the width of the sign and a minimum width of three feet. The base and planter shall be of brick or compatible material matching the finish of the primary structure. In lieu of a brick planter the sign may be located in a landscaped buffer provided low-growing shrubbery is planted to conceal the base of the sign. Monument signs may not be located closer than ten feet from the adjacent right-of-way. Maximum height of the sign shall be ten feet.

   b. *OP, C-1, C-2, and C-2A zoning districts:* A sign in which the base of the vertical structural supports are concealed within an enclosed base. The base shall be a planter structure between two and three feet in height above the ground with a length equal to at least the width of the sign and a minimum width of three feet. The sign shall be of solid material with no air space between individual sign components nor between the base of the sign and the top of the planter base. In lieu of a planter the sign may be located in a landscaped buffer provided low-growing shrubbery is planted to conceal the base of the sign. Monument signs may not be located closer than five feet from the adjacent right-of-way and may not obstruct any sight triangles at intersections or driveways. Maximum height of the sign shall be six feet.

   c. *RP zoning district:* Monument sign criteria shall be as follows:

      1. Maximum one monument sign per site.

      2. Maximum sign height: Five feet.

      3. Maximum monument sign copy area (this is in addition to the 20 square feet allowed for signs under section 6.7.1.4.b for the RP zoning district):

         a. Maximum sign copy area for single building: 15 square feet.

         b. Maximum sign copy area for two or more buildings: 30 square feet with the following breakdown: 50 percent allocated to the office complex name and logo only. The remaining 50 percent may be allocated for tenant business identification.

      4. Monument signs may not be located closer than five feet from the adjacent right-of-way and may not obstruct any sight triangles at intersections or driveways.

      5. Monument is defined as a sign in which the base of the vertical structural supports are concealed within an enclosed base. The base shall be a planter structure a minimum two feet in height above the ground with a length equal to at least the width of the sign and a minimum width of three feet. The sign shall be of solid material with no air space between individual sign components nor between the base of the sign and the top of the planter base. In lieu of a planter the sign may be located in a landscaped buffer provided low-growing shrubbery is planted to conceal the base of the sign.

6. *Pedestal sign:* A stable, movable sign constructed of permanent materials able to withstand the elements and supported by a base so as to allow the sign to stand in an upright position. A pedestal sign may be no larger than four feet in height by two feet in width by two feet in depth.

7. *Projecting sign:* Any sign other than a wall sign affixed to any building or wall whose leading edge extends beyond such building or wall.

8. *Sandwich board:* A two-sided, self-supporting sign with the base of the sign being the supporting structure and the connecting point located at the top of the sign.

9. *Swing sign:* Any sign projecting from an angle or the outside wall or walls of any building, or from an awning, which has a horizontal dimension equal to or exceeding its vertical dimension, and which is suspended from a projecting structure in such a manner that the sign itself, or any part thereof, is not attached to the building or wall.

10. *Wall sign:* Any sign painted on or attached to an erected structure parallel to the face of, or erected and confined within the limits of, the outside wall of any building and supported by such wall or building and which displays only one advertising surface.

11. *Window sign:* Any sign placed inside or upon a window facing the outside and which is intended to be seen from the exterior. Permanently attached signs (i.e. illuminated, painted affixed by mechanical means, etc.) shall be calculated in the total allowable sign area. Temporary and signs integrally related to business operation (i.e. open/closed signs, hours of operation, etc.) shall be allowed but not be included in the allowable copy area. Signs attached to supporting structures inside the business but oriented to customer or vehicular traffic shall be calculated as allowable sign area for permitting purposes.

12. *Menu sign:* Any sign painted on or attached to an erected structure parallel to the face of, or erected and confined within the limits of, the outside wall of any building and supported by such wall or building and which displays only one surface that lists food and/or beverage items and corresponding prices.

6.7.3. *Off-site signs.* Off-site signs shall be allowed within the City of Mount Dora only if they meet the following requirements:

1. Zoning district in which allowed—WP-1 and WP-2.

2. Sign size—Maximum size of outdoor advertising signs shall not exceed a maximum gross area of 120 square feet.

3. Outdoor advertising signs:

   a. Shall be permitted only if approved as a conditional use in industrial zoning.

   b. Shall be set back in accordance with the applicable building setback requirements for zoning district, but shall not be allowed within 100 feet of any public right-of-way and shall not be located nearer than 200 feet to a residential district.

   c. Shall be no closer than 2,000 feet from any other outdoor advertising sign, nor closer than 100 feet from any occupant identification sign on the same side of the road.

   d. The number of signs on any one street shall be limited to a maximum of two in any ten-mile distance if these signs advertise the same business, product or activity.

   e. No single-faced billboard shall have an interior angle from road to face of sign in excess of 30 degrees, and shall be installed as to minimize a view of the rear of a sign. No multi-faced outdoor advertising sign shall be permitted.

   f. No sign may project more than 15 feet in height or above the crown of the road which the sign is designed primarily to serve.

6.7.4. *Prohibited signs.* The following signs are prohibited within the City of Mount Dora:

1. Banner.

2. Bench.

3. Freestanding. (With the exception of pedestal signs and sandwich boards where expressly permitted by this section.)

4. Offsite, which are defined as sign erected except on the premises other than the goods, services, or occupants listed or advertised upon the sign in question are located. Except those signs permitted in subsection 6.7.3 above.

5. Pole, except if erected as a public sign or temporary sign under subsection 6.7.1.

6. Roof, except those roof signs attached to the lower vertical section of a gambrel roof located in the C-2 and C-2A zoning districts.

7. School bus stop shelters used for advertising shall be prohibited in all districts.

8. Snipe.

9. Signs which in any way simulate emergency vehicles, traffic control signs and devices, or directional, informational, and warning signs which are erected or maintained by the State of Florida, a political subdivision thereof, or by any railroad, public utility or similar agency concerned with the protection of the public health and safety.

10. Any private sign placed on public property, unless authorized by the zoning official.

11. Any vehicle with a sign or signs attached thereto or placed thereon subject to the following exceptions:

    a. Any vehicle parked on private property when parked within the confines of a building or in some other manner which provides for effective screening so as not to allow the sign or signs on the vehicle to be viewed from any public street.

    b. Any vehicle upon which is placed a sign identifying the firm or its principal products if such vehicle is one which operated during the normal course of business.

    c. Buses, taxicabs and similar common carrier vehicles which are licensed or certified by the city.

12. Except as provided elsewhere in this section any sign incorporating or consisting of banners, pennants, ribbons, streamers, spinners or wind-operated devices. These devices, when not an integral and functional part of any sign, are similarly prohibited.

13. Any advertisement which uses a series of two or more signs placed in a line parallel to the highway or in a similar fashion, and carrying a single advertising message, part of which is contained on each sign.

14. Any sign which the Mount Dora Police Department determines obstructs the sight-line at intersections and/or public or private driveways.

15. Any sign which incorporates a beacon light or lights as defined herein.

16. Any sign which utilizes intermittent or flashing illuminating devices and which results in changing light intensity, brightness or color, or which is constructed and operated so as to create an appearance or illusion of motion or rotates; however, electronically controlled message centers and signs which provide public service time, temperature and date, which automatically change, shall be excluded from this prohibition.

17. Balloon signs.

18. Any sign not specifically allowed in subsections 6.7.1, 6.7.2, and 6.7.3 above.

19. Outdoor mobile sandwich board sign. An outdoor mobile sandwich board sign consists of two placards fastened together at the top with straps supported on the shoulders of the carrier.

20. Outdoor mobile sandwich board sign. An outdoor mobile sandwich board sign consists of two placards fastened together at the top with straps supported on the shoulders of the carrier.

6.7.5.   *Other regulations.* The following standards shall apply to all signs within the City of Mount Dora:

1.   *Frontage calculations:*

   a.   If the building has multiple frontage with architectural design to indicate front street orientation to both frontages, an additional sign area of one square foot for each linear foot of building front shall be allowed.

   b.   In developments and shopping centers where creative designs are utilized and the building has no adjacent public street frontages, the customary building frontage shall be utilized to determine the building frontage.

   c.   For purposes of this subsection 6.7.5.1, "architectural design to indicate front street orientation" shall mean:

      1.   For new construction to which the architectural guidelines found in subsection 6.13.3 apply, those design characteristics required in subsection 6.13.3 for front facades.

      2.   For existing structures of 20,000 square feet of gross building area or more, the facade in question must have a minimum of a public entry and be comprised of 55 percent windows or must be comprised of a minimum of 60 percent windows with no public entry. For existing structures between 5,000 and 19,999 square feet, inclusive, of gross building area, the facade in question must have a minimum of a public entry and be comprised of 45 percent windows or must be comprised of a minimum of 55 percent windows with no public entry. For existing structures of less than 5,000 square feet of gross building area, the facade in question must have a minimum of a public entry and be comprised of 35 percent windows or must be comprised of a minimum of 50 percent windows with no public entry. Windows shall not appear to be false or applied.

2.   *Copy calculations.* In computing sign area in square feet, standard mathematical forms for known common shapes will be used. In the case of irregular shapes, straight lines drawn closest to the extremities of the shape will be used. On any sign with more than one face, only the face or faces visible from any one direction at one time will be counted; provided, however, that all faces of a multi-faced sign shall be equal in size and contained within a common perimeter. Double-faced ground signs with an interior angle of greater than 30 degrees will be considered two signs for square footage calculations.

3.   *Location.* One ground-mounted (monument) sign may be permitted when the lot upon which it is to be placed has a minimum of 40 linear feet of frontage. If any lot shall have 40 linear feet or more of frontage, then no ground sign shall be erected closer than 40 feet to any other ground sign. No part of any such sign shall be located within five feet of any right-of-way in OP, C-1, C-2, or C-2A zoning districts nor within ten feet in C-3, WP-1, or WP-2 zoning districts, nor be located to interfere with the sight triangle of an intersection.

4.   *Flags.* Up to two flags of up to 24 square feet each may be located on any nonresidential site. Other flags designed as attention getting devices are prohibited.

5.   *Illumination of signs.* Any light from any illuminated sign shall be shaded, shielded or directed so that the light intensity or brightness shall not adversely affect the surrounding or facing premises or affect adversely the safe vision of operators of vehicles moving on public or private roads, highways or parking areas. Light shall not shine directly on or into residential structures.

6.   *Exposed sign structure.* No structure or framework may be exposed by removal of sign faces or advertising copy for a period in excess of ten days without approval from the zoning official.

7.   *Maintenance.* All parts and supports of any sign shall be maintained, treated and/or painted so as to be safe, prevent rust or deterioration, and to maintain their appearance.

8.   *Signs in WP-1 and C-3 districts:*

   a.   All signs shall be located at least 20 feet from all property lines in all WP-1 zoned districts.

b. All signs in WP-1 and C-3 zoned districts shall maintain the minimum distance from all residential districts as follows:

| Zoning District | Minimum Distance (feet) |
| --- | --- |
| R-1AAAA | 500 |
| R-1AAA | 400 |
| R-1AA | 300 |
| R-1A | 200 |
| R-1 | 150 |
| R-1B | 100 |
| R-2 | 100 |
| R-3 | 100 |

9. *Abandoned signs.* Nonconforming signs shall be removed by the owner or lessee of the premises upon which a sign is located when the business which a sign advertises is no longer conducted on the premises. If the owner or lessee fails to remove the sign within 90 days from the termination of the business which was conducted on the premises, the zoning official shall order removal in accordance with this article. Conforming sign structures may be retained if the message is deleted.

10. *Historical signs.* Any sign determined to possess historical value by the Mount Dora Preservation Committee will be allowed to remain, be repaired and maintained notwithstanding any provision of this section.

11. *Sign height.* The height of any sign shall be measured as the difference between the highest point of the structure and the grade of the site directly adjacent to the sign base. For purposes of this measurement, any mounding of the site upon which the sign is located shall be considered part of the sign base.

6.7.6. *Nonconforming sign.*

1. Any sign which existed and was maintained at the time this section became effective may continue in existence, although such sign does not conform to all of the provisions contained herein, except as provided in subsections 2. or 5. below, provided, that all such nonconforming signs and their supporting members shall be completely removed from the premises or brought into conformance not later than five years from the effective date of these land development regulations, unless allowed to remain by state law.

2. Any sign which lawfully existed on property annexed into the city limits of the city may continue in existence, although such sign does not conform to all of the provisions contained herein, except as provided in subsection 5. below, provided, that all such nonconforming signs and their supporting members shall be completely removed from the premises or brought into conformance not later than five years from the date of annexation; and further providing, that nothing herein shall be construed as permitting the continuance of any prohibited sign.

3. Requirements. No existing nonconforming sign shall be altered structurally, repaired or moved unless brought into conformation with the requirements of this article; however, this restriction shall not apply to the change of copy or changeable copy signs. "Repaired" shall mean repairs which cost in excess of 50 percent of the replacement cost of the sign, such cost of repairs to include the cost of labor and material.

4. No sign shall be considered to be a nonconforming sign if it was erected without the approval of the zoning official and a building permit having been obtained or if the sign was erected contrary to the provisions or limitations of a building permit. Any such sign shall be considered unlawful and shall be subject to removal in accordance with the provisions of this article.

5. Freestanding, menu, sandwich, and window signs, and signs which cost less than $200.00 and which do not meet the requirements herein shall be completely removed from the premises or brought into conformance immediately upon the effective date of these regulations.

6.7.7. *Building permit required.*

1. No person shall erect, alter, repair or relocate any sign without first obtaining a building permit for such work from the city. No permit shall be issued until the zoning official determines that such work is in accordance with the requirements contained in this article.

    a. Drawing: Every application shall be accompanied by a scaled drawing of the proposed sign showing the locations, height, size and distances from other signs, where applicable, and all other information required to determine zoning compliance.

    b. All signs shall be designed and installed in compliance with the requirements of the building and electrical codes of the City of Mount Dora.

    c. Exception for changeable copy sign: The changing of advertising copy or message on signs which are specifically designed for the use of replaceable copy shall not require a building permit.

    d. Fees: Fees shall be adopted by the city by resolution, and may be amended from time to time as appropriate.

2. Upon receipt of a fully completed application, a permit shall either be issued or denied within ten working days thereof. A permit not issued within this ten-day period shall be deemed to be denied. An applicant who has been denied a permit hereunder or who has been granted a permit with conditions may appeal such denial or grant with conditions to the planning and zoning commission. Any such appeal must be filed in writing within ten calendar days of the permit denial or grant with conditions. Any such appeal shall be scheduled for the next available planning and zoning commission meeting. The appeal before the planning and zoning shall be *de novo* . Any person aggrieved by a decision of the planning and zoning commission may file a petition for writ of certiorari in the Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida. In order to be valid, any petition for writ of certiorari must be filed within 30 days of the date of final action by the planning and zoning commission.

(Ord. No. 714, § 21, 4-7-98; Ord. No. 751, §§ 14, 15, 12-7-99; Ord. No. 806, § 1, 2-5-01; Ord. No. 790, § 5, 7-17-01; Ord. No. 801, § 1, 12-4-01; Ord. No. 849, §§ 20—23, 6-15-04; Ord. No. 2007-934, § 10, 2-20-07; Ord. No. 2007-943, § 2, 5-15-07; Ord. No. 2008-1012, §§ 2—5, 8-5-08; Ord. No. 2008-1025, § 2, 12-2-08; Ord. No. 2009-11, § 2, 6-16-09; Ord. No. 2009-12, § 1, 7-7-09; Ord. No. 2009-21, §§ 2, 3, 4, 3, 4, 5, 12-1-09; Ord. No. 2010-03, §§ 3, 4, 4, 5, 2-16-10;

Ord. No. 2011-03, §§ 4, 5, 3-15-11; Ord. No. 2013-13, § 2(Exh. A), 10-1-13 ; Ord. No. 2013-20, § 2, 11-19-13 )

# EXHIBIT I

CHAPTER VIII. - DEFINITIONS

The following definitions shall apply throughout this code. Words not specifically defined or otherwise explained within this code shall be as defined in a standard dictionary or as understood by the development review coordinator.

*Abutting property:* Any property that is immediately adjacent to or contiguous with property that may be subject to any hearing required to be held under these regulations or from the property subject to any hearing under these regulations. For the purposes of this definition, when associated with proposed changes in the future land use or zoning the following justification standards shall apply (where different land uses are contiguous, adjacent, or abutting, these circumstances shall not be used as justification for such proposed land use or zoning change), except in the case of annexation.

*Accessory buildings and uses:* A subordinate building or a portion of the main building, the use of which is incidental to that of the dominant use of the main building or land. Accessory use is one which is incidental to the main use of the premises.

*Adult living facility (ALF):* Any institution, building or buildings, residence, private home, boardinghouse, home for the aged, or other place licensed and approved by the Florida State Department having jurisdiction over these facilities.

*Addition (to single family dwelling):* Any walled and roofed expansion to the perimeter of an existing single family dwelling where:

(1) There is an increase to the footprint/square footage or height of the primary structure;

(2) The addition is internally accessible from within the habitable portions of the residence;

(3) A second set of cooking appliances (stove, oven, cooktop) that would exclusively serve the addition is not allowed (unless exempted elsewhere in the LDC);

(4) The addition is connected to a load-bearing wall other than a fire wall;

(5) Any walled and roofed addition which is connected by a fire wall and is separated by an independent perimeter load-bearing wall is new construction and considered to be a separate building.

*Aggrieved person:* A person who, by action under this code, has or will suffer direct pecuniary loss, which loss is not speculative and is not suffered by the public generally. For example, a commercial site owner who is required to install stormwater retention at the owner's expense is not an aggrieved person.

*Agriculture:* The science and art of production of plant(s) and animals useful to humans, including to a variable extent the preparation of these products for human use and their disposal by marketing or otherwise, and includes aquaculture, horticulture, floriculture, viticulture, forestry, dairy, livestock, poultry, bees, and any and all forms of farm products and farm production, including hay or grass harvesting and bailing operation. For the purposes of marketing and promotional activities, seafood shall also be included in this definition.

*Alley:* A public or private way which is not designed for general travel but is used primarily as a means of secondary access to a lot abutting thereon.

*Alteration:* Any change affecting the exterior appearance of an existing structure or improvement by additions, reconstruction, remodeling, maintenance or structural changes involving changes in form, texture, materials or any such changes in appearance in specially designated historic site, or historic interiors.

*Apartment sign:* A sign designating the name of a particular apartment complex which is erected at an entryway.

*Applicant:* Any person applying for or who has been granted a permit or development order to proceed with a project.

*Appropriate to surroundings or appropriate to neighborhood:* Appropriate to neighborhood does not mean uniformity in style or subordination to existing buildings, but rather to bringing new buildings into an orderly relationship with landscape and nature, other buildings and open areas. Again, scale and composition come into importance, related here to adjacent properties.

*Aquifer:* An underground formation, group of formations, or part of a formation that is permeable enough to transmit, store or yield usable quantities of water.

*Archaeological site:* Earthworks, any subsurface remains of historical, archaeological or architectural importance, or any unusual ground formations of archaeological significance.

*As-built record drawings:* Final plans amended to include all locations, dimensions, elevations, capacities, capabilities, as actually constructed and installed (included all final plan sheets such as site layout, utilities, as-built survey, landscaping, photometric, etc.). As-built record drawings shall be prepared, signed and sealed by the engineer of record.

*Available capacity:* Capacity which can be encumbered or reserved by, or committed to, future users of a public facility or service.

*Awning sign:* Information painted on, or imprinted on, awnings. An awning is defined as a sheltering screen, usually of canvas fabric, extending over or before any place which has windows, doors, outside walks or the like, and providing shelter or protection against the weather. Awning signs shall be calculated as a portion of the square footage allowed for on the site as outlined in this code.

*Balloon sign:* A bag of varying types of material, inflated with gas, either attached to or located on a site used for the purpose of attracting attention to the business or location.

*Bars and cocktail lounges:* Those commercial establishments selling, dispensing, serving or providing alcoholic beverages and includes, but is not limited to, bars, nightclubs and cocktail lounges. Any establishment selling, dispensing, serving or providing alcoholic beverages, for on-premise consumption, where the selling, dispensing, serving or providing of alcoholic beverages is not clearly incidental to other products offered for sale, shall be considered a bar or cocktail lounge for the purposes of this code.

*Banner sign:* Any sign intended to be hung either with or without frames, possessing characters, letters, illustrations or ornamentation's applied to paper, plastic or fabric of any kind. National flags, flags of political subdivisions, symbolic flags of any institution or business, or information painted or imprinted on awnings, as defined in this article, shall not be considered banners for the purpose of this article, such definition shall not include over-highway announcement signs erected by the city.

*Bench sign:* A sign located on any part of the surface of a bench or seat placed on or adjacent to a public right-of-way, except for publicly installed bench signs.

*Block:* Includes tier or group and means a group of lots existing within well-defined and fixed boundaries, usually being an area surrounded by streets or other physical barriers and having an assigned number, letter or other name through which it may be identified.

*Buffer:* An area of land, landscape materials, wall or combination thereof between two parcels of land intended to reduce the impacts between the two parcels.

*Buildable area:* That portion of a site within the yard area on which a structure or improvements, including driveways and parking lots, may be erected.

*Building:* Any structure built for the support, shelter or enclosure of persons, chattels or property of any kind, which has enclosing walls for 50 percent of its perimeter. The word "structure" includes the word "building."

*Building, height of* : The vertical distance from the finished grade to the highest point of a flat roof or a mansard roof, or, for gable, hip and gambrel roofs or other pitched roofs, to the mean height level between the highest ridge and the highest eave connected to that ridge.

*Building line:* The line, established by law, beyond which a building shall not extend, except as specifically provided by law, and determined from the extreme support for the roof of the main structure or appurtenance thereto.

*Building setback line:* The line, established by law, beyond which a building shall not extend, except as specifically provided by law.

*Campaign sign:* A sign which announces or promotes a candidate for election to public office.

*Canal:* An artificial waterway for transportation, irrigation or stormwater conveyance.

*Cannabis.* Any plant(s) or part of a plant(s) of the genus Cannabis, whether growing or not; the seeds thereof; the resin extracted from any part of the plant(s); and every compound, manufacture, salt, derivative, mixture, or preparation of the plant(s) or its seeds or resin

*Cannabis farm.* Any property used in whole or in part for the growing or cultivation of Cannabis plant(s), whether or not such growing or cultivation is lawful under federal or state law.

*Capacity:* The ability or availability of a public service or facility to accommodate users, expressed in an appropriate unit of measure, such as gallons per day or peak hour traffic volumes.

*Certificate of appropriateness:* A written document, issued under the terms and conditions of the historic preservation regulations, allowing specified alterations, demolition, construction, or other work to a designated historic site, or for a building or structure within a designated historic district.

*Certificate of capacity:* The document issued by the city indicating the quantity of public facilities that are available and reserved for the property described in the certificate, including any limits on uses, densities, and intensities of the approved development of the property, and containing an expiration date.

*Child care centers:* An establishment where five or more children under the age of six years, excluding members of the family occupying the premises, are cared for. The term includes nurseries, kindergartens, day care centers, and day nurseries.

*City:* Mount Dora, Florida.

*Clearing:* The removal of trees and brush from a substantial part of the land but shall not include mowing.

*Clinic:* An establishment where patients who are not lodged overnight are admitted for examination and treatment by one person or a group of persons practicing any form of healing or health-building services to individuals, whether such persons be medical doctors, chiropractors, osteopaths, chiropodists, naturopaths, optometrists, dentists or any such profession, the practice of which is lawful in the State of Florida.

*Club:* Buildings and facilities owned and operated by a corporation or association of persons for social or recreational purposes, but not operated primarily for profit or to render a service which is customarily carried on as a business.

*Commercial recreation:* Commercial establishments operating for the sole purpose of providing recreational activities including pinball, video games, billiards, and the like. In C-1 zones, no alcohol may be served on premises.

*Common open space:* An area of land, or an area of water, or combination of land and water, within the area of a planned unit development which is designated and intended for the use or enjoyment of residents of the planned unit development in common. Common open space may contain such structures and improvements as are desirable and appropriate for the common benefit and enjoyment of residents of the planned unit development.

*Community center sign:* A sign associated with and erected by a community center. For this purpose, community centers are defined as those building or structures open to the general public which are owned and operated by a governmental, public, or not-for-profit for the purpose of hosting an assemblage of persons.

*Compensating storage:* Equivalent to floodplain storage provided to counterbalance floodplain filling.

*Comprehensive plan:* A plan that meets the requirements of F.S. ch. 163, pt. II.

*Concurrency:* The presence of adequate public facilities that meet the adopted level of service standard or will be available either no later than the impact of development, or within one year of the impact of development, depending on the type of facility.

*Concurrency test:* A comparison of the development's impact on public facilities to the capacity of public facilities that are, or will be, available no later than the impacts of the development, or within one year of the impact of the development, depending on the type of facility.

*Conditional use:* A use allowed in a zoning district only after specific requirements outlined in this code have been met and the planning and zoning commission has attached conditions of approval, if any.

*Construction:* Building, assembling, expanding, modifying or altering the existing contours of a site, the erection of buildings or other structures, or any part thereof, or land clearing.

*Construction sign:* Any sign giving the name or names of principal contractors, architects and lending institutions responsible for construction on the site where the sign is placed, together with other information included thereon.

*Contributing building:* A building contributing to the historic significance of a district which by virtue of its location, design, setting, materials, workmanship, or association with local historic events or personalities lends to the district's sense of time and place within the context of the intent of historic preservation.

*Council:* The city council of the City of Mount Dora, Florida.

*Demolition:* The act or process of wrecking, destroying, or removing any building or structure, or any exterior or structural part thereof.

*Density, residential* : Refers to the number of residential dwelling units permitted per gross acre of land and is determined by dividing the number of units by the total area of land within the boundaries of a lot or parcel; less preservation and undevelopable areas, or areas below the normal high water line of a lake, wetlands and floodplain areas. In the determination of the number of residential dwelling units to be permitted on a specific parcel of land, a fractional unit shall not entitle the applicant to an additional unit.

*Designated exterior:* All outside surfaces of any improvement, building, structure defined in the historic preservation survey as having significant value to the historic character of the building, district or city.

*Detention:* The collection and temporary storage of water in such manner as to provide for treatment through chemical, or biological processes or attenuation of the peak rate of storm physical, or flow.

*Developed:* That point in time when the building and site have received final inspections.

*Developer:* Any person, including a governmental agency, undertaking any development, as defined in this section.

*Development:* The alteration, construction, installation, demolition or removal of a structure, impervious surface or drainage facility; or clearing, scraping, grubbing, killing or otherwise removing the vegetation from a site; or adding, removing, exposing, excavating, leveling, grading, digging, burrowing, dumping, piling, dredging or otherwise significantly disturbing the soil, mud, sand or rock of a site.

*Development order:* Any order, permit or other official action of the city granting, or granting with conditions, an application for development.

*Development permits:* Single-family and duplex residences, new nonresidential/multifamily (greater than duplexes), all other new construction, all commercial interiors, site work/infrastructure permit, demolition/house moving, foundation, additions (commercial, multifamily and all other nonresidential), and any other permits designated by the city from time to time as development permits.

*Directional sign:* A sign of a variety that indicates ingress and egress points only. The intent of these signs is to allow for vehicular visibility to access points for nonresidential development. Directional

language and logos may be incorporated into the sign design but may not exceed the sign area requirements.

*Directory sign:* A sign on which the names and locations of occupants or the use of a building is given. This shall include office building and church directories.

*Discharge, discharge point:* The outflow of water from a project, site aquifer, drainage basin or facility and the point thereof.

*District:* Any section of the certain described area of the City of Mount Dora to which these regulations apply and within which the zoning regulations are uniform.

*Ditch:* Artificial waterway for irrigation or stormwater conveyance.

*Drainage facility:* Component of the stormwater management system.

*Drainage systems, natural drainage system:* All facilities used for the movement of stormwater through and from a drainage area including, but not limited to, any and all of the following conduits and appurtenant features: canals, channels, ditches, flumes, culverts, streets, etc. Also includes all watercourses, water bodies and wetlands.

*Dredging, filling and other related activities:* Any activities which may affect the quality of the waters of the city, such as the following: draining, digging, pumping, pushing, removing or displacing, by any means, of material, or the dumping, moving, relocating or depositing of material, either directly or otherwise, and, the erecting of structures, driving of pilings, or placing of obstructions below the mean high water mark of any body of water within the city.

*Drip line:* The vertical line running through the outermost portion of the tree crown extending to the ground.

*Dry detention:* Detention provided by a pond or basin that normally has a dry bottom except during, and up to 14 days after, a rainfall event.

*Duplex:* A dwelling which has accommodations for and is intended to be used by two families living independently of each other. In order to qualify as a duplex, the dwelling must:

(1)  Have at least one common wall or floor and ceiling, which may be a common garage wall, for at least 25 percent of the maximum depth of the building;

(2)  Must have a common roof;

(3)  Be so designed as to allow passage from one dwelling unit to the other without the necessity of leaving the shelter of a common roof, if a connecting passage were cut through the common wall. Further, the construction of any structure as a duplex shall be duly noted in the public records of Lake County, Florida on a form provided by the city. Any duplex constructed after April 7, 1998, which is damaged shall be repaired, replaced, or demolished in order to ensure no structure remains after the damage which is nonconforming.

*Dwelling:* A building or portion thereof designed exclusively for residential occupancy, including one-family, two-family and multifamily dwellings, but not including hotels, motels, boardinghouses, rooming houses, house trailers, whether such trailers be mobile or located in a stationary fashion as on blocks or other foundations, tents, houseboats, travel trailers or other forms of temporary or portable housing.

*Dwelling, multifamily:* A building containing three or more dwelling units.

*Dwelling, single-family:* A building containing only one dwelling unit.

*Dwelling, two-family:* A building containing only two dwelling units.

*Dwelling unit:* A building or space consisting of one or more rooms which are arranged, designed or used as living quarters for one family only, containing independent sanitation and cooking facilities.

*Easement:* A right of use over the property of another.

*Encumbered capacity:* Capacity for a project which is "set aside" for a limited amount of time (while the project is under review or connected to the time-frame underlying a preliminary development order).

*Erosion:* Wearing or washing away of soil by the action of water.

*Extended dry detention:* Detention provided by a pond or basin that normally has a dry bottom that drains the runoff volume captured for water quality management over a time period exceeding 12 hours and drains completely between storms.

*Exterior:* All outside surfaces of any building or structure.

*Family:* One or more persons living as a single housekeeping unit, as distinguished from a group occupying a hotel, club, fraternity, sorority or an institutional group.

*Fence:* An unroofed barrier or unroofed enclosing structure.

*Final development order:*

a.   Development of regional impact (DRI);

b.   All development permits except those exempted permits;

c.   Site plan;

d.   Final subdivision plan and plat.

*Final master plan:* The specific plan for the development of a planned unit development.

*Final plat:* Those submittals as required by, and following the procedure of this code, showing all building lots, easements, rights-of-way and other information necessary for providing the detailed description of the subdivision of a parcel of land.

*Floodplain management:* See Chapter 23 of the Code of Ordinances for all definitions related to floodplain management.

*Floor-area ratio (FAR):* The total floor area of the building or buildings on a lot or parcel divided by the gross area of the lot or parcel.

*Freestanding sign:* Any mobile or portable sign structure, not structurally secured to the ground or to any other structure.

*Garage:* As required for residential structures, a garage shall be a structure consisting of three solid walls and one door of appropriate size to allow parking of at least one standard size automobile. Minimum garage size shall be 12 feet by 20 feet. Garages shall not extend into any setback. Garages must also be architecturally similar to the primary structure in design and materials.

*Garage apartment:* A fully functional living unit containing cooking and sanitation facilities located in or above a garage. Garage apartments shall not be allowed in single-family zoning districts and shall be considered a separate unit in multifamily residential zoning districts.

*Gas and oil service stations:* A commercial operation offering for dispense, gasoline, diesel fuel or other petroleum-based product for the use in automobiles, as opposed to automotive repair facilities which provide repair and maintenance of automobiles without dispensing fuel.

*Geotechnical engineer* shall mean a licensed professional engineer in the State of Florida whose expertise or experience is in the field of geotechnical engineering.

*Grade:* The slope of a road, street, other public way, or lot specified in percentage terms.

*Green Book:* "Manual of Uniform Minimum Standards for Design, Construction and Maintenance for Streets and Highways," prepared by FDOT, Tallahassee, Florida.

*Ground sign:* A sign which is supported by structures in or upon the ground and independent of support from any building.

*Groundwater:* Water beneath the surface of the ground whether or not flowing through known and definite channels.

*Guest house or cottage:* A detached accessory building located on the same premises of the main residential building, intended for intermittent or temporary occupancy by a nonpaying guest, and which has no cooking facilities.

*Historic district:* A geographically defined area with a significant concentration, linkage, or continuity of landmarks, improvements, or landscape features united by historic events or aesthetically by plan or physical development, and which area has been designated as a historic district under the procedures described in this ordinance. Any historic district may have within its area non-historic buildings or other structures that contribute to the overall visual character of the district.

*Historic site:* Any site, building, structure, feature or improvement which has been designated as a "historic site" under the terms, conditions and procedures of this ordinance.

*Historic site survey:* A comprehensive survey compiled by the historic preservation board designed to identify, research and document buildings, sites and structures of any historic, cultural, architectural or landmark importance in Mount Dora, Florida. The board may compile said survey in cooperation with state and local public and nonprofit historic preservation organizations to prevent a duplication in effort.

*Home occupation:* Any use conducted entirely within a dwelling and carried on by an occupant thereof, which use is clearly incidental and secondary to the use of the dwelling thereof. Home occupations shall not be construed to include barbershops, beauty salons, tearooms, food processing restaurants, sale of antiques or commercial kennels. In addition, any use which requires employees and/or customers to enter the premise shall not be construed as a home occupation.

*Honest design construction:* Honest design construction concerns proper design of all work in its details, the uses of weather-resistant material, etc., and applies to advertising.

*Hotel:* Any building containing principally sleeping rooms in which transient guests are lodged, with or without meals, with no provisions made for cooking in any individual rooms or suites.

*Hydrograph:* A graph of discharge versus time for a selected outfall point.

*Illuminated sign:* Any sign illuminated in any manner by an artificial light source.

*Impact of development:* For purposes of concurrency, the impact of development shall be determined to occur at the time the certificate of occupancy is issued.

*Impervious surface:* A surface which has been compacted or covered with a layer of material so that it is highly resistant to infiltration by water. It includes semipervious surfaces such as compacted clay, as well as most conventionally surfaced streets, roofs, sidewalks, parking lots, and other similar surfaces.

*Improvement:* Any building, structure, fence, gate, wall, walkway, parking facility, light fixture, bench, foundation, sign, work of art, earthworks, sidewalks, or other manmade objects constituting a physical change or betterment of real property, or any part or portion of said change or betterment. Additionally, street pavements, curbs and gutters, sidewalks, alley pavements, walkway pavements, water mains, sanitary sewers, storm sewers or drains, street names, signs, landscaping, permanent reference monuments (P.R.M.s), permanent control points (P.C.P.s), or any other improvements required by the city.

*Independent contractor:* One who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer as the result of the work.

*Inland wetlands:* A publicly or privately owned marsh or swamp bordering on the fresh waters of the city or any marsh or swamp subject to flooding by fresh water.

*Integral sign:* Memorial signs or tablets, names of buildings and date of erection when cut into any masonry surface or when constructed of bronze or other incombustible materials mounted on the face of a building. This definition shall include memorial plaques placed on city-placed benches for public seating.

*Intensity:* As related to stormwater, the depth of accumulated rainfall per unit of time.

*Kennel:* A place where dogs and other small animals and house pets are kept, sheltered, boarded, bred or groomed for compensation.

*Land-locked area:* An area which does not discharge runoff from the ten-year, 24-hour storm event.

*Land owner:* The legal or beneficial owner or owners of all of the land proposed to be included in a development; the holder of an option or a contract to purchase; or a person having possessory rights or equal dignity will be deemed to be a land owner for the purpose of this regulation, so long as the written consent to the development of the owners of all other interest in the land concerned is obtained.

*Land surveyor:* A land surveyor registered under Chapter 472 who is in good standing with the Florida State Board of Professional Engineers and Land Surveyors.

*Land use:* The development that has occurred on the land, or the development that is proposed by a developer on the land, or the use that is permitted or permissible on the land under an adopted comprehensive plan, or element or portion thereof, or under land development regulations or a land development code, as the context may indicate.

*Landscape architect:* A qualified person registered and currently licensed to practice landscape architecture in the State of Florida pursuant to F.S. ch. 481, whose expertise and experience allows for the preparation of stormwater design, calculations, and drawings as set out in the applicable sections of this code.

*Landscape feature:* Any improvement or vegetation including, but not limited to: outbuildings, walls, courtyards, fences, shrubbery, trees, sidewalks, planters, planting, gates, street furniture and exterior lighting.

*Level of service standard:* The number of units of capacity per unit of demand adopted by the city in the comprehensive plan.

*Livestock:* Includes all animals of the equine, bovine or swine class, including, but not limited to, goats, sheep, mules, horses, hogs, cattle and other grazing animals.

*Local Register of Historic Places:* A listing and a means by which to identify, classify and recognize various archaeological sites, buildings, structures, improvements, districts and appurtenances as historically and/or architecturally significant.

*Local roads:* Roadways which do not provide the sole ingress or egress from a dwelling, building, or work.

*Lot:* The least fractional part of subdivided lands having limited fixed boundaries, and an assigned number, letter or other name through which it may be identified.

*Lot, corner:* A lot situated at the intersection of two streets, the interior angle of such intersection not exceeding 135 degrees. Corner lots shall have two front yard setbacks along the adjacent rights-of-way and two side yard setbacks on the remaining sides.

*Lot, depth:* The distance measured from the midpoint of the front line to the midpoint of the opposite rear line of the lot.

*Lot, double-frontage:* A lot having two or more of its nonadjoining property lines abutting upon a street or streets, not including alleys.

*Lot, front:* The portion of a lot that abuts the street or road right-of-way. In the case of a corner lot, this is both.

*Lot of record:* A lot which is part of a subdivision, the plat of which has been recorded in the office of the Clerk of the Circuit Court of Lake County, Florida, or was shown as an individual lot on the Lake County Assessment Maps, as of July 1, 1987.

*Lot width at the building line:* The distance between the side lot lines, measured at the front building line and parallel to the front lot line.

*Maintenance:* The action taken to restore or preserve the functional design of the as-built plans of any facility or system.

*Marquee sign:* Any sign attached to and made a part of a marquee. A marquee is defined as a permanent roof-like structure projecting beyond a building wall at an entrance to a building or extending along and projecting beyond the building's wall and generally designed and constructed to provide protection against the weather.

*Medical marijuana dispensary.* A facility that is operated by an organization or business holding all necessary licenses and permits from which marijuana, cannabis, cannabis-based products, or cannabis plant(s) are delivered, purchased, possessed, or dispensed for medical purposes and operated in accordance with all local, federal and state laws.

*Medical use.* The prescriptive use of any form of cannabis to treat a qualifying medical condition and the symptoms associated with that condition or to alleviate the side effects of a qualifying medical treatment.

*Menu board:* A sign which carries only the name of a restaurant and the current list and prices of food or food preparations available in that restaurant.

*Minimal impact:* A change in a use or development of up to 1,000 square foot building expansion and that generates fewer than 20 additional trips per day. A minimal designation runs with the land for each parcel for which it is granted.

*Monument sign:* A sign which has the vertical structure supports concealed in an enclosed base.

*Motor home:* A portable temporary dwelling to be used for travel, recreation and vacation, constructed as an integral part of a self-propelled vehicle.

*National Register of Historic Places:* A federal listing maintained by the U.S. Department of the Interior of buildings, structures and districts that have attained a quality of significance as determined by the Historic Preservation Act of 1966, as amended.

*Natural flow pattern:* The rate, volume and direction of the surface or groundwater flow occurring under natural conditions.

*Nonconcurrency affidavit:* A document signed by an applicant which defers the application for a certificate of capacity, and the concurrency test, acknowledges that future rights to develop the property are subject to the deferred concurrency test, and acknowledges that no vested rights have been granted by the city or acquired by the applicant without such a test.

*Nonconforming sign:* Any sign which does not conform to the regulations of this code.

*Noncontributing building:* A building within a historic district which does not add to a historic district's sense of time and place and historical development; or a building where the location, design, setting, materials, workmanship, and association have been so changed, or have so deteriorated that the overall integrity of the building has been irretrievably lost.

*Non-medical marijuana sales.* The purchase, sale, transfer or delivery of marijuana, cannabis, cannabis-based products or cannabis plant(s) when such sale, transfer or delivery is not associated with any medical purpose or use, whether or not such purchase, sale, transfer or delivery is lawful under federal or state law.

*Nonresidential subdivision:* A subdivision whose intended use is other than residential, such as commercial or industrial. Such subdivision shall comply with the applicable provisions of these regulations.

*Occupant identification sign:* Any sign which carries only the name of the firm, major enterprise or products offered for sale on the premises, lot or parcel of land.

*Off-street parking facility:* A lot or parcel of land or structure designed, constructed or utilized for the temporary storage or parking of motor vehicles.

*Open channel:* A canal, ditch, or swale used to safely convey stormwater runoff.

*Open space:* Any piece of property that is pervious to water and exposed to the sky. Any portion of a parcel or area of land left undeveloped or minimally developed as part of a natural resource preserve, passive recreational area, lakes, waterbodies, or stormwater management area, buffers, and landscaped areas. Such designated open space excludes street rights-of-way, vehicular use area, impervious surfaces, and active recreation areas, such as golf courses, ball fields, etc. Any portion of property that is covered with man-made products or structures shall not be considered open space.

*Ordinary maintenance or repair:* Any work for which a building permit is not required by law, where the purpose and effect of such work is to correct any physical deterioration or damage to an improvement, or any part thereof by restoring it, as nearly as practical, to its appearance prior to the occurrence of such deterioration or damage.

*Outdoor advertising sign:* Sign which advertises a business, organization, event, person, place or thing not on the premises of said business, organization, event, person, place or thing.

*Owner:* The person in whom is vested the fee, ownership, dominion, or title of property. This term may also include a tenant, if chargeable under his lease for the maintenance of the property, and any agent of the owner or tenant including a developer.

*Parcel or parcel of land:* A contiguous quantity of land in possession of, owned by, or recorded as property of the same claimant person in the Public Records of Lake County, Florida, as of the effective date of this code or as may be subsequently recorded pursuant to the City of Mount Dora Land Development Regulations.

*P.C.P. (permanent control point):* A secondary, horizontal-control monument, according to F.S. § 71.339.

*Peak rate of flow:* The maximum rate of discharge resulting from a given storm event.

*Pedestal sign:* A movable sign constructed of permanent materials able to withstand the elements and supported by a base so as to allow the sign to stand in an upright position.

*Permitted uses:* Those land uses that are permitted within a zoning district.

*Person:* Any and all persons, natural or artificial, and includes any individual, firm, corporation, governmental agency, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal entity.

*Planned unit development:* An area of land devoted by its owner to development as a single entity for a number of dwelling units and/or other uses in accordance with a plan which does not necessarily comply with the provisions of other zoning districts with respect to lot size, lot coverage, setbacks, off-street parking, bulk or type of dwelling, density and other restrictions.

*Planning and zoning commission:* The planning and zoning commission of the City of Mount Dora.

*Plat:* A map or delineated representation of the subdivision of lands, being a complete, exact representation of the subdivision and other information in compliance with the requirement of all applicable statutes and of local ordinances, and may include the terms "replat," "amended plat," or "revised plat."

*Pole sign:* A sign placed on or affixed to a pole which is not concealed from public view.

*Positive outlet:* A gravity discharge from a basin via overland flow, artificial waterway, natural waterway, or pipe.

*Post-development:* The average conditions as of the completion of the development for which a permit has been applied.

*Potable water:* Water which is satisfactory for drinking, culinary and domestic purposes, and which meets the quality standards of the Florida Department of Environmental Regulation, Chapter 17-22, Florida Administrative Code.

*Poultry:* Any animal belonging to the family Phasianidae or family Anatidae, all species, including, but not limited to, chickens, roosters, turkeys, peacocks, geese and ducks.

*Predevelopment:* The hydrologic condition of the project site immediately before development or construction begins.

*Preliminary master plan:* The proposal for development of a planned unit development.

*Private club:* An incorporated or unincorporated association for civil, social, cultural, religious, literary, political, recreational or like activities, operated for the benefit of its members and not open to the general public.

*P.R.M. (permanent reference monument):* A monument according to F.S. § 71.339.

*Professional engineer:* A State of Florida Registered Professional Engineer.

*Professional geologist:* A State of Florida Registered Professional Geologist whose expertise and experience allows for the performance of the tests and preparation of evaluations and reports as set out in the applicable sections of this ordinance.

*Prohibited uses:* Those land uses that are specifically forbidden in a particular zoning district.

*Project:* The particular structures and improvements proposed by the applicant on a particular land area which are part of a common plan of development.

*Project engineer:* A professional engineer of record for the project under consideration.

*Projecting sign.* Any sign other than a wall sign affixed to any building or wall whose leading edge extends beyond such building or wall and projects no more than 48 inches beyond the face of such wall. All projecting signs shall maintain a seven-foot vertical clearance from public or private sidewalks, walkways or paths.

*Proper design concepts:* Proper design concepts refers to architectural planning and to the analysis of the whole structure in terms of form and composition, color, materials and surface decoration. It includes scale in relationship to scale of adjacent buildings and landscape. It applies to inner character of the individual project. It applies in the same manner to alterations and advertising on the project (building). That the area contains other unsightly buildings is not a criteria to allow new unsightly buildings.

*Public facilities:* Roads, potable water supplies, sanitary sewer treatment, solid waste, drainage, public parks.

*Public sign:* Governmental information or direction signs, historical markers, signs relating to national defense and security and other emergency signs, and ornamental signs of a permanent character displaying only the name of a commonly known and accepted name of a section of the city, deemed by the city council to be of general public interest, may be located in any zoning district.

Public signs shall also include street banner signs at city designated locations which meet the following criteria:

1. The applicant is a public body or is a fraternal, benevolent, charitable, eleemosynary, philanthropic, altruistic, civic, community, veteran, educational organization or other organization of like or similar nature;

2. The sign solely advertises an event, function or thing of general public interest;

3. The location of the sign will not interfere with the traffic or public safety;

4. The copy of the sign does not violate any provision of this article;

5. Signs shall be permitted for a maximum of 14 days.

*Public utility:* Any publicly or privately operated utility, such as, but not limited to, storm drainage, sanitary sewers, electric power, water service, gas service or telephone lines, whether underground or overhead which serves the public.

*Rate:* Volume per unit of time.

*Real estate sign:* Any sign which is used to offer for sale, lease or rent the property upon which the sign is placed.

*Receiving waters or receiving water bodies:* Any water bodies, watercourses, and wetlands into which surface waters flow.

*Recharge:* The inflow of water into an aquifer which meets state aquifer and water quality requirements contained in Chapters 17-3 and 17-4, Florida Administrative Code.

*Recreation (use):* Public or private parks which include, but are not limited to playgrounds, swimming pools (open to the public), ball fields, etc. Additionally, cultural facilities supported by the city through direct monetary support, sponsorship in name, or through donations of public property shall be considered recreation uses. Private recreation uses, such as pool halls, video or pinball arcades, shall not be considered as recreation uses.

*Reserved capacity:* Capacity which is removed from the "available capacity" list and is allocated to a particular project or parcel of land.

*Reservoir area:* An area not on the public right-of-way which is provided for the temporary use of vehicles waiting to enter to leave a vehicle-oriented service or an off-street parking facility.

*Resubdivision:* A change in a map of an approved or recorded subdivision plat if such change affects any street layout on such map or area reserved thereon for public use, or any lot line, or if it affects any map or plan legally recorded prior to the adoption of any regulations controlling subdivisions.

*Retention or to retain:* The prevention of, or preventing, the discharge, directly or indirectly, of a given volume of stormwater runoff into surface waters by complete on-site storage.

*Right-of-way (ROW):* Land dedicated, deeded, used or to be used for a street, alley, walkway, boulevard, public facility, drainage facility, access for ingress and egress, or other purpose by the public, certain designated individuals or governing bodies.

*Riverine flood hazard area:* A floodplain area associated with stormwater, rather than tidal, flooding.

*Roadway:* The paved portion of a street available for vehicular traffic.

*Roof sign:* Any sign erected or constructed wholly upon and over the roof of any building and supported solely on the roof structure.

*Rural section:* A paved street having an open drainage system, i.e., utilizing swales rather than curbs and gutters for drainage.

*Sandwich board:* A two-sided, self-supporting sign with the base of the sign being the supporting structure and the connecting point located at the top of the sign.

*Sediment:* Solid material, whether mineral or organic, that is in suspension, is being transported, or has been moved from its site of origin by water.

*Sedimentation control device:* Any structure or area which is designed to hold runoff water until suspended sediments have settled.

*Service drive:* A public street, generally paralleling and contiguous to a main-traveled way, primarily designed to promote safety by eliminating excessive ingress and egress to the right-of-way, and providing safe and orderly points of access at fairly uniformly spaced intervals.

*Service stations:* Any building, structure or use of land used for the dispensing, sale or offering for sale at retail any automobile fuels, oils or accessories and, in connection with which, may be performed general automotive servicing, as distinguished from automotive repairs which are established whose side use is to repair mechanical problems with vehicles.

*Sewage disposal system, individual:* A septic tank, seepage tile sewage disposal system or any other sewage treatment device approved by the county health department in accordance with the regulations of the State of Florida and servicing only one lot.

*Shopping center:* A group of retail stores, planned and developed for the site upon which they are built, with off-street parking provided on the property.

*Shrubs:* A woody plant of relatively low height distinguished from a tree by having several stems rather than a single trunk; a bush.

*Sidewalk:* That concrete portion of a right-of-way intended for pedestrian use.

*Sidewalk sign:* A sandwich board or pedestal sign.

*Sight distance triangle:* The triangular clip required on any intersection corner to permit a vehicle operator an unobstructed view of the crossing roadway for a minimum sight distance in either direction along the crossing roadway.

*Signs:* Any letter, figure, character, mark, plane, point, marquee sign, design, poster, pictorial, picture, stroke, stripe, line, trademark, reading matter, inflatable device, or illuminated surface, which shall be so constructed, placed, attached, painted, erected, fastened, or manufactured in any manner whatsoever, so that the same shall be used for the attraction of the public to any place, subject, person, firm, corporation, public performance, article, machine, or merchandise, whatsoever, which is displayed in any manner whatsoever.

*Site:* Any tract, lot, or parcel of land or combination of tracts, lots, or parcels of land which is in one ownership, or contiguous and in diverse ownership where development is to be performed as part of a unit, subdivision, or project.

*Site plan:* An illustration of the details of development of areas, such as, but not limited to, commercial, recreational, and multiple-family residential uses not being platted.

*Snipe sign:* Any sign of any material whatsoever that is attached in any way to a utility pole, tree, fence post or any other similar object, or placed within public property or within a public right-of-way without city approval.

*Soil, potential, low potential:* Serious soil limitations exist that are difficult to overcome and the practices necessary to overcome the limitations are relatively costly compared to those required for soils with high potential; necessary practices may involve environmental values and considerations; performance for the intended use is poor and unreliable.

*Soil potential, very low potential:* Very serious soil limitations exist that are most difficult to overcome; initial cost of the practices and maintenance costs are very high compared to those for soils with high potential; environmental values are usually depreciated; performance for the intended use is inadequate or below acceptable standards.

*Special restriction:* Those restrictions placed on any permitted or conditional land use within a particular zoning classification.

*Storm event:* The storm of a specific duration, intensity, and frequency.

*Stormwater or runoff:* The flow of water which results from, and which occurs during and immediately following, a rainfall event.

*Stormwater management:* The approved detailed analysis, design, and drawings of the stormwater management system required for all construction.

*Stormwater management system/facilities:* To the designed/constructed features of the property which collect, convey, channel, store, inhibit, or divert the movement of stormwater.

*Street:* Any accessway, such as a street, road, lane, highway, avenue, boulevard, alley, parkway, viaduct, circle, court, terrace, place or cul-de-sac, and also includes all of the land lying between the right-of-way lines as delineated on a plat showing such streets, whether improved or unimproved, but shall not include those accessways such as easements and rights-of-way intended solely for limited utility purposes, such as electric power lines, gas lines, telephone lines, water lines, drainage and sanitary sewers and easements of ingress and egress.

*Street alley:* A public or private right-of-way primarily designed to serve as secondary access to the side or rear of those properties whose principal frontage is on some other street.

*Street, arterial:* A street which provides a direct route for long, local trips and also provides access to interstates, expressways and freeways. The main function of an arterial is to move large volumes of vehicles; on-street parking should be prohibited and access should be carefully controlled. Average daily traffic is normally greater than 6,000 vehicles. Interstates, expressways and freeways can also be classified as arterial roads with greater capacities, greater right-of-way and more limited access than other arterials.

*Street, collector:* A street which conducts traffic between local streets and arterials and also provides access to abutting property. Access should be controlled and on-street parking should be allowed only in cases where extra right-of-way exists and a safety problem will not be caused.

*Street, cul-de-sac:* A local street with only one outlet and having an appropriate terminal for the safe and convenient reversal of traffic movement.

*Street, local:* A street which provides access to property, serving as the first level of roadway for a neighborhood. It serves as a feeder to collector streets.

*Street right-of-way line:* The dividing line between a lot, tract or parcel of land and a contiguous street.

*Structure:* Anything constructed, installed or portable, the use of which requires a location on a parcel of land. It includes a movable structure while it is located on land which can be used for housing, business, commercial, agricultural or office purposes either temporarily or permanently. Structure also includes billboards, swimming pools, poles, pipelines, transmission lines, tracks and advertising signs.

*Structure, temporary:* Any structure to serve a use temporarily, such as a field or sales office, contractor's office or trailer sign.

*Subdivision:* The division of a parcel of land, whether improved or unimproved, into two or more lots or parcels of land for the purpose, whether immediate or future, of transfer of ownership, or if the establishment of a new street is involved, any division of such parcel.

*Subdivision development sign:* A sign advertising a subdivision development of property which donates the owner, developer, architect, construction contractor(s) and or lot layout.

*Subdivision sign:* A sign donating the name of a subdivision for means of identifying the development. Subdivision signs may be placed on entry walls or be constructed as a separate monument sign. In nonresidential subdivisions, these signs shall not be calculated toward the allowable sign over area for any particular site. These signs must be located at the entrance to the subdivision.

*Survey data:* All information shown on the face of a plat that would delineate the physical boundaries of the subdivision and any parts thereof.

*Swale:* An artificial waterway which:

(a)   Has a top width-to-depth ratio of the cross-section equal to or greater than 6:1, or side slopes equal to or greater than three feet horizontal to one foot vertical;

(b)   Contains contiguous areas of standing or flowing water only following a rainfall event;

(c)   Is planted with or has stabilized vegetation suitable for soil stabilization, stormwater treatment, and nutrient uptake; and

(d)   Is designed to take into account the soil erodibility, soil percolation, slope, slope length, and contributing area so as to prevent erosion and reduce the pollutant concentration of any discharge.

*Swing sign:* Any sign projecting from an angle or the outside wall or walls of any building, or from an awning, which has a horizontal dimension equal to or exceeding its vertical dimension, and which is suspended from a projecting structure in such a manner that the sign itself, or any part thereof, is not attached to the building or wall.

*Tail water:* The water into which a spillway or outfall discharges.

*Telecommunications tower:* A structure, such as a self-supporting lattice tower, guy tower, monopole tower, or building on which transmitting or receiving antennae are located, including accessory facilities for equipment storage and operations. The term includes radio and television transmission towers, microwave towers, common carrier towers, cellular telephone towers, and the like, but excludes accessory structures to a permitted use such as ham radio towers, receive-only antennae, radio dispatch systems, transportable telecommunications devices and the like.

*To plat:* In whatever tense used, "to plat" shall mean to divide or subdivide land into lots, blocks, tracts, sites, streets, rights-of-way, easements or other divisions, however designated, and the recording of the plat in the office of the clerk of the circuit court of Lake County in the manner authorized by Chapter 65.2274, Laws of Florida, and other laws regulating the platting of land in Lake County, Florida.

*Trailer sign:* Any sign on a vehicle normally licensed by the State of Florida as a trailer and used for advertising or promotional purposes.

*Tree, mature:* Any living, self-supporting, perennial plant which has a trunk diameter of at least six inches measured four feet above grade (at the base of the tree) and normally grows a minimum overall height of 15 feet.

*Undue economic hardship:* An exceptional financial burden that might otherwise amount to the taking of property without just compensation, or failure to achieve a reasonable economic return in the case of income-producing properties. Where the cost of the renovation exceeds by 1.5 times, the cost of demolition and new construction, undue economic hardship shall be presumed to exist.

*Variance:* As used in connection with the provisions of this act dealing with zoning, a variance is a relaxation of the terms of the zoning ordinance where such variance will not be contrary to the public interest and where, owing to conditions peculiar to the property and not the result of the actions of the applicant, a literal enforcement of the ordinance would result in unnecessary and undue hardship. As used in this act, a variance is authorized only for height, area and size of structure or size of yards and open spaces. Establishment or expansion of a use otherwise prohibited shall not be allowed by variance, nor shall a variance be granted because of the presence of nonconformities in the zoning district or classification or adjoining zoning districts or classifications.

*Vested:* Having the right to develop or continue development notwithstanding the comprehensive plan.

*Volume:* Occupied space measured in cubic units.

*Wall sign:* Any sign painted on or attached to an erected structure parallel to the face of, or erected and confined within the limits of, the outside wall of any building and supported by such wall or building and which displays only one advertising surface.

*Waterbody:* Any natural or artificial pond, lake, reservoir, or other area which ordinarily or intermittently contains water and which has a discernible shoreline.

*Watercourse:* Any natural or artificial stream, creek, channel, ditch, canal, waterway, gully, ravine, or wash in which water flows either continuously or intermittently, and which has a definite channel, bed, or banks.

*Water management district:* The St. Johns River Water Management District.

*Water quality:* The characteristics of water as set forth in Chapter 17-3, Florida Administrative Code, together with physical, chemical and biological characteristics of water that affect the propagation of fish, wildlife, aquatic plants and animals.

*Water retention structure:* A facility which provides for storage of stormwater runoff.

*Water supply, individual:* A water source, distribution system and other appurtenances supplying only one lot.

*Water system:* Any plant, wells, pipes, tanks, reservoirs, system, facility or property used or useful or having the present capacity for future use in connection with the obtaining and supplying of water for

human consumption, fire protection, irrigation, consumption by business or consumption by industry, and, without limiting the generality of the foregoing definition, shall embrace all necessary appurtenances and equipment and shall include all property, rights, easements and franchises relating to any such system and deemed necessary or convenient for the operation thereof.

*Waters:* This item shall include, but not be limited to, rivers, lakes, streams, springs, impoundments and all other water or bodies of water, whether surface or subsurface, and whether navigable or nonnavigable. The term shall encompass all bottom lands lying below the mean high water mark, whether said bottom lands be submerged or not.

*Wet detention:* A detention basin that contains a permanent pool of water that will retain runoff for a minimum period of 14 days for an average rainfall summer, and which has a littoral zone over a substantial portion of the pond surface area.

*Wetlands:* Swamps and wet woodlands characterized by specific vegetational types, plant communities and soils, whether:

(1) Flooded at all times;

(2) Flooded only seasonally; or

(3) Having a water table within six inches of the ground surface for at least three months of the year. As determined by the appropriate regulatory authority.

*Window sign:* Any sign placed inside or upon a window facing the outside and which is intended to be seen from the exterior. Permanently attached signs (i.e. illuminated, painted, affixed by mechanical means, etc.) shall be calculated in the total allowable sign area. Temporary and signs integrally related to business operation (i.e. open/closed signs, hours of operation, etc.) shall be allowed but not be included in the allowable copy area. Signs attached to supporting structures inside the business but oriented to customer or vehicular traffic shall be considered permanent window signs.

*Works:* All artificial structures, including, but not limited to, canals, ditches, swales, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the state (F.S. § 373.403(5)).

*Yard area:* A vegetated or stabilized open space on the same lot with a building, said space being unoccupied and unobstructed from the ground upward, with the exception of trees and other natural vegetation.

*Yard, front:*

(a) A front yard is a yard extended between side lot lines across the front of a lot adjoining a street. In cases of double-frontage lots: Unless the prevailing front yard pattern on adjoining lots indicates otherwise, front yards shall be provided on all frontages. Where one of the front yards that would normally be required on a through lot is not in keeping with the prevailing yard pattern, the development review coordinator may waive the requirement for the normal front yard and substitute therefor a special yard requirement which shall not exceed the average of the yards provided on adjacent lots.

(b) In case of corner lots, full-depth front yards are required on both frontages.

(c) Depth of a required front yard shall be measured at right angles to a straight line joining the foremost points of the side lot lines. The foremost point of the side lot line, in the case of rounded property corners at street intersections, shall be assumed to be the point at which the side and front lot lines would have met without such rounding.

*Yard, generally:* A yard, generally, is required open space with grass or ground cover, other than a court, unoccupied and unobstructed by a structure, or portion of a structure, from 30 inches above the general ground level of the upgraded lot upward; provided, however, that fences, walls, hedges, poles, posts, children's play equipment and other customary yard accessories, ornaments, statuary and furniture may be permitted in any yard subject to height limitations and requirements limiting obstructions to visibility.

*Yard, rear:*

(a) A yard extending across the rear of the lot between inner side yard lines. In the case of double-frontage lots, there will be no rear yards, but only front and side yards.

(b) Depth of a required rear yard shall be measured in such a manner that the yard established is a strip of the minimum width required by district regulations with its inner edge parallel with the rear lot line.

*Yard, side:*

(a) A side yard extending from the interior (rear) line of the required front yard to the rear lot line, or, in the absence of any clearly defined rear lot line, to the point on the lot farthest from the intersection of the lot line involved with the public street. In the case of double-frontage lots, side yards shall extend from the rear lines of front yards required. In the case of corner lots, yards remaining after front yards have been established on both frontages shall be considered side yards.

(b) Width of a required side yard shall be measured in such a manner that the yard established is a strip of the minimum width required by district regulations with its inner edge parallel with the side lot line.

*Yard, special:* A special yard is a yard behind any required yard adjacent to a public street to perform the same functions as a side or rear yard, but adjacent to a lot line and so placed or oriented that neither the term "side yard" nor the term "rear yard" clearly applies. In such cases, the development review coordinator shall require a yard with minimum dimensions, as generally required for a side yard or a rear yard in the district, determining which shall apply by the relation of the portion of the lot on which the yard is to be located to the adjoining lot or lots with due regard to the orientation and location of structures and buildable areas thereon.

*Yard, street side:* As it relates to fencing, a street side yard is the yard adjacent to a street between the front yard setback line and the side lot line. The street the house is addressed to shall be established as the front yard and must meet front yard requirements. The yard adjacent to the secondary street frontage shall be designated the street side yard.

*Yard, waterfront:* A waterfront yard is a yard required on waterfront property with depth measured from mean high water line.

*Zoning coordinator:* The community development director or his designee.

(Ord. No. 695, § 23, 5-20-97; Ord. No. 714, § 23, 4-7-98; Ord. No. 801, § 2, 12-4-01; Ord. No. 816, § 1, 7-16-02; Ord. No. 900, § 1, 5-16-06; Ord. No. 904, § 7, 8-15-06; Ord. No. 2007-950, § 2, 7-3-07; Ord. No. 2008-981, § 2, 3-18-08; Ord. No. 2008-1025, § 2, 12-2-08; Ord. No. 2009-11, § 2, 6-16-09; Ord. No. 2009-20, § 3, 12-1-09; Ord. No. 2010-03, § 2, 2-16-10; Ord. No. 2011-03, § 9, 3-15-11; Ord. No. 2012-11, § 6, 8-21-12; Ord. No. 2012-19, § 6, 12-4-12; Ord. No. 2013-13, § 2(Exh. A), 10-1-13 ; Ord. No. 2014-05, § 3, 5-20-14 ; Ord. No. 2014-18, § 4, 2-3-15 )

**EXHIBIT J**

B2   SL   | February 4, 2018 |   The Daytona Beach News-Journal

# Starry Nightmare

**Mount Dora hits homeowners with new fines for mural**

By Roxanne Brown
GateHouse Florida

MOUNT DORA — The price of keeping the controversial "Starry Night" mural on a Mount Dora home got sky high when a city magistrate approved city officials' request to increase fines against the homeowners.

Mount Dora Code Enforcement inspectors declared the mural graffiti last year but officials later rescinded that ruling and instead dubbed it an illegal sign. In December, City Code Enforcement Magistrate David Tegeler imposed fines of $100 a day but capped the penalty at 31 days, for a total of $3,100.

In recent months, the homeowners, Nancy Nemhauser and Ludomir Jastrzebski, have not shown any signs of giving in to city demands that they paint over the mural but have instead hired an attorney and have filed suit against the city. So on Thursday, at the city's request, the magistrate extended the $100-a-day penalty retroactively, meaning the fine is now $8,000 and will increase $100 a day.

During the hearing, Sherry Sutphen, the city's attorney said the city's end goal regarding this matter is "compliance." She said she hopes the accruing fine will serve as "motivation" for the homeowners to comply by painting over it and that the city feels the mural serves as a distraction to pedestrians and motorists and poses a safety hazard.

Sutphen said the accrual of fines is in accordance with Florida Statutes.

The homeowners'

attorney Jeremy Talcott, with Pacific Legal Foundation, said he will file an opening brief in court next week to challenge the city's fine.

He said the same Florida statute Sutphen referred to gives authority to a magistrate to lower or stay fines in instances where the violation is causing no harm or damages. He said the city's claim the mural is a safety hazard is unfounded since there are no reports of accidents or other safety issues.

Talcott asked for a stay on the fine order until the circuit court date, but to no avail.

After the hearing, he said though he is disappointed with the imposition of additional fines, is more concerned with the true heart of the matter.

"The fines don't matter if the underlying violation is unconstitutional, so we're going to push forward with our appeal with the Circuit Court and try to get that court to acknowledge the fact that the (sign) code being applied to this mural and to this family has numerous unconstitutional infirmities," Talcott said. He said he feels his clients are being targeted because many other homes and businesses in town are painted with designs that could be considered in violation using the city's sign code.

"When a statute is that broad, it gives almost unlimited discretion to the city to kind of pick and choose who they want to enforce it against, which is exactly what has happened here." Talcott said. "Other murals in Mount Dora are being ignored while the mural on this house is being targeted. I think that raises concerns of equal protection as well."

Jastrzebski said for her and Nemhauser, the mural

means more than any fine.

Jastrzebski said their adult son, who is autistic, loves the mural as they do. He also said he immigrated to the United States from a communist country 45 years ago to get away from governmental bureaucracy and oppression.

"We thought this was an art community. We thought we were giving them a gift instead, this is a nightmare. I feel like I am back in communist Poland behind the Iron Curtain," Jastrzebski said. The city has no clear legal rules against murals. They are making the thing up as they go along and I want to know why.

Nemhauser said she followed all the rules when she asked the city about painting the home and was told there were no permits needed and no restrictions.

The homeowners also live in a non-restricted community with no homeowner's association.

"We will continue to fight this to the end," Jastrzebski said.

Artist Richard Barrenechea, who was commissioned to paint the mural, said he is disappointed that the city does not capitalize on the mural's appeal to bring people to town or to introduce people to art and culture. He said he cannot conceive the city wanting to simply paint over the mural.

"Before this mural, some people knew nothing of Van Gogh or his work. Now people are coming to Mount Dora just to see it. They are researching and talking about art," said Barrenechea. "Destroying the artwork would be a big loss to the city. I cannot believe anyone would even want to consider that option."



Homeowners Nancy Nemhauser and Ludomir Jastrzebski in front of their "Starry Night" house. "We thought this was an art community. We thought we were giving them a gift. Instead, this is a nightmare. I feel like I am back in communist Poland behind the Iron Curtain," Jastrzebski said. "The city has no clear legal rules against murals. They are making them up as they go along and I want to know why." [ROXANNE BROWN/DAILY COMMERCIAL]

# EXHIBIT K

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NANCY NEMHAUSER and
LUBOMIR JASTRZEBSKI,

      Plaintiffs,

vs.

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation

      Defendant.

CASE NO. _____

_____/

## DECLARATION OF NANCY NEMHAUSER IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Nancy Nemhauser, declare as follows:

1.     The facts set forth in this declaration are based on my personal knowledge and, if called as a witness, I could and would competently testify thereto under oath.

2.     Together with my husband, Lubomir Jastrzebski, I own the property at 306 West Sixth Avenue, Mount Dora, Florida, where we currently reside.

3.     We are preparing the home so that our son, who suffers from autism, can live there with his full-time caretakers.

4.     In July 2017, a local artist approached us about painting a wall on our property, which was in need of repair.

5.     After considering various designs, we contracted with him to paint a mural based on the iconic Van Gogh painting, *Starry Night*, with variations based on the history of Mount Dora.

6.     Before any work was begun, I made phone calls and spoke with several people within the Mount Dora Planning & Development Department, each of whom told me that no permitting was required to put a painting on our exterior wall. I asked and was repeatedly assured by each person that because Mount Dora has no ordinances restricting colors or patterns of paint, there were "no restrictions" on painting.

7.     I frequently see murals in the City of Mount Dora that, to my knowledge, have never been cited as violations of the sign code.

8.     In July 2017, I discovered a "door hanger" notice of violation on the front door of my house, giving five days for the purported violation to be corrected. I called Mount Dora Code Enforcement Officer Cindy Sommer to ask about the alleged violation and what would need to be done to correct the issues. Ms. Sommer told me that the painting was illegal graffiti, and that the wall "had to be the same color as the house."

9.     As a result of this conversation, I later contracted with the artist to paint my house to match the wall in order to cure the purported violation.

10.     In September, 2017, I attended a hearing on the purported violation. On October 6, the Magistrate ordered my husband and me to paint over the mural within 30 days. Believing the ordinance and Magistrate's opinion to be a violation of my constitutional rights, I filed a notice of appeal in the Circuit Court for Lake County, Florida.

2

11.     The City then filed a motion asking the Magistrate to impose fines. At the initial hearing, the Magistrate imposed a fine of $3,100 against us, $100 per day for the 31 days that we had failed to paint over the mural following the deadline set in the Magistrate's October 6, 2017, order. The City then moved for a rehearing, requesting increased, and continuing, fines. The Magistrate imposed continuing fines of $100 per day for every day after November 6, 2017 that the mural is not painted over. The total amount of fines we currently owe is now over $10,000, and continues to accrue at $100 per day.

12.     The mounting fines put substantial financial pressure on my family to paint over the mural, which we treasure. The mural not only serves as a means of expressing ourselves, but acts as a special comfort to my special needs son. Painting over the mural would be devastating, because it is a one of a kind piece of art that is meaningful to our family.

13.     The mural holds great personal meaning for me, my husband, and my adult son, who has autism and finds the mural comforting. We not only want to keep the mural, we want to complete it. But the Magistrate's order and the mounting fines have caused us to cease all work on the mural, and to consider destroying it.

14.     Because the artist stopped working on the mural before it was completed, the mural has not been treated with a top coat that would protect it from the elements. The mural therefore faces potential damage from sun, wind, and rain.

15.     If the fines continue to accrue, we will have no option but to paint over the mural. We simply cannot afford to risk these significant fines. We seek a speedy resolution

of our dispute so that we are not forced to paint over the mural before pursuing our constitutional claims against the City.

16.     Although we had previously filed a notice of appeal in Florida Circuit Court, on February 8, 2018, my husband and I voluntarily dismissed our appeal of the code enforcement hearing from the Circuit Court of Lake County without any hearing on the merits so that we could seek immediate relief in this court.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  February 16, 2018.

_____
        NANCY NEMHAUSER

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NANCY NEMHAUSER and
LUBOMIR JASTRZEBSKI,

       Plaintiffs,

vs.

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation

       Defendant.

CASE NO. _____

_____/

## DECLARATION OF NANCY NEMHAUSER IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Nancy Nemhauser, declare as follows:

1.     The facts set forth in this declaration are based on my personal knowledge and, if called as a witness, I could and would competently testify thereto under oath.

2.     Together with my husband, Lubomir Jastrzebski, I own the property at 306 West Sixth Avenue, Mount Dora, Florida, where we currently reside.

3.     We are preparing the home so that our son, who suffers from autism, can live there with his full-time caretakers.

4.     In July 2017, a local artist approached us about painting a wall on our property, which was in need of repair.

1

5.      After considering various designs, we contracted with him to paint a mural based on the iconic Van Gogh painting, *Starry Night*, with variations based on the history of Mount Dora.

6.      Before any work was begun, I made phone calls and spoke with several people within the Mount Dora Planning & Development Department, each of whom told me that no permitting was required to put a painting on our exterior wall. I asked and was repeatedly assured by each person that because Mount Dora has no ordinances restricting colors or patterns of paint, there were "no restrictions" on painting.

7.      I frequently see murals in the City of Mount Dora that, to my knowledge, have never been cited as violations of the sign code.

8.      In July 2017, I discovered a "door hanger" notice of violation on the front door of my house, giving five days for the purported violation to be corrected. I called Mount Dora Code Enforcement Officer Cindy Sommer to ask about the alleged violation and what would need to be done to correct the issues. Ms. Sommer told me that the painting was illegal graffiti, and that the wall "had to match the house."

9.      As a result of this conversation, I later contracted with the artist to paint my house to match the wall in order to cure the purported violation.

10.      In September, 2017, I attended a hearing on the purported violation. On October 6, the Magistrate ordered my husband and me to paint over the mural within 30 days. Believing the ordinance and Magistrate's opinion to be a violation of my constitutional rights, I filed a notice of appeal in the Circuit Court for Lake County, Florida.

11.     The City then filed a motion asking the Magistrate to impose fines. At the initial hearing, the Magistrate imposed a fine of $3,100 against us, $100 per day for the 31 days that we had failed to paint over the mural following the deadline set in the Magistrate's October 6, 2017, order. The City then moved for a rehearing, requesting increased, and continuing, fines. The Magistrate imposed continuing fines of $100 per day for every day after November 6, 2017 that the mural is not painted over. The total amount of fines we currently owe is now over $10,000, and continues to accrue at $100 per day.

12.     The mounting fines put substantial financial pressure on my family to paint over the mural, which we treasure. The mural not only serves as a means of expressing ourselves, but acts as a special comfort to my special needs son. Painting over the mural would be devastating, because it is a one of a kind piece of art that is meaningful to our family.

13.     The mural holds great personal meaning for me, my husband, and my adult son, who has autism and finds the mural comforting. We not only want to keep the mural, we want to complete it. But the Magistrate's order and the mounting fines have caused us to cease all work on the mural, and to consider destroying it.

14.     Because the artist stopped working on the mural before it was completed, the mural has not been treated with a top coat that would protect it from the elements. The mural therefore faces potential damage from sun, wind, and rain.

15.     If the fines continue to accrue, we will have no option but to paint over the mural. We simply cannot afford to risk these significant fines. We seek a speedy resolution

of our dispute so that we are not forced to paint over the mural before pursuing our constitutional claims against the City.

16.     Although we had previously filed a notice of appeal in Florida Circuit Court, on February 8, 2018, my husband and I voluntarily dismissed our appeal of the code enforcement hearing from the Circuit Court of Lake County without any hearing on the merits so that we could seek immediate relief in this court.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  February 16, 2018.

_____
NANCY NEMHAUSER

4

**EXHIBIT L**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

NANCY NEMHAUSER and                   CASE NO. _____
LUBOMIR JASTRZEBSKI,

      Plaintiffs,

vs.

CITY OF MOUNT DORA, FLORIDA,
a municipal corporation

      Defendant.

_____/

**DECLARATION OF JEREMY TALCOTT IN SUPPORT OF MOTIONS FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Jeremy Talcott, declare as follows:

1.     The document attached as Exhibit A is a true and correct copy of the

Transcript produced at the hearing before the Code Enforcement Magistrate of Mount Dora

on September 29, 2017 in case number 2017-0187, *City of Mount Dora, Florida v. Nancy*

*Nemhauser and Lubomir Jastrzebski.*

2.     The document attached as Exhibit B is a true and correct copy of the Order

issued by the Code Enforcement Magistrate of Mount Dora on October 6, 2017 in case

number 2017-0187, *City of Mount Dora, Florida v. Nancy Nemhauser and Lubomir*

*Jastrzebski.*

3.     The document attached as Exhibit C is a true and correct copy of the Order

issued by the Honorable William G. Law of the Circuit Court of the Fifth Judicial Circuit

1

in and for Lake County, Florida, on December 8, 2017 in case number 2017CA001815AX, *Nancy Nemhauser and Lubomir Jastrzebski v. City of Mount Dora, Florida.*

4.     The document attached as Exhibit D is a true and correct copy of the Order issued by the Code Enforcement Magistrate of Mount Dora on December 13, 2017 in case number 2017-0187, *City of Mount Dora, Florida v. Nancy Nemhauser and Lubomir Jastrzebski.*

5.     The document attached as Exhibit E is a true and correct copy of the City of Mount Dora's Motion for Rehearing, or Reconsideration of Findings of Fact, Conclusions of Law and Order Dated December 13, 2017, filed in case number 2017-0187, *City of Mount Dora, Florida v. Nancy Nemhauser and Lubomir Jastrzebski.*

6.     The document attached as Exhibit G is a true and correct copy of the Notice of Voluntary Dismissal of Action filed by Nancy Nemhauuser and Lubomir Jastrzebski in the Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida, on February 8, 2017 in case number 2017CA001815AX, *Nancy Nemhauser and Lubomir Jastrzebski v. City of Mount Dora, Florida.*

7.     The document attached as Exhibit H is a true and correct copy of the Mount Dora Land Development Code, Chapter VI, section 6.7, "Signs."

8.     The document attached as Exhibit I is a true and correct copy of the Mount Dora Land Development Code, Chapter VIII, "Definitions."

9.     The document attached as Exhibit J is a true and correct copy of the article "Starry Nightmare," by Roxanne Brown, from the Daytona Beach News-Journal, dated February 4, 2018.

2

10.     On February 16, 2018, I spoke by phone with Sherry Sutphen, counsel for the City of Mount Dora, Florida, and notified her as to the anticipated filings of the Complaint, Motion for Special Appearance, Motion for Temporary Restraining Order, and Motion for Preliminary Injunction in the District Court for the Middle District of Florida.

11.     Ms. Sutphen advised me that the City would not oppose the Plaintiffs' Motion to Appear Pro Hac Vice and Written Designation and Consent to Act.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:  February 16, 2018.

JEREMY TALCOTT, Cal. Bar No. 311490*
E-mail: JTalcott@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Service: IncomingLit@pacificlegal.org

3